IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| VINCENT MARK HILL, | |
| **Plaintiff,** | Civil Action No.: |
| vs. | |
| DELTA AIRLINES, INC., | COMPLAINT AND DEMAND FOR JURY TRIAL |
| **Defendant.** | |

## COMPLAINT FOR DAMAGES

**COMES NOW** Plaintiff, Vincent Mark Hill (hereinafter "Plaintiff" or "Mr. Hill"), by and through the undersigned counsel, and sets forth Complaint and Jury Demand against the above-named Defendant, Delta Airlines, Inc. (hereinafter "Defendant" or "Delta"), seeking damages and injunctive relief and shows this Court as follows:

### INTRODUCTION

1.

This is an action for damages and injunctive relief for violations of the prohibitions against discrimination and retaliation contained in the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et. seq.*, (hereinafter "ADA"), and the prohibitions against discrimination and interference with rights contained in the Employee Retirement Income

Security Act of 1974, 29 U.S.C. § 1001 *et. seq.*, (hereinafter "ERISA").

2.

Claims are brought under the ADA to recover (1) lost pay bonuses, vacation, retirement benefits and healthcare benefits, (2) compensatory damages for physical and emotional distress, (3) interest on his damages, calculated at the prevailing rate (4) punitive damages, and (5) his costs of litigation, including his reasonable attorneys' fees for Defendant's violations of the ADA. Plaintiff also seeks equitable relief, including reinstatement to his former position or front pay in lieu of reinstatement.

3.

Claims are brought in the alternative under ERISA as modified by the Patient Protection and Affordable Care Act, P.L. 111-148, HR 3590, 124 Stat. 119 (March 23, 2010), incorporated *inter alia* at 29 U.S.C. §218c and 42 U.S.C. §300gg-1 *et seq.*, (hereinafter "ACA") for penalties and other relief pursuant to 29 U.S.C. §§ 1132(a)(1)(A) *et seq.* by discriminating against him on the basis of health status or claims for benefits and/or with the purpose of interfering with the attainment of any right to benefits to which he and

his family might become entitled under the Plan or under ERISA and/or under the ACA.

**PARTIES**

4.

Plaintiff is a resident and citizen of the State of Georgia, residing at 5703 Chanta Lane, Powder Springs, GA 30127.

5.

Plaintiff is a male born on July 15, 1964 and is a member of a protected class under the ADA.

6.

Defendant is a foreign profit corporation formed under the laws of the state of Delaware, registered to conduct business in the state of Georgia, and subject to the jurisdiction of this Court, with offices at 1030 Delta Blvd., Atlanta, Georgia 30354.

7.

Defendant may be served by delivering a copy of the complaint and summons to its registered agent: Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092, if service of process is not waived.

8.

Defendant is an "employer" as defined by the ADA, 42 U.S.C. 12111(5) and ERISA, 29 U.S.C.A. § 1167.

9.

At all times relevant hereto, Defendant maintained an employee welfare benefit plan providing medical care that qualifies as a "group health plan" under ERISA.

### Jurisdiction and Venue

10.

Plaintiff is subject to the jurisdiction and venue of this Court.

11.

This Court has jurisdiction over this case and Defendant.

12.

The jurisdiction of this court is invoked pursuant to 42 U.S.C. §12117 and 42 U.S.C. §2000e-5 (ADA), 28 U.S.C. § 1331 (federal question), 28 U.S.C. §1343 (civil rights), 28 U.S.C. §§ 2201 and 2202 (declaratory judgment), and 29 U.S.C. §1132 (ERISA).

13.

Venue in this case is proper pursuant to 28 U.S.C. §1391(b) because the Defendant conducts business in this district and division and the unlawful employment practices described herein

were committed within the State of Georgia, in the Northern District of Georgia, Atlanta Division.

### ADMINISTRATIVE PROCEDURES

14.

Plaintiff properly and timely filed his charges of disability discrimination and retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC"), within 180 days of Defendant's discriminatory and retaliatory acts.

15.

On or about September 12, 2018, the EEOC issued Plaintiff his "Right to Sue" letter on Charge No. 410-2017-04278.

16.

This Complaint is filed within 90 days after Plaintiff's receipt of the Right to Sue letter. This action is timely filed, and Plaintiff has satisfied all conditions precedent to the filing of this action within the meaning of Fed. R. Civ. P. 9(c).

### FACTUAL STATEMENT

17.

Mr. Hill was hired by Delta as an Aircraft Mechanic on May 1, 1989.

18.

During twenty-nine plus (29+) years of service as an Aircraft Mechanic, Mr. Hill has never had a negative performance evaluation and maintains a perfect work record to this day.

19.

On or around October 16, 2016 Mr. Hill's wife, Janice Hill, received an MRI report indicating an 80% chance of breast cancer. Mrs. Hill's breast cancer diagnosis was subsequently confirmed on November 1, 2016.

20.

As soon as Mr. Hill saw his wife's MRI report on October 16, 2016, he called his lead David Farmer. Upon information and belief, Farmer informed Mr. Hill's coworkers at the shop that next day, and over the next few days, of Mrs. Hill's cancer diagnosis.

21.

Mr. Hill also left work early on October 17, 2016 to go with his wife to pick up her medical records from WellStar Kennestone Hospital in preparation for her first appointment at the Winship Cancer Institute at Emory on October 21, 2016. Because of this, most of the employees who were at the shop

that day were aware of what was going on with Mr. Hill and his wife.

### Initial Complaints of Workplace Harassment

22.

On or around November 7, 2016, Mr. Hill had a meeting with his manager Dennis Lindsay and Lindsay's manager David Craig. During this meeting, Mr. Hill provided details of illegal harassment he was subjected to by two leads (Nathan Warren and Mike Buice) in the shop other than his own lead, David Farmer.

23.

Mr. Hill told Craig that he believed the harassment was because of his wife's recent cancer diagnosis (Buice and Warren both were aware of Mrs. Hill's cancer diagnosis). Mr. Hill explained that he knew as a caregiver of a disabled person he should not be harassed like this and that caregivers are protected under the ADA and FMLA.

24.

Mr. Hill provided Craig details of 12 hours missing from his vacation time allotment that had not been deducted by his own lead and asked Craig to check the computer record for who did change his hours and why.

25.

At Delta, it is considered unusual for a lead other that
one's own to deduct time, without even knowing what to deduct
(vacation, sick leave, comp time, holiday, etc.), while the
employee and the employee's lead are also at work and could
have easily been consulted about the situation.

26.

Later in an email to Mr. Hill's lawyer, Amelia Grubbs,
Delta attorney Kelly Guistina contended that the vacation time
was deducted on October 21, 2016 and that the error was
corrected.

27.

This contention by Delta is impossible, as the time was
absolutely deducted at a later date and has never been
corrected (see Exhibits "1," "2," and "3," respectively).

28.

The vacation time did not appear on Mr. Hill's October
28, 2016 check because it was not deducted during the pay
period which ended on October 21, 2016.

29.

Upon information and belief, Mike Buice was the lead who
deducted the 12 hours of vacation time from Mr. Hill's
paycheck that next Monday, October 24, 2016.

30.

Upon information and belief, the 12 hours of vacation time were deducted on October 24, 2016, while Mr. Hill and his lead Farmer were also both at work.

31.

On or around November 11, 2016, Mr. Hill sent an email to his general manager Craig regarding their November 7, 2016 meeting and Mrs. Hill's cancer diagnosis, which stated: "I met with you last Monday in Dept. 382. During that meeting you alleviated my concerns about my work environment during a family crisis. My wife Janice and I met with her Surgical Oncologist at Emory Winship Cancer Institute yesterday. We were disappointed that her breast cancer will require surgery, radiation and chemotherapy. At the same time we were very encouraged that the Doctors we met with gave a good long term prognosis. In short the next few months will be hard then we should be fine. Thank you for your concern and leadership during this time."

32.

On or around November 22, 2016, Mr. Hill reported harassment in writing to his general manager Craig, which stated: "I need to request another meeting with you concerning my situation in Dept. 382. Also I have more information about

the time keeping anomaly I experienced. I can meet anytime next Monday Nov. 28th or Friday Dec. 2nd. I would prefer Dennis Lindsay not be at the meeting. Certainly anyone else that you think may assist could be there if you like." Mr. Hill never received a response.

33.

On or around November 28, 2016, after several failed attempts to contact Craig, Mr. Hill emailed Human Resources ("HR") Manger Nicole Bell complaining of workplace harassment, a hostile work environment, and discrimination, as well as asking for protection from Buice.

34.

On or around December 2, 2016, Mr. Hill was accused of employee theft because of his carrying a grey bag out of the shop that day, which he reported to HR and Defendant's Vice President of Component Maintenance Mike Moore (see Exhibit "4").

35.

That day, Mr. Hill immediately went to his car and retrieved the grey bag in question to show his manager Lindsay that it contained Mr. Hill's personal property. Lindsay then informed Mr. Hill that Craig had asked all involved to submit a written statement. Mr. Hill sent his statement to Moore and

informed Moore that he felt this was continued harassment on
the part of certain Delta leads and that if he couldn't be
assured of a harassment free workplace, he would contact the
CEO.

36.

On December 19, 2016, Plaintiff's wife Janice endured
multiple surgeries related to treatment of her breast cancer
at Emory Hospital.

37.

On December 21, 2016, Mr. Hill was called into a meeting
with Bell and Craig.

38.

During this meeting, Bell and Craig informed Mr. Hill
that their investigation had found no evidence of harassment
and they would make no effort to ask the two leads to not
harass him.

39.

Mr. Hill questioned Bell and Craig as to why they didn't
at least check the computer record for who deducted his
vacation time and when, as well as why they had only
interviewed the leads in an investigation involving leads
harassing mechanics (four leads were interviewed by Craig and

only one mechanic was interviewed by Bell, which was Mr. Hill himself).

40.

During that same meeting, Mr. Hill informed Bell and Craig that he intended to email the Delta CEO about his complaints of harassment.

41.

On December 22, 2016, Mr. Hill sent a comprehensive email to the entire Delta management and HR chain at Delta, up to and including Delta's CEO Ed Bastian, detailing his frustration with the inadequate harassment investigation and the continued refusal to address the harassment in the face of a personal family health crisis (see Exhibit "5").

42.

In the past it has been an accepted practice at Delta to email the CEO with problems that defy a solution. More recently the CEO has advertised that any employee can "Ask ED anything" (see Exhibit "6").

43.

Upon information and belief, the health insurance plan that Plaintiff was a member of was largely self-insured by Defendant Delta and Delta has contracted with United Healthcare to administer the plan.

44.

Leads Buice and Warren engaged in harassment against Mr. Hill for the purpose of interfering with Mr. Hill's and Mr. Hill's wife's right to receive benefits pursuant to Delta's group health and welfare plans and other ERISA plans.

45.

Defendant allowed this harassment by its leads and mechanics to continue, for the purpose of interfering with Plaintiff's right to receive benefits pursuant to Delta's group health and welfare plans and other ERISA plans.

**EAP Suspension**

46.

On December 23, 2016, Bell called Delta's contracted Employee Assistance Program ("EAP") Management Consultant and Certified Psychologist Rose Molitor, who is based in Eden Prairie, Minnesota. Molitor works for Delta's EAP provider Optum, branded as United Behavioral Health.

47.

Molitor provided a transcript of the call, along with all other communications related to Mr. Hill and his EAP referral, in what was referred to as, "EAP Case Notes" (hereinafter, "Case Notes") (see Exhibit "7").

48.

During the call that morning, Bell informed Molitor that
Mr. Hill "recently lodged a harassment complaint, the
workplace did an investigation, and brought him to the office
to let him know the findings of the investigation."
Additionally, Bell informed Molitor that "they had received
statements from several co-workers who said they felt unsafe"
around Mr. Hill (see Exhibit "7").

49.

During this call, no allegation of any specific incident
occurring at any time was given; however, Bell did confirm to
Molitor that Mr. Hill had never been violent at work, had
never threatened anyone at work and that there was no negative
documentation in his personnel file (see Exhibit "7").

50.

Finally, Bell stated that she had contacted both Delta's
legal department and Barbara Martin, Delta General Manager of
Occupational Health, and they suggested contacting EAP.
Molitor informed Bell that EAP would not trigger (i.e.
suspend) the employee, but Delta could if there were safety
concerns (see Exhibit "7").

51.

On December 23, 2016, Molitor received an email that was sent from Barbara Martin to Delta HR General Manager Lisa Abraham Brown requesting "specific behaviors of concern" (see Exhibit "7").

52.

That same day, Molitor received a phone call from Martin in reference to the possible EAP referral (see Exhibit "7").

53.

Later that same day, Molitor received an email from Bell stating, "We will be speaking with Mr. Hill shortly and informing him he will be removed from the property and will need to contact you today and be cleared for work before he can return. Summary of investigation attached. We are meeting with him at 11:30AM" (see Exhibit "7").

54.

That same day at approximately 11:30 a.m., Mr. Hill received a text message from his manager Lindsay to report to Craig's office immediately. Upon arrival, Mr. Hill saw Craig and a man he had never met, whom he later identified as corporate security officer, Larry Hammet. Bell was also in attendance via speaker phone.

55.

Bell informed Mr. Hill that he was being suspended with pay pending EAP clearance to return to work.

56.

Mr. Hill asked Bell repeatedly for a specific reason why he was being excluded from the workplace and she simply kept repeating that it was his "conduct in a meeting" without being any more specific.

57.

After being escorted from Delta property by Hammet, Mr. Hill immediately called the EAP phone number that was provided to him. Mr. Hill was on the phone with Molitor for about one hour.

58.

During their call, Molitor assured Mr. Hill that he could expect to be cleared to return to work by the middle of January 2017.

59.

Later that same day, after being escorted off Delta property, Mr. Hill called two of his co-workers Kurt Johnson and Ted Ryan, who informed him that just before he was walked out, the entire shop (about 30 employees at the time) was evacuated.

60.

Johnson and Ryan informed Mr. Hill that once everyone had returned to the shop, Craig, Lindsay and Bell held a shop meeting and stated that the shop had been evacuated because some sort of safety/security threat protocol had been invoked.

61.

Johnson and Ryan (in addition to three other co-workers of Mr. Hill's — Larry Klein, Barry Pales and Tim Gause) also informed Mr. Hill that during the shop meeting held by Craig, Lindsay and Bell, that it was either communicated or highly insinuated that if any employee were to make a complaint to upper management (as Mr. Hill did), then action would likely be taken against them.

62.

On December 23, 2016, Molitor emailed Craig and Bell, informing them that Mr. Hill had called her and that she had performed an "extensive telephonic assessment" on Mr. Hill and that she had informed Mr. Hill that she would "set him up with a face-to-face provider for further assessment and treatment" (see Exhibit "7"). That same day, Molitor called Bell and informed her that EAP would not "trigger" Mr. Hill at that time (see Exhibit "7").

63.

In the EAP, "trigger" means that the EAP Psychologist has decided that the employee should not be in the workplace until treated for mental illness or posing a threat.

64.

On December 23, 2016, Mr. Hill received an email from Brian SanSouci with the Delta Equal Opportunity Office. He assured Mr. Hill he would investigate the workplace harassment and the reason for Mr. Hills suspension and Mandatory EAP referral. Mr. Hill agreed to cooperate in any way later providing a list of 14 employees who may have information about workplace harassment.

65.

On December 26, 2016, Mr. Hill sent an email to SanSouci complaining about the harassment from Buice and Warren, as well as raising concerns about continued harassment and retaliation regarding his suspension (see Exhibit "8").

66.

On December 28, 2016, Optum UBH Management Consultant and Certified Psychologist Tracy Traugott faxed a "referral for mental health evaluation of Vincent (Mark) Hill" to local Atlanta-area Psychologist Barbara J. Bower, LCSW. The fax communication further stated, "This Aircraft Maintenance

Technician (AMT) was referred by the workplace due to concerns regarding his mental health and stability at work" (see Exhibit "9").

67.

On December 30, 2016, Mr. Hill attended his first involuntary psychotherapy session imposed by Delta as a condition of continued employment.

68.

The involuntary weekly, and later bi-weekly, psychotherapy sessions continued until April 2018 as part of the Mandatory EAP referral imposed by Delta.

69.

On January 3, 2017, Molitor faxed a letter to Bower stating in part, "The workplace denies any history of physical violence for Mark and denies Mark has made any threats to co-workers." Molitor also instructed Bower to "do a thorough mental health assessment" on Mr. Hill (see Exhibit "9").

70.

That same day, Molitor received call from Bower, in which Bower informed Molitor that Bower "does not believe EE has mi [mental illness] issues but more personality issues" (see Exhibit "7").

71.

On or around January 6, 2017, Mr. Hill and his wife were informed that she would need another surgery to have additional lymph nodes removed.

72.

On January 11, 2017, Mr. Hill's wife had an additional cancer surgery at Emory Hospital.

73.

On or around January 12, 2017, Mr. Hill and his wife were given a $500 gift from co-workers at Delta. The money was delivered to the residence by co-worker Larry Klein.

74.

Upon information and belief, sometime in January 2017, Defendant instructed several of Mr. Hill's co-workers (including David Brock, Johnson, and Ryan) to not have any contact with him and to isolate him during his EAP suspension.

75.

On January 18, 2017, Molitor received a call from Bower during which Bower "stated she believes that EE is ready to rtw" and that "she will be sending provider cert form" (see Exhibit "7").

76.

On January 19, 2017, Molitor recorded in the Case Notes, "Received call from EE on 1/18. Informed EE of consultation with B.J. Bower and informed EE of recommendation that he continue in treatment after back at work. Informed EE of RTW agreement. EE was agreeable to that and stated he would be available at 3 or 4pm on Friday for rtw meeting" (<u>see</u> Exhibit "7").

77.

That same day, Molitor sent an email to Bell and Craig, stating: "This is an update to let you know that Marks provider now has signed off that she believes Mark is able to return to work. It is the provider and EAP's recommendation that he come back on a Return to Work Agreement" (<u>see</u> Exhibit "7").

78.

At all times since December 23, 2016, Plaintiff has been treated by Delta as having a mental impairment and/or illness. Delta mistakenly believes that Plaintiff has a mental impairment that substantially limits one or more of his major life activities. Thus, since December 23, 2016, Delta has regarded Plaintiff as disabled under the Americans with Disabilities Act, 42 U.S.C. § 12102(2)(c).

79.

That same day, Molitor received a reply email from Bell (which was also sent to Craig and Cassandra Lee Austin in Delta HR) that stated: "There were interviews conducted yesterday with several employees as a continuum to the investigation that the provider may want to consider. The remaining interviews will be completed tomorrow. I have copied Cassandra in this note as she has been leading the investigation in partnership with our OE team. As far as the agreement, I agree with assuring he agrees to the conditional agreement. I can do 3pm however based on Cassandras feedback we may want to hold off until all meetings have been completed." Molitor responded to the group via email, stating "That makes sense, Nicole. I will hold off on setting anything up until hearing further from you" (see Exhibit "7").

80.

On January 24, 2017, Molitor recorded in the Case Notes, "Had consultation with Nicole. Nicole informed this MC of findings of EO investigation. Additional concerns were expressed about EE's 'short fuse and aggressive behaviors' along with 'talking to himself in unusual voices, speaking openly of his collection of guns with silencers, frequently becoming red-faced and aggressive with fists clenched.' Nicole

was informed new information will be shared with EE's provider for updated treatment recommendations."

81.

On January 26, 2017, Mr. Hill was informed by Molitor that he would not be returning to work at that time and that he would now be required to complete online anger management training and pay for it himself (see Exhibit "7").

82.

During that same conversation, Mr. Hill was also informed of only the "red-faced and aggressive with fists clenched" false allegation, but none of the other allegations against him.

83.

Later that same day, Mr. Hill sent an email to SanSouci complaining of these new false allegations against him and reiterating his concerns of harassment, discrimination, and retaliation (see Exhibit "10").

84.

On January 30, 2017, Molitor received an email from Bell stating, "I forgot to inform you during our call that we will send you the entire completed investigation summary for your/evaluators review" (see Exhibit "7").

85.

On January 31, 2017, Mr. Hill sent a second email to SanSouci reiterating his complaints regarding the new false allegations against him, as well as reiterating his concerns of harassment, discrimination, and retaliation (see Exhibit "11").

86.

On February 2, 2017, SanSouci responded to Mr. Hill's previous emails stating that an investigation into Mr. Hill's complaints had been conducted, but that additional safety concerns regarding Mr. Hill were brought up during that investigation and thus Mr. Hill was now being required to undergo additional evaluation before he could return to work.

87.

After this email from SanSouci, Mr. Hill was informed by co-worker Brock that during his interview with SanSouci, he was never asked about the theft accusations witnessed by Brock. This had been the only reason Mr. Hill had even asked that Brock be interviewed.

88.

On February 3, 2017, Molitor emailed Bell, "Do you have this final investigation summary yet? As soon as I receive it, I will forward it on to the provider. She understands that it

is completely confidential and will not share with Mark even that she has received it" (see Exhibit "7").

89.

On February 9, 2017, Molitor received a response email from Bell stating: "They have not provided me with it as of yet. Do you know if Hill completed the recommended anger management course? If so, then I believe all we are waiting on is the summary" (see Exhibit "7").

90.

On February 17, 2017, Molitor received a call from Bower, during which Bower stated she saw Mr. Hill yesterday and that she believed Mr. Hill was clinically able to return to work (see Exhibit "7").

91.

Later that same day, Molitor received a call back from Bell. During the call, Molitor informed Bell of Bower's recommendation that Mr. Hill was able to safely return to work. Bell stated that the final EO summary would likely be complete on that Tuesday and that she would like Bower to read the final summary to see if there were any remaining concerns regarding Mr. Hill's safely returning to work (see Exhibit "7").

92.

On February 22, 2017, Molitor recorded in the Case Notes, "Received copy of investigation summary from Nicole Bell along with following note: 'Hi Rose, Please see attached the investigation report of the second level investigation. As we have discussed before, It will be vital for the provider not to provide details to Mr. Hill regarding incidents/individual names that could in turn bring tension to the shop, if/when Hill returns'" (<u>see</u> Exhibit "7").

93.

Later that same day, Molitor also received an email from SanSouci, which stated, "another summary will be sent to you regarding concerns from two more employees who were not interviewed in this investigation (because Hill did not name them as witnesses to his alleged harassment), but who have come forward regarding Hill. Please do not reach a final recommendation until you have received and considered both reports" (<u>see</u> Exhibit "7").

94.

In response to Bell's and SanSouci's emails, Molitor responded via email, "Sounds good, Brian. I will wait until receiving the second report and will forward both of them on to the provider.**I have already instructed the provider not

to share anything with Mark regarding these confidential workplace documents, and she's agreed not to even disclose that she has received the reports. I will remind her again when I send them to her. Do we have any idea when the second report will be received?" (see Exhibit "7").

94. 95.

Mr. Hill's wife was scheduled for her first chemotherapy treatment on March 3, 2017. However, on March 1, 2017, she was informed that her chemotherapy treatment was being postponed by Mr. Hill's insurance.

96.

With the help of Mrs. Hill's oncologist and nurses, she and Mr. Hill went to the hospital and got her back on the schedule for March 3, 2017. However, this was an extremely traumatic and trying time for Mr. Hill and his wife, as it had already been four (4) months since her cancer diagnosis and then Mr. Hill's health insurance was trying to postpone her treatment even further.

97.

On March 2, 2017, Molitor emailed Mr. Hill, stating, "Hi Mark, Thank you for the update. I hope all goes well with the chemotherapy appointment this Friday. Take care. Hopefully we will be able to move forward soon" (see Exhibit "7").

98.

On March 2, 2017, Molitor recorded in the Case Notes, "Received call from HR, Nicole Bell. Also received email with write-up of interview with final two co-workers," as well as "Faxed confidential workplace documents to BJ Bower" (see Exhibit "7").

99.

On March 8, 2017, Molitor recorded in the Case Notes that she "Received call from BJ Bower therapist. BJ stated she reviewed all the workplace documents. BJ stated she believes many of the behaviors of concerns: e.g. poor work ethic, getting unruly in meetings, are work performance behaviors and do not appear to have been addressed by EE's previous Manager Mr. West. BJ stated she doesn't see hostility in EE, but stated the option of FFD is always a good one if the workplace has concerns about safety to be in the workplace" (see Exhibit "7").

100.

On March 9, 2017, Molitor called and left a voicemail message for Bell, informing her that Bower had reviewed all of the workplace documents, met with Plaintiff again, and continued to believe that he was able to return to work (see Exhibit "7").

101.

On March 13, 2017, Molitor sent an email to Bell stating, "You wanted me to consult with you after Mark's provider clinically clears him to return-to-work and before sending an EAP clearance email. I left you a voice mail message last week that we're now at that point" (see Exhibit "7").

102.

On March 13, 2017, Molitor recorded in the Case Notes, "Made outreach call to Nicole Bell. Informed Nicole that provider has reviewed workplace reports and informed of providers clinical opinion that EE can return to work" (see Exhibit "7").

103.

On March 20, 2017, Molitor recorded in the Case Notes, "Received call from therapist BJ Bower. BJ was informed this MC has informed HR that EE is cleared by his provider to rtw and that delay is in waiting to hear back from Delta regarding rtw for EE" (see Exhibit "7").

104.

Later that same day, Molitor called and spoke with Mr. Hill. In the Case Notes, Molitor recorded: "Made outreach call to EE. Informed EE workplace is in the process of reviewing next step and normalizing process as EE stated he believes he

is being retaliated against for harassment charge. EE was encouraged to focus on his self-care. EE stated he will be seeing BJ Bower again on Thursday and agreed to do that. This MC clarified with EE that all employment decisions come from Delta and that EAP is not involved in any decisions" (see Exhibit "7").

105.

On March 21, 2017, Mr. Hill emailed Molitor thanking her for the update and informing her that he sent an email to Delta asking why he had not yet been returned to work (see Exhibits "12" and "13").

106.

Defendant's decision to keep Plaintiff out of work for over four (4) months was based on its perception that Plaintiff suffered from a disability. Specifically, Delta believes that several of Plaintiff's major life activities (including, but not limited to concentrating, thinking, communicating, and working, as defined by 42 U.S.C. § 12102(2)(A)) are limited by a mental impairment. Defendant has this perception of Plaintiff despite the fact that all of the medical evidence is to the contrary.

107.

At the time of his suspension, Plaintiff was perceived by the Defendant as suffering from a disability, as that term is defined under the ADA, 42 U.S.C. § 12102.

108.

At all times relevant to this action, Plaintiff was able to perform the essential functions of his job as a mechanic.

109.

Defendant's records indicate that during the relevant time period, Delta had work that Plaintiff could perform. Indeed, Delta has such work available currently.

**Return to Work**

110.

On April 3, 2017, Molitor emailed Mr. Hill stating: "I received an email from Nicole Bell about setting up a return-to-work meeting for Monday April 10th. As soon as I get a time from her I will let you know" (see Exhibit "7").

111.

Later that same day Mr. Hill responded to Molitor's email, stating: "I will let you know I am ecstatic with this news. I didn't mean to be impatient even though it is April now. After over five months of bad cancer news and bad work

news this is fantastic. I see Dr. Bower tomorrow and will fill her in if you haven't" (see Exhibit "7").

112.

On April 11, 2017, Mr. Hill met in person with Managers Charmaine Chen and Craig, as well as HR Mangers Shannon Roane and Bell. Molitor attended the meeting by phone. During this meeting, Mr. Hill was required to read the Return to Work Agreement (hereinafter "RTW Agreement") out loud in front of everyone present. The RTW Agreement required an additional year of forced psychotherapy and that Mr. Hill sign a release of all medical information back to Delta as a condition of continued employment.

113.

Mr. Hill's final psychotherapy session was on April 12, 2018. He had been attending involuntary weekly and bi-weekly psychotherapy sessions since December 30, 2016, which he was also required to pay for.

**Involuntary Transfer to Different Department**

114.

At the end of the meeting on April 11, 2017, after Molitor had hung up from the phone, it was announced that Mr. Hill had "volunteered" to be transferred from Department 382

("Dept. 382"), where he had worked for 23 years to Department 242 ("Dept. 242").

115.

The working conditions in Dept. 242 were, and still are, radically different than those in Dept. 382. Dept. 242 required work in a hangar and the work was more arduous, difficult, and dirty.

116.

Before Mr. Hill's transfer, he worked in a very clean air-conditioned shop environment, which some people have described as "for mechanics who are ready for retirement." Since Mr. Hill's transfer, he has worked in an aircraft hangar and periodically outside, which are dirtier and more physically demanding working conditions.

117.

Delta could have transferred Mr. Hill to another shop instead of the Aircraft Hangar in Dept. 242.

118.

The opportunities to work and obtain overtime are drastically less in Dept. 242 than they are in Dept. 382. Before his involuntary transfer, Mr. Hill worked and was paid for overtime regularly in Dept. 382.

119.

After a lengthy protest by Mr. Hill that he had not volunteered for this job, he was told by Bell that his only opportunity for continued employment at Delta was in the new department. Mr. Hill was also told by Craig that he could never bid for an open position in Dept. 382.

120.

On April 13, 2017, Delta manager Craig held a full shop meeting in Dept. 382 to announce that a decision had been made not to fire Plaintiff but to transfer him to Dept. 242 instead. During this same meeting, employees were told to treat Mr. Hill "normally."

121.

On April 27, 2017, Mr. Hill sent an email to Delta imploring them to reconsider the retaliatory involuntary transfer (see Exhibit "14").

122.

Mr. Hill was subsequently ordered by Delta to report to his new department on April 28, 2017.

123.

On May 2, 2017, Molitor contacted Mr. Hill and recorded in the Case Notes: "Made outreach call to EE. EE expressed frustration that he was transferred to another department. EE

stated he has contacted an attorney and knows that mandatory EAP referral and retaliation for reporting harassment is illegal. EE talked at length about his concerns. EE was informed this MC will assist with his request to access EAP records. EE stated he has an appointment set with Dr. Bower for 5/17" (see Exhibit "7").

### EEOC Charge Filing

124.

On June 1, 2017, Mr. Hill filed a Charge of Discrimination with the EEOC against Defendant Delta.

125.

On June 22, 2017, around 8:30 a.m., Mr. Hill informed his manager in Dept. 242, Van Kale, that he had filed an EEOC Charge with multiple claims against Delta on June 1, 2017. Mr. Hill did this to clarify a rumor that was going around that he had filed a lawsuit against Delta, which he had not yet done.

### Specific Instances of Retaliation

126.

That same day around 12:30 p.m., Mr. Hill was called to a meeting with Kale and his lead Brian Wright. During this meeting, Mr. Hill was presented with a written reprimand stating that he "did not understand the sense of urgency to

get the job done" related to a June 6, 2017 job assignment on an engine thrust reverser of a Boeing 777 (see Exhibit "15").

127.

Mr. Hill was in fact not even at work on June 6, 2017, which he later proved to his Dept. 242 manager and lead (see Exhibit "16"). Furthermore, Mr. Hill also had not recently worked on a B777 thrust reverser.

128.

During August 2017, Mr. Hill was informed by a Delta co-worker that he was being "watched" and every time he went back to his old Dept. 382 it was being "documented." Mr. Hill reached out to Delta HR Representatives Shannon Roane and Bell and complained that this undue surveillance was further discrimination and retaliation against him.

129.

During October 2017, Mr. Hill met with Roane and Bell, and instead of a report of the findings of an investigation, Bell pressed Mr. Hill for the name of his source. Mr. Hill informed her that he would prefer not to divulge his source's name because his source fears being subjected to the same retaliation he had experienced.

130.

During this meeting, Mr. Hill also complained to Roane and Bell that he had continued to be discriminated and retaliated against for the past ten (10) months.

131.

On August 14, 2018, Mr. Hill was informed by Dept. 242 co-worker Jeff Allen that he heard from two leads under Kale that at the time of Mr. Hill's forced transfer in 2017, that he had been transferred by management to Kale's department because "Van is good at establishing a paper trail and firing employees."

132.

On August 22, 2018, Mr. Hill was provided with Delta's Position Statement from the EEOC investigator, which contained more nonspecific, false allegations and accused Mr. Hill of poor work ethic from the time period of Mr. Hill's former lead Mike West's retirement in November 2015 to Mr. Hill's suspension on December 23, 2016.

133.

Prior to Mr. Hill engaging in protected activity beginning in November 2016, the quantity or quality of Mr. Hill's work had never been questioned since he was hired in 1989 as is reflected in his work record. Also, during the time

- 37 -

period in question, he received two good work performance reviews and one after and an award for getting a "nose radome" back into service (see Exhibits "17," "18," and "19").

134.

In the face of all this false speculation, Delta has never presented Mr. Hill with a written reprimand giving a specific reason for its adverse job actions against him. Mr. Hill has been deprived of access to Delta's internal grievance process, as the process specifies that a reprimand in writing is required. Mr. Hill has received no such written reprimand.

135.

Ever since Mr. Hill engaged in protected activity in November and December 2016, culminating with his email to Delta's CEO, Delta has produced a multitude of false allegations against Mr. Hill. Yet, none of the false allegations provide specific details about any incident involving Mr. Hill that could remotely be construed to be violent or threatening in any way or even suggest that Mr. Hill has violated any Delta policy at any specific time.

136.

Defendant has held Mr. Hill to different terms and conditions of employment than that of his co-workers after his engagement in protected activity. Upon information and belief,

there are at least two similarly-situated employees of Defendant, who were accused of anger issues and/or security threats yet were not transferred or subjected to such a lengthy mandatory EAP action as Mr. Hill was. These two employees however, did not engage in protected activity as Mr. Hill did.

137.

Moreover, Delta has in bad faith attempted to reconstitute documents that had been removed from Mr. Hills personnel file under Delta policy. Delta submitted to the EEOC as attachments to its Position Statement two negative writeups from 1995 and 2003, which had since been removed from Mr. Hill's employment file.

138.

The negative writeup from 1995 was removed years ago under Delta policy at the time.

139.

The negative writeup from 2003 was removed in 2003 after a four-hour grievance hearing in which Mr. Hill prevailed. As the review decision letter states, the 2003 writeup was to be removed from "ALL" of Mr. Hill's Delta files (see Exhibit "20").

140.

The effect of Defendant's above-stated actions has been to deprive Plaintiff of employment opportunities, income in the form of wages, prospective employment benefits, including health insurance and other benefits to which he would have been entitled but for Defendant's illegal actions.

141.

Defendant's actions have also caused Plaintiff to suffer out-of-pocket losses and physical, mental and emotional distress for which he seeks redress.

### COUNT ONE
### AMERICANS WITH DISABILITIES ACT — DISCRIMINATION

142.

Plaintiff hereby incorporates, adopts and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

143.

Defendant's suspension of Plaintiff on account of his perceived disability constitutes discrimination against Plaintiff with respect to Delta's conditions or privileges of employment. Delta's actions constitute a violation of 42 U.S.C. §§ 12102(2)(c) and 12112.

144.

Furthermore, Defendant's requirement of Plaintiff to undergo undue medical tests and exams on account of his perceived disability constitutes discrimination against Plaintiff with respect to Delta's conditions or privileges of employment. Delta's actions constitute a violation of 42 U.S.C. §§ 12102(2)(c) and 12112.

145.

Upon information and belief, Defendant would not have suspended Plaintiff had he not been regarded as disabled by Defendant.

146.

Furthermore, upon information and belief, Defendant would not have forced Plaintiff to undergo undue medical exams had he not been regarded as disabled by Defendant.

147.

In suspending Plaintiff on account of his perceived disability, Defendant acted with malice or with reckless indifference to the federally protected rights of Plaintiff.

148.

Furthermore, in requiring Plaintiff to undergo undue medical exams on account of his perceived disability, Defendant

acted with malice or with reckless indifference to the federally protected rights of Plaintiff.

149.

As a direct and proximate result of Defendant's discrimination on the basis of its perception that Plaintiff suffered from a disability, Plaintiff has suffered lost wages and benefits, as well as emotional distress.

150.

Defendant's discriminatory conduct towards Plaintiff has caused, continues to cause, and will cause Plaintiff to suffer substantial damages for pecuniary losses, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

**COUNT TWO**
**AMERICANS WITH DISABILITIES ACT — RETALIATION**

151.

Plaintiff hereby incorporates, adopts and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

152.

Plaintiff was persistent in requesting that Defendant return him to work, once he was cleared by EAP and therapist Bower.

153.

Following Plaintiff's requests to return to work, Defendant transferred him to a different, less desirable department.

154.

Defendant's transfer of Plaintiff was in whole or in part in retaliation for Plaintiff's opposition to Defendant's failure to return him to work and failure to prevent harassment from leads in his department, in violation of 42 U.S.C. § 12203(a).

155.

Defendant's transfer of Plaintiff was done as an effort to intimidate Plaintiff from exercising his right to oppose Defendant's unlawful employment discrimination practices and thus also constituted illegal retaliation in violation of 42 U.S.C. § 12203 (b) of the ADA.

156.

Defendant's statement from Craig ordering Mr. Hill that he could not apply or "bid" for another position in Dept. 382 was done as an effort to intimidate Plaintiff from exercising his right to oppose Defendant's unlawful employment discrimination practices and thus also constituted illegal retaliation in violation of 42 U.S.C. § 12203 (b) of the ADA.

157.

Defendant's June 6, 2018 write up from Kale was done as an effort to intimidate Plaintiff from exercising his right to oppose Defendant's unlawful employment discrimination practices and thus also constituted illegal retaliation in violation of 42 U.S.C. § 12203 (b) of the ADA.

158.

Defendant's attempt to reconstitute documents that had previously been removed from Mr. Hill's personnel file under Delta policy was done as an effort to intimidate Plaintiff from exercising his right to oppose Defendant's unlawful employment discrimination practices and thus also constituted illegal retaliation in violation of 42 U.S.C. § 12203 (b) of the ADA.

159.

Defendant's multiple false allegations against Plaintiff have been made in an effort to intimidate Plaintiff from exercising his right to oppose Defendant's unlawful employment discrimination practices and thus also constituted illegal retaliation in violation of 42 U.S.C. § 12203 (b) of the ADA.

160.

Defendant's multiple sham investigations into Mr. Hill were done as an effort to intimidate Plaintiff from exercising

his right to oppose Defendant's unlawful employment discrimination practices and thus also constituted illegal retaliation in violation of 42 U.S.C. § 12203 (b) of the ADA.

161.

Defendant intentionally, with malice and reckless indifference to Plaintiff's rights, violated the ADA by retaliating against him for protesting his suspension and retaliated against him by transferring him to a new department, although they knew or should have known that the ADA prevents employers from retaliating against employees covered by the ADA.

162.

As a direct and proximate result of Defendant's intentional discrimination and retaliation, Plaintiff has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job-related benefits, including health insurance benefits, all in an amount to be established at trial.

163.

In addition, Defendant's actions have caused, continue to cause, and will cause the Plaintiff to suffer damages for emotional distress, mental anguish and other non-pecuniary

losses, as well as damages to his personal and professional reputation.

164.

Moreover, Plaintiff is entitled to be reinstated to his previous position in Dept. 382 by Defendant and, if reinstatement is not feasible under the circumstances, Plaintiff is entitled to an award of damages for future lost wages and benefits of employment.

## COUNT THREE
### EMPLOYMENT RETIREMENT INCOME SECURITY ACT INTERFERENCE

165.

Plaintiff hereby incorporates, adopts and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

166.

Leads Buice and Warren engaged in harassment against Mr. Hill, and Defendant's continued allowance of this harassment, was for the specific purpose of interfering with Plaintiff and Plaintiff's wife's attainment of participation rights in violation of ERISA Section 510, 42 U.S.C. §1140.

167.

The conduct of Defendant and its employees, and its failure to stop this harassment was for the purpose of interfering with

Plaintiff and Plaintiff's wife to participate in Delta's employee benefit plans, constitutes a breach of their obligations under the Plans and ERISA.

168.

Moreover, Plaintiff was suspended shortly after informing Defendant and Defendant's various employees that his wife, who was on Mr. Hill's Delta's health insurance plan, had breast cancer that would require surgery, chemotherapy, as well as radiation therapy.

169.

Upon information and belief, Delta's health insurance benefits plan was primarily self-insured, and Defendant paid claims under that plan.

170.

Upon information and belief, a motivating factor in Defendant's decision to suspend Plaintiff was to prevent or interfere with his and his family's ability to use Defendant's health insurance benefits.

171.

In doing nothing to curtail Warren and Buice's harassment of Mr. Hill, allowing the harassment to continue, and then suspending Mr. Hill and interfering with Plaintiff's (and his wife's) right to participate in group benefit plans, Defendant

acted with malice or with reckless indifference to the federally protected rights of Plaintiff.

172.

As a direct and proximate result of Defendant's violation of ERISA, Plaintiff has suffered, and continues to suffer substantial pecuniary damages for lost wages and benefits (including by his failure to receive benefits promised to him, including health insurance benefits for himself and his family members and short-term disability insurance and/or the continuing right to health insurance and/or disability, pension and other employer funded benefits) and medical care, as well as emotional distress, other non-pecuniary damages, and damage to his personal and professional reputation.

173.

To the extent these promised benefits were benefits governed by ERISA and/or an ERISA benefits plan, the suspension of Plaintiff's employment to prevent him from obtaining such benefits violated 29 U.S.C. §1140.

COUNT FOUR
ATTORNEY'S FEES

174.

Plaintiff hereby incorporates, adopts and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

175.

Defendant has acted in bad faith and has been stubbornly litigious, causing the Plaintiff unnecessary trouble and expense. Consequently, Plaintiff is entitled to recover attorney's fees pursuant to O.C.G.A. § 13-6-11.

176.

Plaintiff is also entitled to recover his reasonable costs and expenses, including attorneys' fees, as part of his recovery from Defendants for Defendants' violations of federal law.

**TRIAL BY JURY DEMANDED ON ALL COUNTS.**

**WHEREFORE,** Plaintiff prays that this Court:

a. Issue a declaration that Defendant engaged in unlawful employment practices in violation of, and violated Plaintiff's rights under, the ADA and ERISA;

b. Award Plaintiff all of his back pay and lost benefits which Plaintiff has suffered as a result of Defendant's ADA and ERISA violations;

c. Award Plaintiff compensatory damages in an amount commensurate with the pecuniary losses imposed upon him by Defendant's unlawful, discriminatory and retaliatory acts, including but not limited to his lost wages (overtime), 401(k) benefits, and lost bonus pay;

d. Award Plaintiff compensatory damages sustained as a result of Defendant's unlawful, discriminatory and retaliatory acts, including but not limited to damages for future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses sustained by Plaintiff as a result of Defendant's violations of the ADA and ERISA;

e. Grant Plaintiff injunctive relief requiring the Defendant corporation to reinstate Plaintiff to his previous position in Dept. 382, with all interim salary increases he would have received had he not been unlawfully transferred — or, if reinstatement is not feasible under the circumstances, Grant

Plaintiff an award of damages for future lost wages and benefits of employment;

f. Grant Plaintiff an award of his medical expenses which he has incurred as a direct result of the injuries inflicted upon him by the conduct of Defendant, in an amount to be proven at trial;

g. Grant Plaintiff liquidated damages for the Defendant's willful, intentional, malicious and recklessly indifferent violation of Plaintiff's rights under the ADA;

h. Grant Plaintiff special damages for all out-of-pocket costs and expenses that he would not have incurred but for the Defendant's unlawful conduct, including costs incurred in bringing this action and his reasonable attorneys' fees;

i. Issue an Order granting Plaintiff costs and attorney's fees per O.C.G.A. §13-6-11;

j. Issue a permanent injunction enjoining Defendant, its officers, agents, successors, employees, attorneys, and those acting in concert with them, from engaging in any employment practice or policy which discriminates against the Plaintiff and other

qualified employees on the basis of disability in violation of the ADA;

k. Issue a permanent injunction enjoining Defendant, its officers, agents, successors, employees, attorneys, and those acting in concert with them, from retaliating against Plaintiff or other qualified employees for engaging in activity protected under the ADA;

l. Award Plaintiff punitive damages to punish Defendant's willful and intentional violations of the ADA as provided by 42 U.S.C. § 12117(a);

m. Award Plaintiff pre- and post-judgment interest at the maximum rates allowable by law;

n. Grant Plaintiff a trial by jury of all issues so triable; and,

o. Grant such additional relief as this Court deems necessary, appropriate, just and proper.

This 9th day of December, 2018.

**HORNSBY LAW GROUP**

/s/ Amelia Grubbs
Brandon Hornsby
Ga. State Bar No. 367680
Amelia Grubbs
Ga. State Bar No. 696724

1180 W Peachtree St NW #2220

```
Atlanta, GA 30309
Tel: 404-577-1505
Fax: 404-577-1565              Attorneys for Plaintiff
```