UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| **VINCENT MARK HILL,**<br><br>    **Plaintiff,**<br><br>**vs.**<br><br>**DELTA AIR LINES, INC.,**<br><br>    **Defendant.** | **Civil Action No. 1:18-CV-5589-JPB-WEJ** |

## DEFENDANT DELTA AIR LINES, INC.'S <u>STATEMENT OF UNDISPUTED FACTS</u>

Pursuant to Local Rule 56.1 and this Court's May 20, 2019 Order on summary judgment in this case (stating in part that each party is limited to asserting 50 one-sentence facts in their respective statement of undisputed facts and statement of disputed facts), Defendant Delta Air Lines, Inc. ("Delta") hereby submits its Statement Of Undisputed Facts in support of its Motion For Summary Judgment ("SOUF") in this two-count ADA lawsuit filed by current Atlanta-based Delta Aircraft Maintenance Technician ("AMT" or "aircraft mechanic") Vincent Mark Hill ("Hill").

1.     In the Fall of 2016, Hill was employed by Delta as an AMT in Department 382 (components shop) in Atlanta, and, depending on his day and shift, reported for work assignments to one of a group of Department 382 Lead

AMTs – including Dave Farmer ("Farmer"), Mike Buice ("Buice") and Nathan Warren ("Warren") - who reported to Manager David Lindsay ("Lindsay"), who reported to General Manager David Craig ("Craig").  Deposition of Mark Vincent Hill ("Hill Dep.") attached to the accompanying brief as Exhibit "A", pp. 18, 24, 63-66, 68.

2.   Hill's AMT position is safety-sensitive under FAA regulations and is "100% safety."  Hill Dep., pp. 27, 29.

3.   On October 16, 2016, Hill learned that his wife might have breast cancer, a diagnosis that was confirmed on November 1, 2016.  Hill Dep., pp. 69, 70.

4.   In November and December 2016, Hill reported to Lindsay, Craig and Delta Human Resources Manager Nicole Bell ("Bell") three alleged incidents involving either Lead AMT Buice or Lead AMT Warren that Hill claimed amounted to "harassment" of him allegedly because of his wife's health condition (even though Hill never claimed Buice or Warren ever said anything to him about his wife's condition and instead at most acted "indifferent" to his wife's condition when he once talked about it with Lindsay and Farmer).  Hill Dep., pp. 63-66, 72-77, 101, Exh. 4, pp. 8, 12 (Hill 00807 and Hill 000811).

5.   With respect to the first of the three incidents, on November 7, 2016, Hill reported to Lindsay and then to Lindsay and Craig that he "was afraid"

"maybe of being harassed" solely because (1) he had failed to report to his scheduled 12-hour shift on Friday, October 21, 2016 and (2) a Lead AMT (who was determined to be Buice) had followed the normal Lead AMT timekeeping act of applying 12 hours from Hill's vacation bank to that missed shift so that Hill would not be later docked 12-hours pay for missing that scheduled shift.  Hill Dep., pp. 65, 66, 72-74, 77, 79-83, 88, 141, 142.

6.  Hill complained about this normal practice by Buice (that was in the interest of Hill) because Hill had recently reached what he called an "extraordinary" verbal arrangement with Lead AMT Farmer (Hill's lead on most of Hill's shifts), that he could miss a scheduled shift due to his wife's condition and avoid his pay being docked for that missed shift by working a future unscheduled shift.  Hill Dep., pp. 81-83.

7.  Farmer had not told Buice of this "extraordinary" arrangement, and there was nothing unusual about Buice applying Hill's vacation hours to his missed shift as "we all put in [AMT] time for each other" and such actions by Buice "happen[s] regularly."  Deposition of Lead Dave Farmer ("Farmer Dep."), attached to the accompanying brief as Exhibit "B", pp. 58, 59, 61, 62; Deposition of Nicole Bell ("Bell Dep."), attached to the accompanying brief as Exhibit "C", p. 142.

8.   After he raised this vacation issue with Lindsay/Craig, Hill was aware that he could have obtained his 12 hours of vacation back by working an extra future shift, but Hill chose not to do so and instead chose to agree to have the 12-hours of vacation applied to his missed shift -- just as Buice had followed the normal practice of recording vacation hours for that shift to prevent Hill from being pay docked for missing that shift.  Hill Dep., pp. 95, 96.

9.   As a result of this application of vacation hours that favored Hill and that was Hill's ultimate choice as to how to treat his missed shift, Hill asked Lindsay to direct one of his Leads, Buice, to not to interact with him in any way, to not give him any instructions, and to not even check on him, and, shortly thereafter, Hill wrote Delta, "I don't want Mike Buice interacting with me at all."  Hill Dep., p. 91; Exh. 4, at Hill 00813; Deposition of Dennis Lindsay ("Lindsay Dep.,"), attached to the accompanying brief as Exhibit "D", pp. 28, 29.

10.   With respect to the second of the three allegedly "harassing" incidents, Hill asked Bell and Craig to investigate an event whereby, on November 14, 2016, Buice merely told Hill to get back to work (or back to his part) when Hill admits he was having a personal discussion with another employee rather than working.  Hill Dep., p. 101-105; Exh. 4, p. 12 (Hill 000811).

11.   Hill then asked Buice why he was singling him out and harassing him, and Buice responded that he had or was going to tell everyone else to get back to work (which Buice did).  Hill Dep., pp. 101-105; Farmer Dep., Exh. 14.

12.   Hill did not go back to work as directed by Buice but instead, after standing around for about ten minutes, approached Buice who was sitting at his desk and accused Buice of harassing him for asking him to return to work – causing Buice to put up his hand with an open palm as if to send a signal for Hill to hold back or calm down.  Hill Dep., pp. 106-113.

13.   Hill then told Buice that he thought his action (of using his open palm to ask Hill to calm down) was threatening to him and he three times stated, "Please do not to that" and then walked away.  Hill Dep., p. 108, 112.

14.   AMT Mark Sloan (who Hill did not accuse of harassment and who Hill considered to be "pretty objective in the situation") witnessed the interaction between Buice and Hill at Buice's desk and reported to Delta that (1) Hill used a loud voice acted in an erratic and aggressive manner towards Buice; and (2) Buice did not use a loud voice and, after Buice raised his open palm as a gesture asking Hill to back off, Hill became even more aggressive towards Buice.  Hill Dep., p. 107, 160; Deposition of Dennis Lindsay, Exh. 111 (Hill/Delta 002365).

15.  Between the second and third incident reported by Hill, on November 15, 2016, Lead AMT Warren (who was not involved in either of the first two incidents reported by Hill addressed above) wrote to Lindsay that, on the previous date, Hill had told him:

> I don't need you!  You need to know that I am off the chain!  After I found out you don't care for me and you are with Buice.  I am off the chain!!!  You know what that means don't you?  I am watching you!  I am going to get you and Buice!  THE CHAINS ARE OFF!!!!

Deposition of Nathan Warren ("Warren Dep."), attached to the accompanying brief as Exhibit "E", Exh. 17, p. 4.

16.  Warren then made a report to Lindsay that said:

> My personal opinion is that Mark is under more stress than he can handle.  I am concerned he is going to have a medical crisis.  Later I have talked to Dennis [Lindsay] about the situation and he recommended to Mark the EAP [Employee Assistance Program].  He is very volatile and it makes the situation very sensitive.

Warren Dep., Exh. 17, p. 3.

17.  Finally, with respect to the third of the three allegedly "harassing" incidents reported by Hill, on December 2, 2016, Hill reported to Lindsay, Craig and Bell that, earlier that day, he had purchased items from a vendor at Delta and took them out to his car in a large grey garbage bag.  Hill Dep. Exh. 4, pp. 8, 12-13 (Hill 00807; Hill 0811-0812).

18.  Hill understood that walking out to his car with a large bag of items from the shop might raise some suspicions, and he claimed that an AMT told him that "one of the other leads [who Hill determined was Buice or Warren] had questioned whether I was stealing something from Delta or not in that grey bag." Hill Dep., p. 128, 130, 131; Exh. 4, pp. 12-13 (Hill 0811-0812).

19.  Nothing at all happened to Hill because of this alleged question by a Lead AMT about the items in his gray bag and whether or not he had stolen items. Hill Dep., p. 134.

20.  Bell and Craig investigated the three events below and found that nothing at all improper had occurred towards Hill in any of these events.  Hill Dep., Exh. 5.

21.  Bell and Craig learned in their investigation that some Delta employees (including Warren in his statement referenced above) had expressed concerns about Hill's recent behavior in the workplace.  Hill Dep., Exh. 5, p. 3.

22.  AMT Sloan (who again Hill testified was "pretty objective in the situation") reported that (1) Hill has been extremely upset of late; (2) a number of employees were scared to be in the shop due to Hill's erratic behavior; (3) he was worried that Hill might do serious harm to himself as well as others in the shop;

and (4) he did not want to return to the shop when Hill was present.  Hill Dep., P.

160; Exh. 5, p. 3.

23.  Lead AMT Dave Farmer (who was and is a friend of Hill's) reported in

part to Lindsay on November 21, 2016:

> Mark Hill has recently found out that his wife has breast cancer and it
> has brought him an enormous amount of stress.  I have done what you
> asked me, I have been helping and supporting in every way I can.
> Mark in his anger is lashing out at Delta, the leads, the PLM and our
> department.  We are, and will continue to be supportive but I also
> have the responsibility of looking out for what is best for Delta, our
> shop and the other 12 guys on my crew. . .. It is with great reserve and
> respect that I tell you the following statements. . .. Mark needs to get a
> fresh start in a different shop in Delta Air Lines.  Mark is lashing out
> and feels like he is treated unfairly and unjustly.  This is the exact
> opposite of what has happened. . .. I am very concerned that this may
> escalate into a bigger issue if it goes ignored.  We have come to a
> point in time that we cannot ignore such actions that may escalate into
> work place violence.  I have not seen this as of yet but I cannot
> explain how upset Mark is with his department.  I am open to talking
> about this more if that is what is needed, but I hate to see the shop be a
> place where people dread to come into work.

Farmer Dep., pp. 78, 79, Exh. 20.

24.  On December 20, 2016, Farmer reported to Lindsay that Hill had come

to him "very upset" about the distribution of overtime and then that several others

in the department told Farmer that Hill had been stating "Mother-Fuck Delta,"

Mother-Fuck the leads," and "Mother-Fuck the upper management and I am gonna

stick this up their asses."   Farmer Dep., p. 77, Exh. 18.

25.  Farmer wrote to Lindsay, "I am not sure what to do, my men are looking to me for direction and help on this and I feel that action must be taken."   Farmer Dep., Exh. 18.

26.  On December 21, 2016, Craig and Bell met with Hill to apprise him of the results of their investigation and, after this meeting, Bell told her supervisor, Lisa Abraham Brown ("Brown"), that Hill had acted in an irrational and concerning manner during the meeting as described in more detail below.  Hill Dep. pp. 151, 152; Deposition of Nicole Bell ("Bell Dep."), pp. 149, 150.

27.  Bell reported that, during the meeting, Hill (1) became emotional and angry (2) clenched his fists and became red-faced (3) then "directly after that reaction he would start to laugh, which was, again, concerning [with him] being in a safety-sensitive position" (4) would purport to repeat back what Bell or Craig had just said but he would state something different than what was just said (5) repeatedly switched back and forth from laughing to showing anger and (6) his conduct caused her to be concerned about his behavior.  Hill Dep., pp. 133, 134, 135, 146, 147, 149, 150.

28.  The day after the meeting that concerned Bell, on December 22, 2016, Hill sent a lengthy email to 18 individuals, including Bell, Lindsay, Craig and

Delta's CEO, and wrote that he felt that he was in a "very surreal irrational environment."  Hill Dep. Exh. 7, p. 3; pp. 150, 151.

29.  Among other things, Hill wrote in his email:

> I related the story of how a friend of mine [actual name changed to John Smith in this SOUF for confidentiality purposes] in 381 had committed suicide *because of issues similar to this* where you realize that no matter how much evidence piles up in your favor during harassment or unfair treatment like this Delta the Corporation will crush the individual because they can.  I related that while I personally have very strong mental and physical control some humans are frail and sometimes when they see no hope for fairness and justice or just basic human dignity they react irrationally.

Hill Dep., Exh. 7, p. 2.  (emphasis added).

30.  Hill wrote that what he claimed had recently happened to him (i.e., the three incidents addressed above), "I think this is probably what happened in [Department] 381 when [Smith] died."  Hill Dep., Exh. 7, p. 3.

31.  When asked at his deposition why he raised Smith's suicide in this email, he testified in pertinent part, "there are people who are frail or maybe mentally ill, and we don't know it.  We don't know what they'll do," and that his reference to Smith's suicide in the email "was not a good statement."   Hill Dep., pp. 167, 168.

32.  Bell reviewed the events about Hill with her HR supervisors, and she was advised to contact Delta's outside EAP consultant (at a company called

Optum), Rose Molitor ("Molitor"), and, after Bell explained the events to Molitor, Molitor determined that Hill must contact her and not be permitted to return to work until he had been evaluated by EAP.  Bell Dep., pp. 55, 148-154.

33.   On December 23, 2019, Hill attended a meeting with Craig and Bell (who participated by phone) and was told that he was to call Molitor (which Hill then did) and that he would be suspended with continued pay and benefits for review by EAP.  Hill Dep., pp. 175, 176, 179, 181.

34.   Because Hill was unhappy with the investigation done by Craig and Bell of his harassment allegations, on December 26, 2016, Delta's then Manager – Equal Opportunity Brian San Souci ("San Souci") emailed Hill and informed him that he was going to do a second investigation of his complaints of alleged "harassment."   Hill Dep., pp. 181, 182.

35.   At Hill's request, San Souci in conjunction with two others (EO Program Manager Pamela Kelly and TechOps HR Manager Terrence Jackson) interviewed 14 employees who Hill wrote to San Souci would support his "harassment" allegations.  Hill Dep., pp. 183, 192, 193; Exh. 9.

36.   As reported in San Souci's February 17, 2017 9-page investigation memo, in mid-January 2017 interviews, none of the 14 employees identified by Hill supported Hill's complaints.  Hill Dep., Exh. 9.

37.  Interviewee AMT David Brock stated (1) he was concerned about Hill's wife but that he personally feared Hill (2) Hill had made the shop uncomfortable talking openly talking about his collection of firearms when Hill does not hunt and (3) Hill had recently told employees that he successfully completed an eight-month process to obtain silencers for his guns (and Hill admitted purchasing a silencer when he did not hunt and claimed it was "just a whim").  Hill Dep. p. 149, Exh. 9, pp. 4, 5.

38.  Interviewee AMT Charles Flowe stated that (1) he was concerned about Hill's mindset because of Hill's accusations that Buice was out to get him and (2) Hill had been vocal in the workplace about owning guns.  Hill Dep. pp. 147, 148, 149; Exh. 9, p. 3; Delta Deposition under Rule 30(b)(6) (with Bell as Rule 30(b)(6) witness) hereinafter "Rule 30(b)(6), Dep.", attached to the accompanying brief as Exhibit "F", Exh. 145, p. 2-3.

39.  Interviewee AMT Paul Rosenstein reported that (1) he had witnessed Hill become overly aggressive towards another employee (2) Hill had become aggressive and his temper "can rise from 0 to 100 in a matter of seconds" and (3) most of the AMTs try to avoid Hill as much as possible.  Rule 30(b)(6) Dep., Exh. 145, pp. 2-3.

12

40.   In January 2017, after Molitor told Bell that EAP was likely to clear Hill to return to work in a couple of days, Bell informed Molitor that there had been new concerns raised in the San Souci-led investigation of Hill's complaints that Bell wanted EAP to review, and, as a result, Molitor made the decision for EAP to revoke the return to work process at that time and stated, "I need to see the document [of the results of that investigation]," which was later sent to Molitor. Bell Dep., pp. 157-160; Rule 30(b)(6) Dep., pp. 100-101.

41.   After EAP later concluded that Hill could return to work with a recommendation that he be moved to another department in order to give him a "clean start," in April 2017, Hill was returned to work in his same title, pay and benefits, and with same shifts and off days in another Department.  Hill Dep., pp. 209, 210; Deposition of David Craig ("Craig Dep."), attached to the accompanying brief as Exhibit "G", pp. 85-86; Bell Dep., pp. 169, 170; Rule 30(b)(6) Dep., pp. 104, 105.

42.   Delta considered Hill's transfer to another Department as an AMT using his exact same skill set (essentially doing the same AMT work but in the hangar instead of in the shop) (1) to be a "fresh start" for Hill (considering that he had complained repeatedly about working in his old department and even stated he did not want to have to interact at all with one of his Lead AMTs - Buice); and (2) in

the interests of the employees of his previous department as several had expressed fear about working with him.  Craig Dep. pp. 85-86; Bell Dep., pp. 169, 170.

43.   While Hill alleges that there have been less overtime opportunities in his new department, he admits that there have been overtime opportunities both in Atlanta and on special short-term assignments at other locations (where he can fly to on Delta for free) and that he has always declined those opportunities since April 2017.  Hill Dep., pp. 25-26.

44.   While Hill complains that he did not seek overtime in his new department for his first few months there because of his wife's primary cancer treatments, he has not ever taken an overtime opportunity in his transferee department since September 2017 when his wife's primary treatments were concluded.  Hill Dep., pp. 25-26, 70, 71.

45.   Hill received a team journal entry from his new manager in his transferee department on June 22, 2017 (stating that supervision had been unable to locate him on a shift and that "it was imperative that you understand the importance to complete each assignment quickly and be ready to move onto the next task") and that team journal entry was removed in July 2017 after Hill filed an internal grievance challenging it.  Hill Dep., pp. 212, 213, 214, Exh. 13.

46. In 2017, Hill claimed he received "undue surveillance" based solely on a co-worker statement to him, but he admits that (1) the co-worker (who worked in another area) would have had no personal knowledge of any such surveillance; and (2) when HR asked Hill who this co-worker was, Hill would not identify him or her to HR.  Hill Dep. pp. 215, 216, 217.

47. In recommending that Hill be returned to work in a different department in 2017, EAP (Optum) also determined that Hill should continue therapy with the EAP therapist for a period of a year after his return to work.  Rule 30(b)(6) Dep., pp. 114, 115.

s/Thomas J. Munger
Georgia Bar No.  529609

s/Benjamin A. Stone
Georgia Bar No. 683850

MUNGER & STONE LLP
999 Peachtree Street, NE
Suite 2850
Atlanta, GA 30309
Tel: (404) 815-1884
Fax: (404) 815-4687
tom.munger@mungerandstone.com
ben.stone@mungerandstone.com

Attorneys for Defendant

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**VINCENT MARK HILL,**

     **Plaintiff,**

**vs.**

**DELTA AIR LINES, INC.,**

     **Defendant.**

Civil Action No. 1:18-CV-5589-JPB-WEJ

## CERTIFICATE OF SERVICE

This is to certify that I have this 12th day of February, 2020 filed the foregoing DEFENDANT DELTA AIR LINES, INC.'S STATEMENT OF UNDISPUTED FACTS such that it would be served by email from Pacer on Plaintiff's counsel D. Brandon Hornsby, Esq. and Amelia Dallas Grubbs, Esq.


s/Thomas J. Munger
Georgia Bar No. 529609