UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **VINCENT MARK HILL,** | |
| **Plaintiff,** | |
| **vs.** | **Civil Action No. 1:18-CV-5589-CAP-WEJ** |
| **DELTA AIR LINES, INC.,** | |
| **Defendant.** | |

**DEFENDANT DELTA AIR LINES, INC.'S**
**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Plaintiff Vincent Mark Hill ("Hill") is employed by Defendant Delta Air Lines, Inc. ("Delta") as an aircraft mechanic in Atlanta.  In the fall of 2016, he complained to Delta about three very minor incidents involving two employees that caused him no adverse impact whatsoever.   Hill not only claimed that these three incidents amounted to harassment but, without submitting evidence or even logic to support his assertion, he also claimed these three events were somehow caused by his wife's recent diagnosis of breast cancer.  Delta investigated his allegations and found them to be without merit.

During this same time frame, several employees (including a friend of Hill's and employees who were not alleged to have engaged in any wrongdoing by Hill) reported to management that Hill had recently engaged in concerning conduct in the workplace.  Hill then displayed similar, concerning behavior in a meeting with an HR Manager, and the next day sent an email to 18 people (including Delta's CEO) asserting that his situation was analogous to the situation of a Delta employee who had committed suicide years earlier.  Delta immediately contacted its outside Employee Assistance Program ("EAP") and reported the concerns.  The EAP consultant concluded that Hill should be required to contact EAP and not be returned to work until he had been assessed.  Delta followed this recommendation and kept Hill on the payroll during all of his EAP leave.  After EAP recommended that Hill could be returned to work and that he be transferred to a different work group, Delta followed those recommendations.  Thus, since August 2017, he has worked as an AMT in another department with the same hourly rate and benefits.

Hill filed this lawsuit alleging that Delta in two ways violated the Americans With Disabilities Act ("ADA").  First, he alleges that Delta's referral of him to EAP evaluation and counseling was an unlawful medical exam under the ADA and undertaken because Delta regarded him as having a non-transitory mental

impairment.  Both the controlling law and the undisputed facts establish that this claim easily fails as a matter of law.

Second, he alleges that his April 2017 lateral transfer was in retaliation for his "harassment" complaints against the two employees months earlier.  The notion that his reports about the two employees are "close enough" to unlawful ADA harassment to amount to protected conduct under the ADA is so weak as to be frivolous.  Moreover, Hill's lateral transfer was not an actionable adverse action.  And the undisputed facts establish that Delta laterally transferred him because of the concerns that both he and his co-workers expressed about him working in his previous department and the transfer recommendation of the third-party EAP consultant.

Accordingly, Delta moves for summary judgment and respectfully requests that the Court dismiss this lawsuit.[1]

---

[1] It is Delta's position that Hill's legal claims in this lawsuit are not only subject to dismissal as a matter of law, but that they are frivolous.  However, Delta does not address that issue in this motion.

## II.  <u>SUMMARY UNDISPUTED FACTS</u>[2]

In 2016, Hill was employed by Delta as a safety-sensitive commercial Aviation Maintenance Technician ("mechanic" or "AMT") in Atlanta.  SOUF, ¶¶ 1, 2, 3.  His reporting structure was to a group of Lead AMTs to Manager Dennis Lindsay ("Lindsay") to General Manager David Craig ("Craig").  SOUF, ¶¶ 1, 2.

In November and December 2016, Hill complained to Craig, Lindsay and HR manager Nicole Bell ("Bell") about three events involving either Lead AMTs Mike Buice ("Buice") or Nathan Warren ("Warren").  SOUF, ¶ 4.

First, he complained that, after he missed a 12-hour scheduled work shift on October 21, 2016, Buice followed the normal Lead AMT process in such circumstances and applied 12 hours of Hill's paid vacation bank to Hill's missed 12-hour shift.  SOUF, ¶¶ 5-8.  By so doing, Buice prevented Hill from having his pay docked for missing his shift.  Id.  Hill complained because he stated that he had reached what he called  an "extraordinary" verbal agreement (that Buice indisputably did not know about at the time) with a different Lead AMT -- Dave Farmer ("Farmer") -- that, if he missed work in that time period, he could make up a missed shift by working a future unscheduled shift.  Id.  Upon learning this fact,

---

[2] A somewhat more detailed statement of undisputed facts is contained within Delta's Statement Of Undisputed Facts ("SOUF") filed concurrently herewith and citations to facts in this brief will cite to the SOUF Paragraph number(s).

Delta told Hill that he could choose to work the shift rather than use his vacation --
but Hill chose not to follow that option and thus chose to have the missed shift
treated exactly as Buice had treated it (paid by application of vacation hours).  Id.
Nonetheless, Hill told Delta that he wanted Lindsay to direct Lead AMT Buice that
he could have no further contact with him.  Shortly thereafter, Hill wrote Delta, "I
don't want Mike Buice to interact with me at all."  SOUF, ¶ 9.

Second, Hill complained that, on November 14, 2016, when he should have
been working but was instead having a personal conversation with another
employee in a tool room, Buice instructed him to get back to work (or back to his
part).  SOUF, ¶ 10-13.  Buice told other AMTs who were not in their work areas to
do the same thing.  SOUF, ¶ 10.  Rather than go back to work, Hill admittedly
stood around for at least another ten minutes and then approached Buice at Buice's
desk and accused Buice of harassing him by asking him to get back to work.
SOUF, ¶ 11-12.  Buice held up his open palm as if to ask Hill to calm down, before
Hill inexplicably claimed that he felt threatened and walked off (again not to go
back to work).  Id.  A nearby AMT (Mark Sloan) reported to Delta that Hill was
erratic and the aggressor in this incident, and Hill admitted that Sloan was "pretty
objective in the situation."  SOUF, ¶14.

Finally, on December 2, 2016, Hill complained that, after he walked out of his work area with a garbage bag full of items to take to his car that day (in a manner that he admitted could cause suspicion), a Lead AMT told him that another Lead AMT (who Hill believed was Buice or Warren) had asked whether or not Hill had engaged in theft.  SOUF, ¶¶ 17, 18, 19.  Nothing whatsoever happened to Hill because of this alleged, logical question from a Lead AMT.  SOUF, ¶ 20.

While these three alleged events over a three-month period could not have been more inconsequential, Hill irrationally alleged that these three incidents alone amounted to harassment by Buice or Warren of him because of his wife's recent diagnosis of breast cancer.  SOUF, ¶ 4.  He at no time presented any evidence to support the facially illogical claim that these incidents occurred because his wife had cancer.  Nonetheless, Craig and Bell investigated his harassment claims and understandably found them to be without merit.  SOUF, ¶ 20.

During this same time period, Delta employees raised concerns about Hill's statements and conduct in the workplace since his wife's diagnosis.  SOUF. ¶ 21.  Sloan reported that Hill had been extremely upset and that Sloan was worried that Hill may do harm to himself or others.  SOUF, ¶ 22.  Sloan also reported that, because of Hill's recent behavior, a number of employees (including himself) did not want to be around Hill.  Id.

6

On November 15, 2016, Lead AMT Warren reported to Lindsay (*before* the grey garbage bag incident which is the only one of the three Hill-reported incidents that even remotely involved Warren) that Hill had stated the day before:

> You need to know that I am off the chain! . . . I am off the chain!!!
> You know what that means don't you?  I am watching you!  I am
> going to get you and Buice!  THE CHAINS ARE OFF!

SOUF, ¶ 15.  Warren reported to Lindsay that he believed that Hill was "very volatile" and under more stress than he could handle, and raised the issue of Hill obtaining services from Delta's Employee Assistance Program ("EAP").  SOUF, ¶ 16.

On November 21, 2016, Lead AMT Farmer (who was and remains a friend of Hill's) reported to Lindsay in part that (1) Hill's wife's diagnosis had "brought [Hill] an enormous amount of stress" (2) Hill had been "lashing out" at the leads and the department (3) Hill needed a "fresh start" in another department (4) Farmer was "very concerned that this may escalate into a bigger issue if it goes ignored" and (5) "we cannot ignore such actions that may escalate to workplace violence." SOUF, ¶ 23.

On December 20, 2016, Farmer reported to Lindsay in part that (1) Hill had come to him "very upset" about the distribution of overtime and (2) other employees reported to Farmer that Hill had been stating "Mother-Fuck Delta,"

7

"Mother-Fuck the leads," and "Mother-Fuck the upper management and I am gonna stick this up their asses."  SOUF, ¶ 24.  Hill's friend Farmer again wrote to Delta that "I feel action must be taken."  SOUF, ¶ 25.

On December 21, 2016, Craig and Bell had a meeting with Hill to inform him of the findings in their investigation of the three incidents addressed above.  SOUF, ¶ 26.  After this meeting, Bell reported to her HR supervisor, Lisa Abraham Brown, that Hill had acted irrationally at the meeting and that, especially considering that Hill was in a safety-sensitive airline mechanic job, she was concerned about his behavior.  SOUF, ¶¶ 26, 27.

Bell reported that, during the meeting, Hill (1) became emotional and angry (2) clenched his fists and became red-faced (3) then "directly after that [angry] reaction he would start to laugh, which was, again, concerning [with him] being in a safety-sensitive position" (4) would purport to repeat back what Bell or Craig had just said but he would state something different than what was just said and (5) repeatedly switched back and forth from laughing to showing anger.  SOUF, ¶ 27.

The next day Hill wrote a lengthy email to 18 individuals, including Bell, Craig and Delta's CEO.  SOUF, ¶ 28.  He wrote that he felt that he was in a "very surreal irrational environment."  Id.  He repeatedly wrote that he viewed his circumstances as similar to the circumstances that led a Delta employee [whose

name is omitted here to protect his privacy] to commit suicide.  SOUF, ¶¶ 28, 29, 30.  At his deposition, Hill testified that he raised this employee's suicide as comparable to it to his situation at the time because, "there are people who are frail or maybe mentally ill, and we don't know it.  We don't know what they will do." SOUF, ¶ 31.

After Bell reported the above events, Bell's supervisors told her to contact Delta's outside EAP provider (a company called Optum) and relate the situation regarding Hill.  Bell then called Rose Molitor at Optum.  SOUF, ¶ 32.  Molitor told Bell that Hill must contact her and should not be permitted to return to work until he had been evaluated by EAP.  Id.  Thus, on December 23, 2016, Hill was told he must contact Molitor (which he did) and that he would remain out of work on full pay and benefits during EAP's review.  SOUF, ¶ 33.

Because Hill had so complained about the investigation of his harassment claim by Craig and Bell, while Hill was on full-pay EAP referral leave, Delta's Equal Opportunity ("EO") department conducted another investigation of Hill's complaints of alleged harassment ("EO investigation").  SOUF, ¶ 36.  As part of this EO investigation, Hill identified 14 employees who he claimed would support his harassment allegations.  SOUF, ¶¶ 35, 36.  Delta's EO Department talked to all of these 14 employees, and none of them supported Hill's allegations.  SOUF, ¶ 36.

However, some of the interviewed employees raised additional concerns about Hill's recent behavior in the workplace.  SOUF, ¶¶ 37-39.  For example, AMT David Brock stated that he feared Hill and that Hill had made the shop uncomfortable by openly talking about his guns and his recent purchase of a silencer for his guns when Hill did not hunt.  SOUF, ¶ 37.  Hill testified on deposition he bought the silencer on a whim.  SOUF, ¶ 37.  AMT Charles Flowe echoed these same concerns.  SOUF, ¶ 38.  AMT Paul Rosenstein reported that he had seen Hill acting overly aggressive towards another employee and that he saw Hill's temper "rise from 0 to 100 in a matter of seconds."  SOUF, ¶ 39.

After Molitor told Bell that EAP was moving towards concluding that Hill could return to work, Bell informed her of the EO investigation and some of the additional concerns, and Molitor made the determination to revoke the return to work process until EAP could review the results of these interviews.  SOUF, ¶ 40.

EAP ultimately concluded that, with a recommendation that he be assigned to another department (so he could have a "clean start") and a determination that he should receive additional counseling from the EAP counselor, Hill could return to work.  SOUF, ¶¶ 41, 47.  Thus, in April 2017, Hill was returned to an AMT position in another department (doing the same tasks but in the hangar instead of the shop) with the same skill sets, shifts, title, pay and benefits as his previous

AMT position.  SOUF, ¶¶ 41, 42.  Thus, at no time did Hill lose any base pay or benefits and remains in that position today.  SOUF, ¶¶ 33, 41.[3]

## III.   ARGUMENT

### A.   Hill's Count One ADA "Regarded As" Disabled/Unlawful Medical Exam Claim Fails As A Matter Of Law.

In his first ADA Count, Hill alleges that Delta's December 23, 2016 referral of him to EAP with continued full pay (1) was made because Delta regarded him as being disabled and (2) amounted to "undue medical tests and exams" on account of his alleged perceived disability.  Dkt. 1, ¶¶ 142-150.

Under the ADA, a plaintiff can show he was wrongly regarded as disabled, if he "establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment" that is not "transitory."  42 U.S.C. §12102(3)(A) and (B).  "A transitory impairment is an impairment with an actual or expected duration of 6 months or less."  42 U.S.C. §12102(3)(B).

---

[3] As addressed below, Hill alleges that there was less opportunity to work overtime in his new department, but that allegation is immaterial as he admits he has not taken any of the opportunities to work overtime in his new department since he started there almost three years ago.  SOUF, ¶¶ 43, 44.

The ADA also states: "A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A)

This Court has stated that an employer shows that such a medical exam is proper if (1) there was an objective, legitimate reason to question the employee's capacity to perform his duties, (2) a medical examination was required to determine whether the plaintiff could perform job-related duties, and (3) the examination requested was a "'reasonably effective method' of resolving [or] achieving the employer's asserted business necessity." Owusu-Ansah v. Coca-Cola Co., 2011 U.S. Dist. LEXIS 160029 * 19 (N.D. Ga. June 17, 2011)(MJ Johnson), adopted, 2011 U.S. Dist. LEXIS 160028 (N.D. Ga. July 8, 2011), affirmed with opinion, 715 F.3d 1306 (11th Cir. 2013)(citations omitted).

All of the applicable cases in this Circuit establish that Delta did not regard Hill as being disabled and met the ADA standard for an EAP evaluation as a matter of law.  Owusu-Ansah, supra (discussed below); Watson v. City of Miami Beach, 177 F.3d 932 (11th Cir. 1999)(dismissing

regarded as disabled claim where employee was referred to psychological

medical exam  - without first getting medical recommendation - because,

while no threat was made, supervisor believed that the plaintiff had

displayed defensive and antagonistic behavior and overreacted to situations,

nurse had reported that she found plaintiff to be rude to her, and other

employees reported plaintiff as lately being unusual, oppositional, difficult

to interact with and suspicious); Copeland v. MARTA, 2010 U.S. Dist.

LEXIS 149401 (N.D. Ga. Oct. 8, 2010)(dismissing regarded as disabled

claim where manager – again without medical recommendation first –

required plaintiff to undergo psychological evaluation because, since the

death of plaintiff's father, she had been observed as being withdrawn and

grieving and reported to have exhibited odd and potentially dangerous

behavior; holding insufficient evidence of a conclusion of a mental

impairment and separately holding that any impairment was at most

temporary and likely related to father's death); Adkison v. Willis, 214 F.

Supp. 3d 1190 (N.D. Ala. Sept. 30, 2016)(dismissing regarded as disabled

claim where employer required medical examination because of reports of

plaintiff "acting different" and in an antagonistic way); Morgan v. County

Commission of Lawrence County, 2016 U.S. Dist. LEXIS 80281 ** 81-82

(N.D. Ala. June 20, 2016)(dismissing regarded as disabled claim where supervisor concluded that plaintiff was "crazy" and had a "mental problem" as there was no evidence that "those remarks pertained to any *cognitive* or *intellectual* deficiency.")(emphasis in original); Rodriguez v. Sch. Bd., 60 F. Supp. 3d 1273 (M.D. Fla. 2014)(dismissing ADA claim by teacher who was required to undergo psychiatric evaluation after she told principal she was having problems with custodian and that she had previously considered suicide); Snider v. U.S. Steel-Fairfield Works Med. Dep't, 25 F. Supp. 3d 1361 (N.D. Ala. June 10, 2014)(dismissing regarded as disabled claim where plaintiff, while dealing with illness of family member, made concerning statements and was placed on EAP leave for under 6 months before returning to work – any possible perceived mental impairment had to be transitory as employer returned plaintiff to work less than 6 months after EAP referral); Mickens v. Polk County School Board, 430 F.2d 1265 (M.D. Fla. 2007)(employer's characterization of plaintiff as "really upset," "volatile," "agitated," "irrational," "angry," "threatening," "unpredictable," and testimony that plaintiff had exhibited "uncharacteristic behavior," and a tendency to "fly off the handle" insufficient to support ADA claim of perceived mental impairment ADA).

In Owusu-Ansah, unlike Hill, the plaintiff did not have a safety-sensitive job (he was a customer service employee who normally telecommuted as opposed to an FAA safety-sensitive commercial aircraft mechanic) and, unlike Hill, he was referred to EAP because of only one statement he was reported to have made -- at a meeting with his manager, he raised several incidents of what he considered to be workplace mistreatment of him, became agitated, and banged his fist on the table and stated that someone "was going to pay for this."[4]   Like Hill, the plaintiff was placed on a paid EAP leave and, like Hill, after a psychologist concluded that the plaintiff could return to work, the employer returned him to work about four months after his EAP referral.

In an R&R, this Magistrate Judge recommended summary judgment on the plaintiff's ADA unlawful medical exam claim, citing Watson and other similar decisions holding that an employer lawfully required such examinations.  See e.g. Leach v. Mansfield, 2009 U.S. Dist. LEXIS 89574 * 4 (S.D. Tex. Sep. 28, 2009)(requiring psychiatric examination and certification of ability to return to

---

[4] In Oliver v. TECO Energy, Inc., 2013 U.S. Dist. LEXIS 180372 * 23 (M.D. Fla. Dec. 26, 2013), the court found that the plaintiff's statement in Owusu-Ansah was only a "generalized threat" in contrast to the specific threat in that case.

work of employee who complained of emotional reaction from work stress and sent increasingly aggressive emails to other employees). Id. at * 20.

The R&R then stated that "the law is clear that employers do not have to wait until an employee's job performance suffers, or a perceived threat results in injuries before requiring the employee undergo a fitness for duty examination." Id. at * 21.[5]

The R&R also considered that the employer contacted EAP before the EAP referral (which Delta did here), allowed EAP to opine if the employee was fit to return to work (which Delta did here), and that the employee was returned to work after the EAP provider advised that the employee could return to work (as Delta did here with an EAP recommendation that he return in another department). Id. at ** 24, 25.

The R&R rejected the plaintiff's argument that he denied making the "someone will pay for this" statement. That denial was legally irrelevant as the

---

[5] For this assertion, the R&R cited Watson and other cases. See e.g. Cody v. CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 599 (8th Cir. 1998)("Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims . . ."); Fritsch v. City of Chula Vista, 2000 U.S. Dist. LEXIS 14820 (S.D. Cal. Feb. 22, 2000)("In today's climate of workplace violence, an employer need not wait for the sound of gunfire to institute a preliminary investigation into the mental stability of an employee.").

decision-maker reasonably believed that he had made the statement.  Elrod v. Sears

Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).  Id. at * 22.  The Magistrate

Judge also rejected plaintiff's argument that his lack of past discipline or positive

job performance reviews rebutted the employer's legitimate concern.  Id. at * 24.

   After the District Court adopted the R&R, the Eleventh Circuit affirmed.

The court held that the employer had a business necessity for the mandatory

referral because it had "information suggesting that an employee is unstable and

may pose a danger to others."  715 F.3d at 1312.  The court rejected the plaintiff's

argument that the employer was required to show evidence that he was a "direct

threat" as that term is used and defined in the ADA ("a significant risk to the health

or safety of others.")  Id. at 1312.  The court restated that the employer had reason

to act based on the fact that the employee was "under emotional distress and was

exhibiting signs of mental instability."  Id.  The court also noted that an employee's

ability to handle reasonably necessary stress and work reasonably well with others

are essential functions of every position and that and employee who cannot do so is

not "otherwise qualified" under the ADA.  Id.

   Here, the undisputed facts are even more compelling for summary judgment

than the numerous cases cited above.  Unlike some of the plaintiffs in those cases,

Hill was in a safety-sensitive position.  Unlike most the cases cited above, Hill

made a direct and overt threat to get Buice and Warren when he stated "I am going to get you and Buice!  THE CHAINS ARE OFF!"   Unlike some of the cases cited above, the EAP referral was not based on one statement, a generalized concern, or simply vague reports by others.  Several employees -- including Hill's good friend Farmer -- reported concerns based on specific events such as his aggression toward Lead AMTs, his sudden focus on guns and buying a silencer, his claim that the chains were off, etc.  HR Manager Bell reported Hill's concerning and aberrant behavior at the December 22, 2016 meeting.  And *Hill himself* at least implied in a blast e-mail to Delta leaders including its CEO that his situation was such that he believed that his suicide should not be a surprise.  His claims that three of the most minor of incidents amounted to cause for suicide alone triggered reasonable concern.  Hill also acknowledged his own disorientation and emotional stress to Delta.  Delta's actions were not only legitimate as a matter of law, but (as Hill's friend Farmer urged) it would have been irresponsible if Delta had simply ignored all these actions by an individual who is responsible for repairing and maintaining commercial aircraft.

Moreover, even if Delta had concluded that Hill had a mental impairment (and there is no such evidence), it could only have concluded that the impairment was transitory (e.g., likely caused by his adjustment to his wife's diagnosis) and

thus could not support a regarded as disabled claim in any event.  As noted above,

Hill was returned to work (in a safety-sensitive job) within much less than six-

months as occurred in <u>Snider</u>.

Delta not only met its obligations to safety, but it showed compassion for

Hill by protecting his pay status and benefits and returning him to work when EAP

recommended he could do so in another work group.  "No good deed goes

unpunished" is not a basis for an ADA claim.

### B.  Hill's Count Two ADA Retaliation Claim Fails As A Matter Of Law.

In Count Two, Hill claims that Delta retaliated against him for ADA-

protected conduct in violation of the anti-retaliation provision of the ADA.

To establish a *prima facie* case of retaliation, Hill must show (1) that he

engaged in protected activity, (2) that he suffered a material adverse action, and (3)

that a causal connection existed between the activity and the adverse action.

<u>Buchanan v. Delta Air Lines, Inc</u>., 2018 U.S. App. LEXIS 9094 (11th Cir. Apr. 9,

2018); <u>Luke Bd. of Trs. Fla A&M Univ</u>., 674 Fed. Appx. 847, 851 (11th Cir. Dec.

22, 2016).  Hill cannot meet any of these the ADA *prima facie* requirements.

With respect to a claim of protected activity based as here on an internal

complaint(s), "it must satisfy two requirements:  (1) notice to the employer that the

employee opposed a practice made unlawful by [the ADA], and (2) the complaint

must have been based on a 'good faith, reasonable belief' that the employer engaged in unlawful discrimination." Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999); Kelly v. Dun & Bradstreet, Inc., 2014 U.S. Dist. LEXIS 198480 * 5 (N.D. Ga. Sept. 12, 2014)(MJ Johnson).

With respect to the second requirement, an employee "must show that he both 'subjectively believed that [his employer] engaged in unlawful discrimination and that his belief was objectively reasonable in light of the facts and record present.'" Kelly, at * 6 (citation omitted). "Where the conduct opposed is not actually unlawful, the conduct must be 'close enough' to unlawful conduct." Id. (citing Clover at 1351).

To determine whether the conduct is "close enough" to unlawful discrimination to be protected activity, "it is measured against existing substantive law." Clover at 1351 (11th Cir. 1999). Thus, the plaintiff "is charged with knowledge of what [the ADA] does nor does not prohibit." Id.

In the Fact section of his Complaint, Hill alleges that his protected conduct was his internal hostile work environment harassment complaints that he made in November and December 2016 culminating in the December 22, 2016 email where he equated his situation to another employee's suicide. Dkt. 1, p. 7 (heading), ¶¶ 23, 33, 35, 135.

The only incidents that he asserts to support this claim of harassment are (1) that Buice pay protected him when he missed a shift by applying his vacation – the very action Hill preferred and ultimately chose and (2) that Buice or Warren asked whether he had committed theft when he admittedly suspiciously walked out of the shop to his car with then unidentified items in a garbage bag – an incident that he admits led to no action whatsoever against him.  Dkt. 1, ¶¶ 24, 28, 29, 34, 35.[6]

Under the existing substantive law, a complaint of harassment under the ADA (or any similar law) requires a showing of conduct by the employer that is "sufficiently severe or pervasive to alter the terms and conditions of employment." Gupta v. Florida Bd. of Regents, 212 F.3d 571, 582-83 (11th Cir. 2000).  "Conduct must be extreme to amount to a change in the terms and conditions of employment."  Id.  That the three alleged incidents are not close enough to severe or pervasive harassment under the law is self-obvious.  That there is no factual basis for any allegation that any "harassment" was caused by his wife's health is also self-obvious.[7]  There was no protected conduct as a matter of law.

---

[6] In his Complaint, Hill did not even reference the incident where Buice told him to go back to work, but Delta addresses it here as it was included in his emails to Delta as alleged "harassment."

[7] In his retaliation Count, while he never uses the term "protected conduct," Hill appears to allege that his protected conduct was his "opposition to Defendant's failure to return him to work and failure to prevent harassment from leads in his

Moreover, Hill's retaliation Count alleges no material adverse action ("MAA") necessary to meet the second *prima facie* requirement of an ADA retaliation claim.  An MAA is one that might dissuade a reasonable worker from making or supporting a charge of discrimination.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

Hill primarily alleges that his lateral transfer was an MAA.  Dkt. 1, ¶ 152. However, such a lateral transfer is not an MAA.  Martin v. Eli Lilly, & Co., 702 Fes. Appx. 952, 958 (11ᵗʰ Cir. July 21, 2017); Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1448-49 (11ᵗʰ Cir. 1998).[8]

Hill next alleges that a June 2017 "write up" he received in his new department amounted to an MAA.  Dkt. 1, ¶ 157.   However, his "write up" then and later had no adverse impact on him whatsoever and was just a team journal entry.  SOUF, ¶ 45.  Such a write up is not an MAA as a matter of law.  Bush v. Regis Corp., 257 Fed. Appx. 219, 222 (11th Cir. 2007)(written warnings for

---

department . . ."  Dkt. 1, ¶ 154.  This general allegation adds nothing to his claim because his opposition to his EAP referral was based on a claim that his referral was because of his alleged protected conduct of making harassment complaints that were nowhere near to being close enough to unlawful harassment.

[8] While Hill claims that he could have worked more overtime in his old department, *he has chosen to turn down all of his overtime opportunities in his transferee department since April 2017.*  SOUF, ¶¶ 43, 44.

leaving shift without permission and for confrontation with customer not sufficient to be a material adverse action in retaliation claim); <u>Martin</u>, at 956 (11th Cir. July 21, 2007)(negative written comment not actionable in retaliation claim where it did not trigger any more tangible form of adverse loss in benefits, ineligibility for promotion, or more formal discipline)(citations omitted).  Moreover, after Hill received his write up, he grieved it internally and his write-up was then rescinded such that it had no adverse impact on him.  Thus, it was not an MAA for that independent reason.  <u>Martin</u>, at 958 (citing <u>Pennington v. City of Huntsville</u>, 261 F.3d 1262, 1267 (11th Cir. 2001).

Hill's other alleged MAAs also fail as a matter of law.[9]

---

[9] Hill alleges that Delta retaliated against him by making false allegations and sending document to the EEOC that dated back from 2003.  Dkt. 1, ¶¶ 158, 159.  Aside from the fact that Delta's defense of Hill's Charge could not be an MAA, an employer's statements to the EEOC are absolutely privileged and cannot be actionable.  <u>Mack v. Delta Air Lines, Inc</u>., 2014 U.S. Dist. LEXIS 196883 ** 29-30 (N.D. Ga. Nov. 26, 2014)(letter to the EEOC from the employer alleging the plaintiff accusing her of fraud is not a material adverse action).  Finally, Hill alleges that he suffered a retaliatory MAA because he claims that Delta's investigations of his harassment allegations were a sham. Dkt., 1, ¶ 160.  Aside from the fact that the undisputed evidence shows that it conducted two investigations that, in total, were overly thorough in light of his incredibly minor complaints, even an employer's refusal to investigate an employee's complaint or claim is not actionable.  <u>Etrekin v. City of Panama City, Fla.</u>, 376 Fed. Appx. 987, 995 (11th Cir. 2010). <u>See</u> <u>also</u> <u>Carbrera v. Town of Lady Lake</u>, 2013 U.S. Dist. LEXIS 201324 * 49 (M.D. Fla. March 28, 2013).

Hill also cannot meet the third causation prong of a retaliation claim. His transfer was 3-4 months after his harassment complaints -- and he identifies no other evidence of a "causal connection." Cazeula v. Wells Fargo Bank, 2014 U.S. Dist. LEXIS 186562 (N.D. Ga. May 29, 2014)(3-4 months between alleged protected conduct and adverse action insufficient to show temporal proximity).

Further, even where temporal proximity is shown, the inference of causation created by close temporal proximity may be negated by intervening events and sever any possible causal connection finding. Cazeau, at ** 54, 58; Holland v. Web.com Group, Inc., 2015 U.S. Dist. LEXIS 191702 ** 47-48 (N.D. Ga. April 7, 2015). Here, the recommendation of EAP that he be transferred, the expressed concerns of employees of having him to return to his previous department and his own desire not to interact with Lead AMT Buice establish that there is no plausible causation argument.[10]

Finally, Delta has articulated its reasons for the transfer: the EAP recommendation, Hill's desire not to interact with Buice and unhappiness in his old department and the expressed concerns of employees in his old department.

---

[10] Hill's retaliation claim alleges that Delta may have only "in part" transferred him due to alleged protected conduct, but the law requires that he allege and show that "but for" the protected conduct, the material adverse action would not have occurred. Univ. of Tex. Sw. Med. Ctr., 133 Sc.t. 2517, 2528 (2013); Luke Bd. of Trs. Fla A&M Univ., 674 Fed. Appx. 847, 851 (11th Cir. Dec. 22, 2016).

(SOUF, ¶ 40).  Hill has no evidence to even suggest that these reasons are

pretextual.

      For all of these reasons, Delta respectfully requests that Hill's Complaint be

dismissed on summary judgment.

<div style="margin-left:40%">

s/Thomas J. Munger
Georgia Bar No.  529609

s/Benjamin A. Stone
Georgia Bar No. 683850

MUNGER & STONE LLP
999 Peachtree Street, NE
Suite 2850
Atlanta, GA 30309
Tel: (404) 815-1884
Fax: (404) 815-4687
tom.munger@mungerandstone.com
ben.stone@mungerandstone.com

Attorneys for Defendant

</div>

## <u>CERTIFICATE OF COMPLIANCE ON FONT</u>

Pursuant to Local Rule 7.1D of the Local Rules for the United States District Court for the Northern District of Georgia, I hereby certify that the foregoing pleading has been prepared in Times New Roman, 14-point font, as permitted by Local Rule 5.1B

<u>s/ Thomas J. Munger</u>
Georgia Bar No. 529609

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**VINCENT MARK HILL,**

      **Plaintiff,**

**vs.**                                      Civil Action No. 1:18-CV-
                                              5589-CAP-WEJ

**DELTA AIR LINES, INC.,**

      **Defendant.**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 12th day of February, 2019 filed the foregoing

DEFENDANT DELTA AIR LINES, INC.'S BRIEF IN SUPPORT OF MOTION

FOR SUMMARY JUDGMENT such that it will be served by Pacer on Plaintiff's

counsel D. Brandon Hornsby, Esq. and Amelia Dallas Grubbs, Esq.


          s/Thomas J. Munger
          Georgia Bar No. 529609