IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| VINCENT MARK HILL,<br><br>            Plaintiff,<br><br>    vs.<br><br>DELTA AIR LINES, INC.,<br><br>            Defendant. | Civil Action No.:<br>1:18-cv-05589-JPB-WEJ |

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On October 16, 2016, Plaintiff Vincent Mark Hill received the most devastating news of his life: his wife had been diagnosed with breast cancer. Hill immediately reported this to his Delta co-worker and lead David Farmer who, in turn, informed Delta leads Mike Buice and Nathan Warren. Knowing Hill was particularly vulnerable, Buice and Warren began harassing Hill. As Warren explained: "Now that Mark Hill's wife has cancer, I am going to double down and make his life miserable."

On November 7, 2016, Hill began complaining to Delta supervisors that Buice and Warren were unlawfully harassing him by (1) improperly deducting and withholding his vacation time and pay; (2) singling him out for a verbal reprimand and threatening gestures; and, (3) falsely accusing him of theft. Hill followed this with over 14 additional complaints about unlawful discrimination and retaliation between November 28, 2016 and April 27, 2017.

After hearing about his complaints, Delta subjected Hill to the following instances of retaliation:

- Removing Hill from Delta's premises under escort by corporate security during a shop evacuation, which destroyed Hill's personal and professional reputation;

- Suspending Hill, placing him on leave for four months and causing him to lose overtime pay opportunities;

- Forcing Hill to pay out of pocket for anger management treatment;

- Forcing Hill to pay out of pocket for part of his EAP treatment for over one year and four months;

- Transferring Hill to a new department where his opportunities for overtime were significantly less and causing him a loss in pay;

- Refusing to transfer Hill back to his old department (from Apr. 2017 until Apr. 2019) where he would have been able to work overtime for additional pay;

- Refusing to increase Hill's pay or provide him with the same overtime opportunities to make up the loss in pay;

- Subjecting Hill to undue surveillance of Hill after his return to work and instructing former coworkers to have no contact with Hill inside or outside of work; and,

- Forcing Hill to submit to Mandatory EAP including 50 psychotherapy sessions as a condition of continued employment after the EAP Psychologist refused to "trigger" him.[1]

Simply put, prior to his wife's cancer diagnosis, Hill had devoted his life to Delta during a successful 27-year career. However, once Hill disclosed his wife's cancer and complained about harassment – rather than stop the harassment – Delta embraced Hill's harassers and targeted Hill with an unconscionable pattern of discrimination and retaliation.

---

[1] See Plaintiff's Response to Defendant's Statement of Facts ("R-DSMF") and Plaintiff's Statement of Additional Material Facts

I.   **Hill has Satisfied his *Prima Facie* Cases**

A.   **Hill has Satisfied his *Prima Facie* Case for "Regarded As" ADAAA Discrimination**

Delta first contends Hill should be denied a trial because he cannot succeed on his ADAAA disability discrimination claim. Def.'s Br. at 11-19. This argument is without merit. To establish a *prima facie* disability discrimination case, Hill must establish that: (1) he is disabled; (2) he was a "qualified individual"; and, (3) he was unlawfully discriminated against because of his disability. <u>Mazzeo v. Color Resolutions Int'l, LLC</u>, 746 F.3d 1264, 1268 (11th Cir. 2014).[2]

**1. Hill was a "Qualified Individual" and Regarded as Disabled**

An individual qualifies as disabled if he is "regarded as having [a disabling] impairment." 42 U.S.C. § 12102(3)(A). To be "regarded as" having a disabling impairment, a plaintiff must establish that "he has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). An individual is regarded as disabled even if the employer "asserts, or may or does ultimately establish, a defense to such [prohibited] action." 29 C.F.R. § 1630.2(l)(2). Also, 29 C.F.R. § 1630.2(j)(2) states, "[w]hether an individual's impairment 'substantially limits' a major life activity is not relevant to coverage under [the "regarded as" prong] of this

_____

("PSMF") for a full recital of the facts.
[2] "The ADA defines the term 'disability' as (1) a physical or mental impairment that 'substantially limits one or more' of an individual's 'major life activities,' (2) a 'record of such an impairment,' or (3) 'being regarded as having such an impairment' as

section." 29 C.F.R. § 1630.2(j)(2). Further, a plaintiff need not prove he was disabled under the ADAAA to prevail on a "regarded as" ADA discrimination claim: whether an individual is regarded as having an impairment is "not subject to a functional test." See Saley v. Caney Fork, LLC, 886 F.Supp.2d 837, 851 (M.D. Tenn. 2012).[3]

As early as Nov. 15, 2016, Delta regarded Hill as having a mental health impairment (i.e. following his wife's cancer diagnosis). R-DSMF ¶ 16. Nicole Bell, Delta's lead HR investigator, testified that Delta recommended mandatory EAP because of concerns about Hill's mental health. R-DSMF ¶ 32. Bell explained that after Hill told her about his wife's cancer and that he was being subjected to discrimination and retaliation, he began clenching his fists, laughing inappropriately and switching back and forth between anger and laughter. Bell Depo 146-48. Bell testified that Hill's behaviors in her Dec. 21 meeting with Hill were objective manifestations that supported her conclusion that Hill needed to be referred to EAP to see a mental health therapist. R-DSMF ¶ 32. Lead AMT Warren also testified that he was concerned with Hill's "state of mind" and that:

> Hill] was so preoccupied and so upset [following his wife cancer diagnosis]. He was very, very upset. To the point I would think he's at the point and I'm not a doctor, but his blood pressure being risen and something, you know, like a **stroke or a heart attack.** […] I was afraid someone that upset could have a **heart attack or a stroke.**

described in subsection (1)." Id. (quoting 42 U.S.C. § 12102(1)). [3] Id. (finding employee to be regarded as having a disability and noted that an employee with hemochromatosis "may recover under the 'regarded as' prong in the absence of visible symptoms, or any symptoms at all"); see also Johnson v. Farmers Insurance Exchange, 2012 WL 95387, at *1-2 (W.D. Okla. Jan. 12, 2012) (rejecting def.'s argument that pl. was not regarded as having a disability because her sleep apnea did not substantially limit a major life activity).

PSMF ¶ 14 and R-DSMF ¶ 16. Mike Lashley also testified that employees were led to believe by management that Hill was suffering from a mental health disorder. <u>Id</u>. Lashley said he had "never seen another employee at Delta be walked out with security and during a shop evacuation" and that "it was highly unusual." <u>Id</u>. Lashley testified that "moving Mr. Hill to the hangar without regard to seniority was an unusual event." Lashley agreed that these events on Dec. 23, 2016, conditioned Hill's coworkers to believe he was mentally ill. <u>Id</u>.

Delta cites to <u>Morgan v. Cty. Comm'n of Lawrence Cty.</u>, 2016 WL 3525357 (N.D. Ala. June 20, 2016), arguing that that Delta did not regard Hill as disabled. But <u>Morgan</u> is distinguishable[4] because the evidence here shows that Delta referred Hill to EAP because Delta was concerned about his mental health and because its employees believed Hill was suffering from a mental impairment. PSMF ¶¶ 5, 13.

A reasonable juror could find that Delta perceived Hill to have a mental impairment because it was so concerned about his mental stability that Delta evacuated Hill's area of work and escorted him off the premises by Delta security. PSMF ¶ 14. Indeed, this was such an extreme measure that Delta's ten-year employee Brian San Souci testified that he had **never** before heard of a shop evacuation during his time as an employee in HR or EO at Delta. <u>Id</u>. San Souci further explained that Hill had not broken any Delta policy to his knowledge

---

[4] In <u>Morgan</u>, the court stated that "[t]he Eleventh Circuit also has held that exhaustion and high blood pressure, **without more**, are not conditions that substantially impair a person's ability to perform major life activities, such as working <u>Id</u>. at *28 (emphasis added).

that would justify such an evacuation and removal: "I don't recall making a finding that there was any policy violation." PSMF ¶ 10. Also, Warren admitted that, during this time frame, the perception was that Hill was being investigated and not the other way around. PSMF ¶ 14. A reasonable juror could conclude that Hill was escorted out by security and his shop evacuated occurred during that same time because Delta regarded Hill as having a mental health impairment.

There is no evidence that Hill's ability to perform his essential job functions were impaired by a medical condition. He was not written up, nor was he found to have violated any Delta policy during the relevant time period (not to mention his pristine work record, awards and accolades and the compelling testimony of several Delta employees that Hill was an excellent employee who "never had any problems or issues.") PSMF ¶ 2. Thus, a reasonable jury could conclude that Hill was a "qualified individual" under the ADAAA satisfying the second element of his *prima facie* claim.

**2. Delta Discriminated When It Suspended and Sent Hill Out on EAP Leave, Had Security Walk Him Out and Evacuated His Shop**

A plaintiff may establish the third element of a *prima facie* disability discrimination claim by showing the employer took an adverse action because of the plaintiff's disability or "regarded as" disability. 42 U.S.C. § 12112(b)(1). The ADA does not require that you establish that the disability was the sole basis for the discrimination, simply that the disability was a determinative factor. Andrews v. City of Hartford, 700 F. App'x. 924, 926 (11th

Warren's concern that Hill may have a heart attack, or a stroke

Cir. 2017). "Moreover, the 'regarded as' analysis is separate from whether the employer can eventually establish a defense to the action[.]" Id. at 1275-76.[5]

A reasonable jury could find that Hill's perceived mental disability was a determinative factor in Delta's suspension of his employment and involuntary departmental transfer from the pattern of negative treatment Hill endured that was directly related to Delta's regarding him as disabled. Delta's own documents show that on Dec. 22, 2016, Craig's boss Mike McBride wrote about Hill in an email to Lisa Abraham Brown stating: "[W]e have **an unstable individual** who potentially poses a risk to our people and our operation." PSMF ¶ 5 (emphasis added).[6]

A reasonable jury could also find that Hill's perceived mental disability was a determinative factor because Delta communicated that Hill was suicidal – using the social stigma of mental illness – to portray Hill as mentally ill and to disregard his complaints of harassment, discrimination, and retaliation after he disclosed his wife's breast cancer diagnosis. R-DSMF ¶ 31. Delta's management, HR,

---

clearly demonstrates Delta regarded Hill as disabled.

[5] Accord Lewis v. City of Union City, Ga., 877 F.3d 1000, 1012 (11th Cir. 2017) (clarifying that for purposes of the "regarded as" disabled prong, an employer's defense to its adverse employment action, such as a safety concern, is a separate inquiry).

[6] McBride said in the same email, based on this perceived lack of instability, "my preference would be to have [Hill] removed from the workplace." Id. Bell's 12/23/16 email to Craig stated: "12/19/16, PLM, Dennis Lindsey stated he would no longer meet with Hill alone due to recent behavior and uncertainty of what he may do to him." PSMF ¶ 13. Also, San Souci's 2/17/17 EO Memo said Buice felt: "Mr. Hill's behavior has amplified 'like he is **going off the edge.**'" and "Hill's perceived **short fuse and unusual behavior**. . ." PSMF ¶ 23 and R-DSMF ¶ 36.

and EO perpetuated this stigma and these negative stereotypes, despite Hill being a high-performing AMT and not suicidal.

**B. Delta Discriminated and Retaliated by Subjecting Hill to an Continuing Involuntary Medical Exam for a Year and Four Months**

A reasonable jury could find that the medical exam Hill was subjected to was discriminatory and retaliatory.[7] Delta did not have a business necessity for sending Hill to EAP, as there is no evidence that Hill's ability to perform his essential job functions were impaired by a medical condition. Hill had not been written up, nor was he found to have violated any Delta policy during the relevant time period. PSMF ¶¶ 2, 10 13, 21 and R-DSMF ¶ 32.

Delta cites to Owusu-Ansah v. Coca-Cola Co., 715 F.3d 1306 (11th Cir. 2013), for its position that the medical examination was proper, but it is factually distinguishable.[8] Moreover, the Court in Owusu-Ansah held that the EEOC guidance providing that a "medical examination of an employee may be 'job-related and consistent with business necessity' **when an employer has a reasonable belief, based on objective evidence**, that (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition"

---

[7] The medical exam was retaliatory as it followed Hill's multiple complaints from 11/7/16 to 12/22/16 of harassment, discrimination, and retaliation, and within 24 hours of Hill's CEO Email.

[8] Prior to the meeting that triggered Coca-Cola Co.'s ("Coke") concerns about him, Owusu-Ansah had not made complaints, therefore, it was reasonable for Coke to be concerned about his level of agitation and alleged threat(s) during a meeting. Id. at 1309. Five days after the meeting, Coke asked if he would be willing to speak with a "consultant" and he **agreed** (but was not forced to). Id. The psychologist then recommended Coke place him out on EAP. Id.

was persuasive. Id. at 1312–13 (citing EEOC, Notice No. 915.002, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act ¶ 5, 2000 WL 33407181 (2000)). To be sure, [a] plaintiff

> is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000). However, according to the Court in Owusu-Anshah, Delta must show objective evidence prior to the decision to suspend and refer Hill to mandatory EAP, which it cannot do.

Here, Bell admitted to EAP Rep Molitor that Hill was not violent and had not made threats of violence ("denied EE has been violent in the workplace and denied EE has threatened anyone"), with EAP then refusing to "trigger" Hill. This destroys any argument Delta may have regarding having objective evidence. R-DSMF ¶ 32.[9] It's equally clear that Owusu-Ansah is distinguishable from this case because Hill made no threats of violence and Delta did not have **sufficient objective evidence** showing that he had been violent or made any threats (and therefore could not have considered him to pose a danger to others or potentially threaten the safety of other employees) when it triggered him for mandatory EAP. PSMF ¶ 10 and R-DSMF ¶ 32. There is also no

---

[9] Also, there are several conflicting statements written by Delta employees regarding incidents in Nov. and Dec. 2016 compared to San Souci's 2/17/17 EO Memo, that San Souci could not adequately explain

evidence that Hill's ability to perform his essential job functions were impaired by a medical condition. He was not written up, nor was he found to have violated any Delta policy during the relevant time period. PSMF ¶¶ 2, 10 13, 21 and R-DSMF ¶ 32.

Delta also cites to several other cases to support its claim that the involuntary medical exam Hill was subjected to was proper, but they are also distinguishable.[10] Every case Delta cites to on

---

during his deposition. R-DSMF ¶ 36 and PSMF ¶ 34.

[10] Watson v. City of Miami Beach, 177 F.3d 932 (11th Cir. 1999) is distinguishable due to the timing and order of events. Watson refused to participate in department wide, mandatory tuberculosis testing because he did not want to disclose his HIV status and so the nurse recommended a FFD. The investigation into Watson had already started when this happened, as Watson had been "unusually defensive and antagonistic . . . towards his co-workers and supervisors." Id. at 934. The investigation revealed 10 internal affairs complaints and 11 incidents during the last three years, including disciplinary action. Id. at 934. However, Hill did not violate any Delta policy, made no threats and was not insubordinate; Delta triggered Hill, not the EAP or a psychologist; and Hill was kept out of work for four months, not eight days. PSMF ¶ 2, 6, 10, 15 and R-DSMF ¶ 32, 41, 46.
Copeland v. MARTA, 2010 U.S. Dist. LEXIS 149401 (N.D. Ga. Oct. 8, 2010) (distinguishable because: (1) pl. was a police officer, like in Watson, which Courts typically find to be held to a higher standard with regard to an FFD or medical exam; (2) pl. was placed on leave because of a policy violation, not because she complained of disability discrimination, and an internal investigation was launched into this policy violation; Id. at *2-3 (3) the investigation showed that she did violate her employer's policies; (4) pl. received a three-day suspension for this; (5) while pl. was on leave, based on the recent issues and her behavior earlier that year, the major recommended she be sent for an FFD; (6) the suspension was concurrent with pl.'s behavior that caused her employer to send her for an FFD; (7) pl. was also returned to work immediately when her psychologist cleared her to do so.).
Rodriguez v. School Board, 60 F. Supp. 3d (M.D. Fla. 2014) (distinguishable because the health care provider concluded that pl. was not fit for duty, but once pl. was deemed fit for duty, pl. was returned **immediately** to work, which is not what occurred here, as Hill was cleared to return to work by two psychologists (Molitor and Bower) and kept out of work another three months at Delta's behest.).
Mickens v. Polk County Sch. Bd., 430 F. Supp. 2d 1265 (M.D. Fla. 2006) (distinguishable because (1) it was decided prior to the ADA

this issue turns on (1) whether the employer had a business necessity for submitting the employee to a medical exam and (2) whether the employer's decision was reasonably objective under the circumstances. Here, however, when Hill was sent out on mandatory EAP leave, Delta did not have a business necessity for sending him to EAP and Delta's decision was not reasonably objective under the circumstances known to the decision makers at the time of the EAP trigger.

Delta cites to <u>Snider v. U.S. States Steel-Fairfield Works Medical Dept</u>., 25 F. Supp. 3d 1361 (N.D. Ala. June 10, 2014), to argue that "any possible perceived mental impairment had to be transitory as employer returned plaintiff to work less than 6 months after EAP referral." First, Hill's case is distinguishable from <u>Snider</u>.[11] Second, an employee has a "disability" under the ADA when

---

Amendment Act of 2008 and (2) pl. was never out of work and therefore def. did not regard him as disabled because def. offered him another teaching contract simultaneously with the termination of his assistant principal contract.).
<u>Leach v. Mansfield</u>, 2009 U.S. Dist. LEXIS 89574, *4 (S.D. Tex. Sept. 28, 2009) (distinguishable as pl. threatened to kill his coworkers stating: "Even more, I have never been so tempted to simply 'go 86.' For those that don't know what 'going 86' is, let is [Sic] us to understand it's not a good thing," which Hill never did.).
<u>Adkison v. Willis</u>, 214 F. Supp. 3d 1190 (N.D. Ala. Sept. 30, 2016), is distinguishable as it involves a police deputy who was sent to four psychologists over a period of time because the sheriff had 10 years of complaints against the deputy. Also, the court held that a written job description was indicative of an employee's essential job functions. <u>Adkison</u> at 1197-98; <u>see also</u> <u>Earl v. Mervyns, Inc.</u>, 207 F.3d 1361, 1365 (11th Cir. 2000) (quoting 42 U.S.C. § 12111(8)) ("In determining what functions are deemed essential," courts consider the employer's judgment, and "if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."). <u>See</u> R-DSMF ¶ 2 for Hill's Job Description and Qualifications.
[11] Including, unlike this case: (1) Snider was referred by a **psychologist** to EAP; (2) Snider was **noncompliant** in his EAP

that employee is perceived as having an impairment that is **not** transitory **and** minor (it is not an either-or proposition). Whether an impairment is "transitory **and** minor" is an objective determination. Suggs v. Central Oil of Baton Rouge, LLC, 2014 WL 3037213, *5 (M.D. La. July 3, 2014) (holding the def. must objectively show that an impairment is both transitory and minor). An impairment is "transitory" if its "actual or expected duration [is] 6 months or less." Snider, 25 F. Supp. 3d at 1366. A plaintiff does not have to prove the employer regarded him as disabled under the definition of the ADA, so long as the employer took a prohibited action against plaintiff because of an actual or perceived impairment, regardless of whether the employer asserts or establishes a defense for its action.[12] As shown above, this case is distinguishable from Snider regarding the issue of Hill's impairment being **transitory**. Hill's perceived impairment is also not **minor**, as Hill would not have been put out of work and forced to see an EAP psychologist if this was a minor impairment. The Return to Work Agreement required Hill to continue with the EAP treating psychologist for another year after returning to work (as a condition of continued employment). R-DSMF ¶ 47. Thus, Delta objectively perceived Hill as having a mental health impairment for over a year and four months (the duration of the EAP

---

treatment; (3) Snider **would not sign a return to work agreement**; (4) once Snider was returned to work, he had been **released** by the treating physician and **was not required** to continue treatment beyond six months as part of his return to work agreement.

[12] "The relevant inquiry in such cases is not the plaintiff's actual condition, but how the Defendant '**perceived [his] condition, including the reactions and perceptions of the persons interacting with or working with him.**'" E.E.O.C. v. Am. Tool & Mold, Inc., 21 F.

referral and treatment), long past the 6-month requirement to overcome the perceived disability being only transitory in nature. Also, an "impairment" under the ADA does not have to limit a plaintiff's ability to work, as it can limit other major life activities.[13] Simply because Hill was returned to work does not mean that Delta did not continue to regard him as disabled.

## C.   Hill Has Satisfied His *Prima Facie* Case for ADAAA Retaliation

Delta's contention that Hill cannot succeed on his ADAAA retaliation claim is equally without merit. Def.'s Br. at 19-25. To establish a *prima facie* case of ADA retaliation, Hill must show that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and, (3) there is a causal connection between the protected activity and the adverse action. Martin v. Brevard Cnty. Pub. Sch., 543 F.3d 1261, 1266-67 (11th Cir. 2008). A plaintiff may prevail on a claim of retaliation even if the underlying claim of disability fails. Vaughan v. World Changers Church Int'l, Inc., 2014 U.S. Dist. LEXIS 141912, *33-34 (N.D. Ga. 2014). Hill easily satisfies this *prima facie* case.

### 1.   Hill Engaged in Protected Activity

Hill can show that his complaints and opposition resulted from an objectively reasonable belief that Delta's actions constituted **both** discrimination and unlawful harassment. See Furcron v. Mail

---

Supp. 3d 1268, 1275 (M.D. Fla. 2014) (citation omitted).
[13] "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." Id. § 12102(2)(A).

Centers Plus, LLC, 843 F.3d 1295, 1311 (11th Cir. 2016) ("The conduct opposed need only be close enough to support an objectively reasonable belief that it is [unlawful]." (citation and quotation marks omitted)). Hill **subjectively** and **objectively** believed he was complaining about illegal harassment and discrimination.

For an expression to be protected under ADA, the plaintiff must show that he "subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, [and] also that his belief was objectively reasonable in light of the facts and record presented." Weeks v. Harden Mfg. Corp., 291 F.3d 1308, 1312 (11th Cir. 2002) (internal quotation marks and citation omitted). Hill objectively believed his treatment was unlawful, as is proven by his Nov. 7, 2016, complaint that he believed he was being targeted or discriminated against because his wife had cancer, his Dec. 21, 2016 meeting with Bell and Craig, his Dec. 2016 CEO Email, and the allegations in his subsequent emails to San Souci in late 2016 and early 2017. Compare PSMF ¶¶ 1-3, 18, 20-22, 24, 26, 42-43, 47, 50 and R-DSMF ¶¶ 4-6, 9-11, 17, 20, 26-30, 46 and Garrison v. City of Tallahassee, 664 F. App'x. 823, 827 (11th Cir. 2016) (the pl. engaged in statutorily protected activity when she filed a formal complaint alleging she was being discriminated against based on her disability). Further, when asked if Hill's complaints of harassment and discrimination seemed reasonable or normal, multiple Delta employees and decisionmakers said his complaints did appear to be reasonable and were typical complaints that management, HR or EO would receive. PSMF ¶ 21.

Delta cites to <u>Kelly v. Dun & Bradstreet, Inc.</u>, 2014 U.S. Dist. LEXIS 198480 (N.D. Ga. Sept. 2014) and <u>Clover v. Total Sys. Services, Inc.</u>, 176 F.3d 1346, 1351 (11th Cir. 1999), to support its contention that Hill did not engage in protected activity. Both are distinguishable.[14] Delta also cites to <u>Gupta v. Florida Bd. Of Regents</u>, 212 F.3d 571, 582-83 (11th Cir. 2000), for the holding that the conduct a hostile work environment sexual harassment plaintiff complained of must be "sufficiently severe and pervasive from an objective standpoint to alter an employee's terms or conditions of employment, as required to support hostile environment sexual harassment claim."[15] However, the question of whether the acts

---

[14] In <u>Kelly</u>, plaintiff's complaints did not include the protected class. <u>Id</u>. at *3. The last complaint made by Kelly did include the protected class; however; it was not objectively reasonable under the facts of that case (where a white male complained of a minority/woman getting preferential treatment, but she actually had a lower position, less pay, and worse clients than Kelly). <u>Id</u>. at *4. The Eleventh Circuit found in <u>Clover</u> that the employee had engaged in statutorily protected activity, but that the employee failed to demonstrate the requisite causal connection between her protected activity and her termination. 176 F.3d 1346, 1351. However, the Court found that Clover's statutorily protected activity was under the participation clause instead of the opposition clause. Under the opposition clause, Clover complained of five behaviors. <u>Id</u>. at 1350-51. Further, the analysis regarding Clover's retaliation claims were related to an underlying claim of hostile work environment premised on sexual harassment. <u>Id</u>. at 1350. That is not the case here.
[15] <u>Gupta</u> does not touch on whether the complained of disability **discrimination** was "sufficiently severe or pervasive;" instead, there is only analysis in the context of a **hostile environment claim under Title VII based on harassment by a supervisor**. <u>Id</u>. at 582. Hill has not brought claims of hostile work environment or retaliatory hostile work environment. Hill brought claims of ADA discrimination and ADA retaliation. The Court in <u>Gupta</u> even stated that: "Retaliation is a separate violation of Title VII 'To recover for retaliation, the plaintiff need not prove the underlying claim of discrimination which led to her protest, so long as she had a reasonable good faith belief that the discrimination existed.'[…]

complained of were "sufficiently severe or pervasive" is not the correct standard here since he is bringing claims of ADA discrimination and retaliation. <u>Id</u>.

A recent case from this Court strongly supports a finding of protected activity in this case. <u>Gilio v. Lowe's Home Centers, LLC.</u>, No. 4:17-CV-132-HLM-WEJ (N.D. Ga. May 20, 2019).[16] The R&R was on a "regarded as" disability discrimination and retaliation claim, where the magistrate judge found for the plaintiff and the district court judge fully adopted the R&R on September 19, 2019. <u>Gilio v. Lowe's Home Centers, LLC.</u>, No. 4:17-CV-132-WMR (N.D. Ga. Sept. 19, 2019).[17] As in this case, Gilio made complaints about "harassment" that the court considered to be protected activity.[18] Likewise, as in this case, Gilio complained to his employer that he believed they were violating federal employment laws.[19] Further, as in this case, <u>Gilio</u> was regarded as disabled by his employer.[20] Moreover, as in this case, the magistrate judge held in <u>Gilio</u> that Lowe's HR and management "downgraded" plaintiff's performance by insulting him in meetings and treating him differently.[21] Also, as in this case, the

---

Although the conduct Gupta complained about was not so severe and pervasive that it altered her working conditions," the Court held that it could not say that she lacked a "'reasonable good faith belief'" that she was being sexually harassed. <u>Gupta</u>, 212 F.3d 571, 586-87 (11th Cir. 2000).

[16] A copy of the R&R is attached to this Brief as Exhibit "N."

[17] A copy of the Order and Opinion is attached to this Brief as Exhibit "O." (The R&R and Order are attached per FRCP 32.1(b)).

[18] <u>Compare</u> <u>Gilio</u> R&R p. 16-17 <u>and</u> PSMF ¶¶ 1, 21, 24, 26, 43 and R-DSMF ¶¶ 6, 20, 30, 46.

[19] <u>Compare</u> <u>Gilio</u> R&R p. 18 <u>and</u> PSMF ¶¶ 18, 24.

[20] <u>Compare</u> <u>Gilio</u> R&R p. 50 <u>and</u> PSMF ¶¶ 5, 13.

[21] <u>Compare</u> <u>Gilio</u> R&R p. 42 <u>and</u> PSMF ¶¶ 13, 47-49, 51-65 and R-DSMF ¶¶ 46-47.

defendant's HR in <u>Gilio</u> mischaracterized events that led to the plaintiff's termination (the EAP "trigger" in Hill's situation).[22]

### 2.   Hill Has Suffered Multiple Adverse Employment Actions

It is undisputed that the following material changes to Hill's employment occurred and are ongoing, including, but not limited to: (1) removing Hill from Delta under escort by Delta security during a shop evacuation, which destroyed Hill's personal and professional reputation;[23] (2) suspending Hill and placing him on leave for four months and causing him a loss of overtime pay;[24] (3) forcing him to pay for anger management treatment;[25] (4) forcing him to pay for at least a portion of his EAP treatment for over one year and four months;[26] (5) transferring him to a new department where his opportunities for overtime in Atlanta were significantly less, which caused him a loss in pay;[27] (6) refusing to transfer him back to his old department (from Apr. 2017 until Apr. 2019) where he would have been able to work overtime for additional pay;[28] (7) refusing to increase pay or provide with the same overtime opportunities to make up the loss in pay;[29] (8) engaging in undue surveillance at Delta after his return to work and instructing former coworkers to have no contact with Hill inside or outside of work;[30] and, (9) forcing Hill

---

[22] <u>Compare Gilio</u> R&R p. 56 <u>and</u> PSMF ¶¶ 6-14 and R-DSMF ¶ 32.
[23] PSMF ¶ 14.
[24] PSMF ¶ 28 and R-DSMF ¶¶ 33, 41, 44.
[25] PSMF ¶ 19 and R-DSMF ¶ 44.
[26] PSMF ¶ 19.
[27] PSMF ¶¶ 47-49.
[28] R-DSMF ¶ 44.
[29] R-DSMF ¶ 44.
[30] R-DSMF ¶ 46.

to submit to Mandatory EAP including, 50 psychotherapy sessions after the EAP Psychologist refused to "trigger" him.[31]

Contrary to Delta's argument, Eleventh Circuit case law supports Hill's claim that Delta's reduction of vacation time is an adverse action. See Crawford v. Carroll, 529 F.3d 961 (11th Cir. 2008) and Gillis v. Georgia Dep't of Corr., 400 F.3d 883 (11th Cir. 2005). The fact that it was eventually resolved and/or restored is immaterial. Crawford, 529 at 972. The Eleventh Circuit in Crawford held that:

> [A]lthough [plaintiff] received a retroactively awarded merit pay increase, that raise could not alter the fact that she had been denied the increase or erase all injury associated with it, specifically the lost value and use of the funds during the time she was not receiving them. […] To conclude otherwise would permit employers to escape Title VII liability by correcting their discriminatory and retaliatory acts after the fact.[32]

Delta cites to Martin v. Eli Lilly, & Co., 702 F. App'x. 952, 958 (11th Cir. 2017) and Doe v. DeKalb County Sch. Dist., 145 F.3d 1441, 1448-49 (11th Cir. 1998) to support its argument that a lateral transfer is not an MAA. First, the Court in Martin did not touch on whether the transfer in that case was lateral and, therefore, was or was not an MAA. Id. at 958. Second, the Court in Doe did not hold that all transfers labeled as "lateral" by the employer do not qualify as MAA's. Specifically, the Court stated:

> Transfers that result in **lesser pay**, responsibilities, or **prestige** will still be 'adverse.' […] So, too, will transfers that involve **arduous travel** or that impede an employee's professional growth or advancement. […] In other

---

[31] PSMF ¶¶ 15, 19 and R-DSMF ¶ 47.
[32] Id. See also Phelan v. Cook County, 463 F.3d 773, 780 (7th Cir. 2006) (finding that a 4-month job termination was an adverse action even though plaintiff was later reinstated and awarded back pay).

> words, our reasonable person standard will continue to
> protect disabled employees from transfers that are a form
> of demotion or that disrupt investment in education,
> training, or **seniority**.

Id. at 1452. To that point, Hill's transfer to a different department

(Hangar 242) was not a "lateral" transfer. The department where Hill

was transferred, was outside of Delta's rigid seniority system (less

prestige), had significantly less overtime opportunities (less pay)

and at that required mostly out of state or out of the country travel

(arduous travel) and the working conditions were much poorer

(including being dirtier, outside, more dangerous/hazardous). PSMF ¶¶

47-49. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 71

(2006)("But here, the jury had before it considerable evidence that

the track laborer duties were 'by all accounts more arduous and

dirtier' […]Based on this record, a jury could reasonably conclude

that the reassignment of responsibilities would have been materially

adverse to a reasonable employee."). Hill does not just allege that

the transfer was the only MAA that he was subjected to by Delta and

Delta does not dispute any of the eight others listed above.[33]

---

[33] Footnote 9 of Delta's Brief, states that making false allegations
about Hill in its EEOC Position Statement does not constitute an
MAA; however, it can constitute evidence of pretext. Miller v.
Raytheon Co., 716 F.3d 138 (5th Cir. 2013) (affirming a verdict in a
discrimination case partially because pl. "presented undisputed
evidence that [def.] made erroneous statements in its EEOC position
statement."; see also Burton v. Freescale Semiconductor, Inc., 798
F.3d 222, 239-40 (5th Cir. 2015) (holding that jury may view
"erroneous statements in [an] EEOC position statement" as
"circumstantial evidence of discrimination."); McInnis v. Alamo
Comm. College Dist., 207 F.3d 276, 283 (5th Cir. 2000) (reversing
summary judgment for the employer in a discrimination case partially
because the employer's report to EEOC "contained false statements. .
. ."). Delta's FN 9 also states Hill's claim that Delta's

### 3. Hill Has Established a Causal Connection

Causation requires only that the decision-makers were aware of Hill's protected activity and that the protected activity and the adverse employment action are not "wholly unrelated." McCann v. Tillman, 526 F.3d 1370, 1376 (11th Cir. 2008). To do so, Hill may show a close temporal proximity between his protected activities and the adverse actions. Id. Hill made appropriate complaints of ADA discrimination prior to the mandatory EAP leave and suspension, and it is undisputed that temporal proximity was very close. For example, on Dec. 22, 2016, Hill sent Delta's CEO (and numerous other decision makers) an email which included the following: "I have problems with a family health crisis," "Mike Buice had took a vacation day from my time in an inappropriate manner," "it was done with full knowledge that I was in the middle of a family health crisis . . ." "All of this was done to harass me during a family health crisis." PSMF ¶ 3. Hill's CEO Email was received by Delta on Dec. 22, 2016. **Less than 24 hours later**, Hill was suspended on mandatory EAP leave, walked out by security (and his shop was evacuated during this time), and subjected to an involuntary medical exam, forced to continue to treat with EAP for over a year and four months, and transferred to a new department immediately upon his return to work. Further, even if this Court were

---

investigations were a sham is also not an MAA; however, departures from Delta's normal investigation procedures can show pretext. Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S., 252 267 (1977) ("Departures from the normal procedural sequence also may afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decision maker strongly favor a decision contrary to the one reached.")

to determine that Hill's CEO Email was somehow not protected activity, Hill also continued to engage in protected activity during his suspension and mandatory EAP leave (the next Monday Hill reported Delta for corporate harassment and Hill complained in Jan. about ADA discrimination and retaliation when his RTW approval from EAP was revoked at Delta's behest). PSMF ¶¶ 14, 15, 18, 20, 30.

Citing to Cazeau v. Wells Fargo Bank, 2014 U.S. Dist. LEXIS 186562 (N.D. Ga. May 29, 2014), Delta argues that Hill cannot meet the causation prong of his retaliation claim because his transfer was 3-4 months after his complaints. However, during this time, Hill was out on mandatory EAP leave (another adverse employment action) and thus the transfer was a continuation of the retaliation in another form when Delta had to return Hill to work. Moreover, throughout this time, he sent several emails complaining that keeping him out of work and the mandatory EAP referral was against federal employment laws,[34] so the gap in his continued protected activity and Delta's decision to transfer him are also close in temporal proximity. Also, the court in Cazeau cites to Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001)(internal citations omitted), where the Supreme Court stated that "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action ... must be very close," which is exactly what we have here (Hill's CEO email and within hours sent out on mandatory EAP leave and suspension).

---

[34] PSMF ¶¶ 1-3, 18, 20-22, 24, 26, 42-43, 47, 50 and R-DSMF ¶¶ 4-6, 9-11, 17, 20, 26-30, 46.

Second, Delta argues that Hill cannot establish causation because the "intervening events" of "the recommendation of EAP that he be transferred, the expressed concerns of employees of having him return to his previous department and his own desire not to interact with Lead AMT Buice" break the chain of causation. Delta misstates the law. It is "intervening acts of **misconduct**" that can break the chain of causation. In support of its argument, Delta cited again to Cazeau and Hollan v. Web.com Group, Inc., 2015 U.S. Dist. LEXIS 191702, **47-48 (N.D. Ga. April 7, 2015).

Hollan is distinguishable as the "intervening conduct" in that case was misconduct by the plaintiff, where the court noted: "the Eleventh Circuit has made clear that even if a plaintiff is terminated in close temporal proximity to [protected activity], a plaintiff's **intervening act of misconduct** severs the causal connection between the [protected activity] and the decision to terminate her employment." Cazeau is also distinguishable as the "intervening conduct" was "the expiration of Plaintiff's disability leave and Job Search Leave and his failure to apply for any position with Wells Fargo." Id. at *19. These acts were all direct or indirect actions by plaintiff, which led to his termination, and were not acts that could be considered protected activity.

Here, the only "intervening act" that Delta points to (direct or indirect) that Hill engaged in was protected activity (i.e., requesting that Buice not be allowed to retaliate). Further, there is a dispute of fact as to whether EAP recommended Hill be transferred prior to Delta making the decision on its own and whether Delta

interfered with EAP to effectuate the recommendation (i.e. the EAP recommendation of transfer was illegitimate because Delta sent EAP investigation summaries altered by San Souci and Jackson and the recommendation came only after Bower read these reports).[35]

There is a dispute of fact as to whether employees in Dept. 382 were concerned about Hill returning to work since they never expressed these concerns prior to him being walked off of Delta property by security and the shop evacuated (and also prior to Hill's protected activity in Oct.-Dec. 2016). Hill asked to not interact with Buice only after Delta refused on multiple occasions to instruct Buice not to retaliate. Also, it is not logical that the individual who reported harassment would be transferred and the harasser gets to remain (in management no less). Thus, the "intervening events" Delta has identified fails to negate the *prima facie* case.

The Eleventh Circuit only requires a plaintiff to present facts from which an inference of discrimination can be made. Andrews v. City of Hartford, 700 F. App'x. 924, 927 (11th Cir. 2017) (per curiam). Thus, the third prong of a *prima facie* case for ADA retaliation only requires a showing that an adverse employment action which could be actionable under the ADA occurred, i.e., facts from which an inference of discrimination can be made. See Connelly v. Wellstar Health Sys., Inc., 1:16-CV-2687-RWS-JKL, 2018 WL 1800893, at *12 n.13 (N.D. Ga. Jan. 10, 2018). Hill has offered evidence from which a jury clearly could find (1) that his conduct on Dec. 21, 2016

---

[35] PSMF ¶¶ 32, 38-40.

in a meeting with Bell and Craig did not actually serve as the reason for his suspension and mandatory EAP referral (as a legitimate, non-retaliatory reason) and (2) that "the recommendation of EAP that he be transferred, the expressed concerns of employees of having him return to his previous department and his own desire not to interact with Lead AMT Buice" did not actually serve as factors for his transfer — whether they were intervening to break the causal connection or as legitimate, non-retaliatory reasons. Instead, Delta used the events on Dec. 21 and the alleged "intervening events" as justification because of its discriminatory and retaliatory animus when Hill did not violate Delta policy at any point in time.[36]

### 4. **Hill Has Compelling Comparator Evidence**

Comparator evidence is another way to establish a *prima facie* case of retaliation. A "plaintiff asserting an intentional-discrimination [or retaliation] claim under <u>McDonnell Douglas</u> must demonstrate that she and her proffered comparators were 'similarly situated in all material respects.'" <u>Lewis v. City of Union City, Georgia</u>, 918 F.3d 1213, 1218 (11th Cir. 2019). The Eleventh Circuit held that to be a similarly situated comparator they, (1) will have engaged in or been accused of the same basic conduct (or misconduct); (2) will have been subject to the same employment policy, guideline, or rule; (3) will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor, and (4) will share the plaintiff's employment or disciplinary history. <u>Id</u>. at 1227-28.

---

[36] PSMF ¶¶ 2, 10, 13, 21.

Todd Correia and Kenneth Plain are the comparators and are similarly situated in all material respects to Hill.[37] Correia not only held the same position as Hill as an AMT, but also worked in the same Department (382) and therefore was, at all relevant times, subject to the same employment policies, and also reported to the same supervisor(s) (Lindsay, Craig, and Bell). Correia was reprimanded for threats of violence in Aug. 2015, unprofessional conduct in Aug. 2016, lying to his immediate supervisor in Apr. 2018, and in May 2018 was accused of having a live round of ammunition in his tool box in Department 382 at the Atlanta Airport and going into fits and throwing items among other issues. PSMF ¶¶ 52-59. For each of these reprimands, Correia was given a written reprimand, which allowed him to utilize Delta's internal grievance process called the Conflict Resolution Process ("CRP"). PSMF ¶¶ 54, 57.

Hill was never given a written reprimand for the events from Oct. 2016 to Apr. 2017, which denied him access to the CRP grievance process because a written reprimand is required to do so. PSMF ¶ 54. Both Craig and Lindsay admitted to being made aware in May 2018 of the live ammunition in Correia's toolbox but took no action to investigate except when Lindsay asked Correia about the allegation and took Correia's word, even though Correia had been reprimanded for lying less than a month earlier. PSMF ¶ 56. According to the final discipline issued to Correia on Oct. 11, 2016 he was required to contact EAP, but he was never removed from Delta by security or even

---

[37] PSMF ¶¶ 51-65.

suspended. PSMF ¶¶ 57–58. Correia was terminated in Nov. 2019 for bad attendance. PSMF ¶ 59. Correia did not engage in any protected activity or make any complaints related to harassment, discrimination, or retaliation during the months leading up to his EAP referral, final corrective action, or termination. PSMF ¶ 60.

Plain holds the same position as Hill as an AMT (and therefore was, at all relevant times, subject to the same employment policies as Hill) but works in Department 401. PSMF ¶ 61. On Apr. 18, 2018, Plain was upset due to the two-year anniversary of his son's death and was kicking and throwing items around the shop and then the next day on Apr. 19, made statements at work along the lines of he was going to "clean everybody out of this place" or "shoot up the place." PSMF ¶ 62. Later that day, Plain's Delta ID was deactivated by manager Michel Aletraris and HR Rep Amber Khaaliq called Plain at his residence and informed him that "there were concerns based on comments he made in the shop about shooting people up," that "he would need to call Maureen at EAP," and that "he would not be able to return to work until he has met with and cleared by Maureen." PSMF ¶ 63. Plain called Delta EAP Management Consultant Maureen McLaughlin, who set him up for appointments that same day and the following Monday and Plain was cleared to return to work on Apr. 23, 2018. PSMF ¶ 64. Plain did not engage in any protected activity or make any complaints related to harassment, discrimination, or retaliation during the months leading up to his EAP referral. PSMF ¶ 65.

## II.  Defendant's Proffered Reasons Are Pretextual[38]

Delta's alleged non-discriminatory/retaliatory reasons for suspending Hill and subjecting him to involuntary medical exams stem primarily from his alleged actions on Dec. 21 in a meeting with Bell and Craig.[39] Delta's alleged non-discriminatory/retaliatory reasons for transferring stem primarily from "the EAP recommendation, Hill's desire not to interact with Buice and unhappiness in his old department and the expressed concerns of employees in his old department." Both reasons are pretextual.[40] A jury could infer that

---

[38] Pretext may be demonstrated by showing a discriminatory reason more than likely motivated the employer, or that the proffered reason for the decision is not worthy of belief. Young v. General Foods Corp., 840 F.2d 825, 828 (11th Cir. 1998). The former relies on evidence of the decision maker's motive. As to the latter method, "[t]he district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotations and citations omitted).

[39] Use of subjective criteria has been held to require an evaluation of the credibility of the proffer of subjective criteria. Medina v. Ramsey Steel Company, Inc., 238 F.3d 674, 681-82 (5th Cir. 2001). "[D]istinguishing legitimate employer decisions based entirely on subjective criteria and those in which subjective criteria serves as a pretext for discrimination can only be made by weighing the employer's credibility." Medina, 238 F.3d at 681 (emphasis added) (holding that on summary judgment the employer cannot defeat employee's claim by relying upon subjective employment criteria).

[40] A plaintiff survives summary judgment if circumstantial evidence is presented that would allow jury to infer a defendant acted with discriminatory or retaliatory intent. Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). In addition to close temporal proximity and deviation from investigative standards, Delta's shifting reasons for suspension and sending Hill to mandatory EAP, Hill has presented other evidence that presents a convincing mosaic of unlawful animus or further evidence of pretext.

Delta manufactured these reasons after Hill made legitimate complaints of discrimination and retaliation.

Delta fails to adequately explain why Hill was walked out by security when Delta admitted that was not the norm. PSMF ¶ 14. Delta failed to adequately explain why shop 382 was evacuated. Id. Delta fails to explain why Bell told EAP that Hill had never been violent or made any threats, yet knew about Warren, Farmer, and/or Sloan's Nov. 2016 statements. R-DSMF ¶ 32. Delta fails to adequately explain why it claims that EAP "triggered" Hill, when the documentation shows Delta overrode EAP's decision not to "trigger" Hill. PSMF ¶¶ 6-13. All these actions occurred after he engaged in protected activity and **within 24 hours** of his CEO email. PSMF ¶¶ 3-14.

Plaintiff has also shown that San Souci intentionally altered the final San Souci Report (such as changing Flowe's testimony to indicate that he believed Hill was vocal about gun ownership and changing Pamela Kelly's EO interview summaries) after Hill informed him that he planned to file an EEOC Charge, and also called Hill an "indignant EEOC filer" and Hill's decision to file a Charge "Jekyll Hyde." PSMF ¶¶ 22, 24, 25, 34. Finally, Delta fails to adequately explain why Plain and Correia were treated differently than Hill and given years of leeway before being sent to EAP and not being required to remain out on EAP for a long as Hill). PSMF ¶¶ 51-65.

## A. Delta Deviated from its Policies and Procedures

Deviating from Delta's own policies is proof of pretext, and Delta deviated from them during their investigations into Hill's complaints of harassment, discrimination, and retaliation. See

Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771-772 (11th Cir. 2005) (an employer's deviation from its own procedures is evidence of pretext). Here, Bell indicated that Delta policy required the accused be informed not to retaliate, the accused be interviewed last, the personnel files of the accused should be considered, after the initial investigation Delta should meet with the accused and accuser separately and inform them of the outcome. None of these policies were complied with.[41]

**B.  Bell and San Souci Ignored Exculpatory Information**

A reasonable jury could find that the investigation was a ruse to execute an EAP referral and departmental transfer decision grounded in retaliatory animus. See Pattee v. Ga. Ports Auth., 477 F. Supp. 2d 1253, 1265 (S.D. Ga. 2006) (where evidence showed pl. would have been disciplined regardless of how he answered internal investigator's cursory questions, jury would be authorized to find "the investigation … did not motivate the termination at all, but [was] manufactured to cover the illegitimate reason for [pl.'s] termination—retaliation").[42] Bell stated to Molitor that Hill had never been violent or made threats of violence. R-DSMF ¶ 32. Then San Souci never attempted to obtain the first level investigation statements written contemporaneously. R-DSMF ¶ 36. Moreover, San

---

[41] PSMF ¶ 1 and R-DSMF ¶¶ 9, 16, 20.

[42] See also Laxton v. Gap Inc., 333 F.3d 572, 580 (5th Cir. 2003) ("Gap produced no contemporaneous written documentation of any employee complaints ..."); Humphries v. CBOCS W., Inc., 474 F.3d 387, 407 (7th Cir. 2007), aff'd, 553 U.S. 442 (2008) (quality of the investigation can create disputed factual issues); Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 855 (D.C. Cir. 2006)(flawed

Souci could not explain why these alleged concerns of Hill, his mental state, and ownership of guns was never brought up and why Hill was never confronted about these issues until after he engaged in protected activity and was sent out on mandatory EAP leave. PSMF ¶ 32 and R-DSMF ¶¶ 21, 36, 42. Finally, Hill was returned to work in a different department with a higher security clearance requirement, so if Delta had been concerned about Hill and his gun ownership, this decision would have made no sense. PSMF ¶¶ 47-49.

Further, while there are striking similarities between this case and Gilio, Hill's case has facts that are stronger for the Plaintiff. For example, unlike in this case, Gilio had been written up several times and had even yelled expletives at one point, leading up to his termination. (Gilio R&R p. 11-16). In sum, like in Gilio, Hill has raised "a triable issue over whether defendant's reasons for terminating him are pretextual." (Gilio R&R p. 56-57).

## III. Conclusion

Plaintiff respectfully requests that this Court deny Defendant's Motion for Summary Judgment.

**RESPECTFULLY SUBMITTED,** this 1st day of April, 2020.[43]

HORNSBY LAW GROUP

/s/ Amelia Grubbs_____
Brandon Hornsby
Ga. State Bar No. 367680
Amelia Grubbs
Ga. State Bar No. 696724
Attorneys for Plaintiff

---

investigation can creates disputed factual issues).
[43] Counsel certifies that this pleading was prepared using Courier New 12-point font.

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2020, I filed the foregoing unsealed, redacted copy per the Order Granting Motion for Leave to File Matters Under Seal (Doc. 70) with the Clerk of Court using the NextGen CM/ECF system which will automatically send e-mail notification of such filing to opposing counsel of record: Benjamin A. Stone and Thomas J. Munger.

**HORNSBY LAW GROUP**

*/s/ Amelia Grubbs_____*
Brandon Hornsby
Ga. State Bar No. 367680
Amelia Grubbs
Ga. State Bar No. 696724

1180 W Peachtree St NW #2220
Atlanta, GA 30309
Tel: 404-577-1505
Fax: 404-577-1565          Attorneys for Plaintiff