IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VINCENT MARK HILL,

        Plaintiff,

   vs.

DELTA AIR LINES, INC.,

        Defendant.

Civil Action No.:
1:18-cv-05589-JPB-WEJ

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S STATEMENT OF MATERIAL FACTS

**COMES NOW** Plaintiff Vincent Mark Hill and respectfully submits this Response to Defendant's Statement of Material Facts, in support of Plaintiff's Response to Defendant's Motion for Summary Judgment and pursuant to the Federal Rules of Civil Procedure, Local Rule 56.1, and this Court's May 20, 2019 Order on summary judgment in this case.

1.

**Defendant's Alleged Fact:**

In the Fall of 2016, Hill was employed by Delta as an AMT in Department 382 (components shop) in Atlanta, and, depending on his day and shift, reported for work assignments to one of a group of Department 382 Lead AMTs – including Dave Farmer ("Farmer"), Mike Buice ("Buice") and Nathan Warren ("Warren") – who reported to Manager David Lindsay ("Lindsay"), who reported to General Manager David Craig ("Craig"). Deposition of Mark Vincent Hill ("Hill Dep.") attached to the accompanying brief as Exhibit "A", pp. 18, 24, 63-66, 68.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that he reported to his assigned Lead AMT, David Farmer, the majority of the time and was occasionally assigned

to work for other Lead AMT's in Dept. 382 on day shift. Deposition of Vincent Mark Hill ("Hill Dep.") attached to the accompanying Brief as Exhibit "A", pp. 14-18 and 65-67; Deposition of David Farmer ("Farmer Dep.") attached to the accompanying Brief as Exhibit "B", pp. 30-31.

Plaintiff denies that Buice was ever the lead he reported to in 2016. Instead, the record shows that in 2016, Mr. Buice was permanently assigned to what is called the "tooling line," which Plaintiff did not work on. Deposition of Nathan Warren ("Warren Dep.") attached to the accompanying Brief as Exhibit "C", Exh. 28 (Delta Bates #1464); Second Declaration of Mark Hill ("Second Hill Dec.") attached to the accompanying Brief as Exhibit "J" at ¶ 24.

2.

**Defendant's Alleged Fact:**

Hill's AMT position is safety-sensitive under FAA regulations and is "100% safety." Hill Dep., pp. 27, 29.

**Plaintiff's Response:** Admitted in part, denied in part. Additionally, Plaintiff objects that Defendant's asserted material fact does not otherwise comply with Rule 56(c) because it calls for a legal conclusion.

Plaintiff admits that Hill's AMT position is safety sensitive under FAA regulations.

Plaintiff denies the above statement of fact to the extent it suggests or is used to assert that Hill's position is also security sensitive. Federal regulations, including the FAA, distinguish between safety-sensitive and security-sensitive positions. The FAA

regulates airlines who have employees who perform **safety sensitive functions** (FAA 14 CFR Part 120: "The purpose of this part is to establish a program designed to help prevent accidents and injuries resulting from the use of prohibited drugs or the misuse of alcohol by employees who perform safety-sensitive functions in aviation." 14 CFR § 120.3). FAA part 14 CFR 120 pertains **only** to substance abuse testing requirements for employees who perform safety sensitive functions. Hill Dep., pp. 28-30. Furthermore, this requirement is explained in Delta's job description for Mr. Hill's position under "Job Qualification":

> As required by the FAA for all persons in safety-sensitive positions, candidates selected for this position are **subject to a drug test** to detect the presence of the following illegal drugs: marijuana, cocaine, opiates, phencyclidine (PCP), and amphetamines, or a metabolite of these drugs in your system.

Hill Bates #2245 (emphasis added).

At Delta, this document and the FAA regulation it references are the only documents that define "safety sensitive" as it pertains to Mr. Hill's position at Delta Airlines. Hill Bates #2244-2246.[1]

3.

**Defendant's Alleged Fact:**

> On October 16, 2016, Hill learned that his wife might have breast cancer, a diagnosis that was confirmed on November 1, 2016. Hill Dep., pp. 69, 70.

**Plaintiff's Response:** Admitted in part**,** denied in part.

---

[1] These documents (all Hill Bates) were produced by Plaintiff to Defendant in the course of discovery. See Second Declaration of Amelia Grubbs on Hill Documents ("Second Grubbs Dec.") attached to the accompanying Brief as Exhibit "K."

Plaintiff admits he was notified on those dates about his wife's breast cancer diagnosis. He denies that he was told she "might" have breast cancer. Mr. Hill was notified that his wife had a very high likelihood of breast cancer. Hill Dep., pp. 69-70. The radiologist report of Bi-Rads 4C (Breast Imaging Reporting and Data System) is indicative of a 79% chance of breast cancer and, as a result, Hill believed that he had been told his wife had breast cancer. Hill Dep., pp. 69-70. Second Hill Dec. at ¶ 6.

4.

**Defendant's Alleged Fact:**

> In November and December 2016, Hill reported to Lindsay, Craig and Delta Human Resources Manager Nicole Bell ("Bell") three alleged incidents involving either Lead AMT Buice or Lead AMT Warren that Hill claimed amounted to "harassment" of him allegedly because of his wife's health condition (even though Hill never claimed Buice or Warren ever said anything to him about his wife's condition and instead at most acted "indifferent" to his wife's condition when he once talked about it with Lindsay and Farmer). Hill Dep., pp. 63-66, 72¬77, 101, Exh. 4, pp. 8, 12 (Hill 00807 and Hill 000811).

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that he reported three incidents of harassment.

Plaintiff denies the remainder as stated. Mr. Hill reasonably believed Warren and Buice were targeting him because of his wife's cancer news, as the acts he complained about involving Warren and Buice started immediately after he notified them that his wife had breast cancer. Mr. Hill stated in his deposition the reasons why he suspected that Warren and Buice started harassing him when his wife got cancer, including, but not limited to, the fact that Mr. Hill

- 4 -

believed that Buice and Warren started harassing him as soon as they found out his wife was diagnosed with breast cancer and because Warren had done the same thing to another cancer patient. Hill Dep., pp. 115-119. Buice and Warren knew about the breast cancer news almost immediately after October 16, 2016. Farmer Dep., pp. 31-32. Furthermore, another Delta employee Michael Lashley admitted to telling former co-worker Mike West that he had heard Warren make a statement similar to: "Now that Mark Hill's wife has cancer, I am going to double down and make his life miserable." Deposition of Michael Lashley ("Lashley Dep.") attached to the accompanying Brief as Exhibit "D", pp. 38. Mr. Lashley also testified that in his opinion Warren and Buice "target individuals for scrutiny or unfair treatment." Lashley Dep., pp. 37-38. Furthermore, Mr. Farmer testified that he had heard co-workers call Nathan Warren "The Jackal." Farmer Dep., pp. 95-96, Exh. 9 (Delta Bates #2277).

5.

**Defendant's Alleged Fact:**

> With respect to the first of the three incidents, on November 7, 2016, Hill reported to Lindsay and then to Lindsay and Craig that he "was afraid" "maybe of being harassed" solely because (1) he had failed to report to his scheduled 12-hour shift on Friday, October 21, 2016 and (2) a Lead AMT (who was determined to be Buice) had followed the normal Lead AMT timekeeping act of applying 12 hours from Hill's vacation bank to that missed shift so that Hill would not be later docked 12-hours pay for missing that scheduled shift. Hill Dep., pp. 65, 66, 72-74, 77, 79-83, 88, 141, 142.

**Plaintiff's Response:** Denied. Plaintiff further objects that Defendant's asserted material fact is not supported by the evidence cited.

Defendant misleadingly cites to only a portion of Mr. Hill's deposition testimony that discusses this issue. Defendant does not cite to other instances in the deposition that discuss this issue and Hill's errata sheet.

First, Mr. Hill has never "failed to report" for a scheduled shift at Delta. Farmer Dep., pp. 32. Second, although Mr. Hill did testify that he was "was afraid" of "maybe" being harassed, Mr. Hill explained this by stating: "I told them that I had been harassed, and I would like for it to be stopped." Hill Dep., pp. 74. Furthermore, when Mr. Buice deducted Mr. Hill's vacation time it was anything but a "normal Lead AMT timekeeping act."

This is evident from Delta's shifting and evasive explanations throughout this case when giving answers about when the time was deducted and who was at work when the time was deducted. Deposition of Brian San Souci ("San Souci Dep.") attached to the accompanying Brief as Exhibit "E", Exh. 14 (Delta Bates #2422), and Farmer Dep., Exh. 38 (Delta Bates #1610-1612).

For example, Mr. Hill testified that he asked Bell and Craig to check the computer record and neither did. Hill Dep., pp. 162-163. On December 22, 2016, shortly after the CEO email, Bell asked Dennis Lindsay when Buice had deducted Mr. Hill's time and Lindsay confirmed it was not October 29, 2016 as Buice had falsely stated, but Monday, October 24, 2016. Farmer Dep., Exh. 42 (Delta Bates #2339). Delta also ultimately admitted that David Farmer was at work on Monday, October 24, 2016. Delta's Responses and Objections to Plaintiff's First Requests for Admission, attached to the

accompanying Brief as Exhibit "M", No. 2; Delta Bates #3026.[2] Finally, under the MPS timekeeping system, Mr. Hill's pay was not going to be docked regardless of whether Buice deducted the vacation time, so there was no act of pay protection on Buice's part. Deposition of Dennis Lindsay ("Lindsay Dep.") attached to the accompanying Brief as Exhibit "F", pp. 72-78.

6.

**Defendant's Alleged Fact:**

> Hill complained about this normal practice by Buice (that was in the interest of Hill) because Hill had recently reached what he called an "extraordinary" verbal arrangement with Lead AMT Farmer (Hill's lead on most of Hill's shifts), that he could miss a scheduled shift due to his wife's condition and avoid his pay being docked for that missed shift by working a future unscheduled shift. Hill Dep., pp. 81-83.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that he made harassment complaints. Plaintiff denies the remainder of Defendant's asserted facts as stated.

The misconduct Plaintiff complained about was in no way normal. When Mr. Hill made the statement in his deposition that the agreement made with Farmer for the day was an "extraordinary circumstance." The word "extraordinary" was used to describe the "circumstance" that his wife very likely had breast cancer and was needing to take her to her first surgical oncologist meeting—not his verbal agreement with Farmer. Furthermore, Bell recorded in her

---

[2] These documents (all Delta Bates) were produced by Defendant to Plaintiff in the course of discovery. See Third Declaration of Amelia Grubbs on Delta Documents ("Third Grubbs Dec.") attached to the accompanying Brief as Exhibit "L."

December 23, 2016 Executive Summary that Mr. Hill had told her that this was a normal verbal arrangement between Farmer and Hill (as well as other AMT's and their leads), which Farmer also explained was the norm in their department. Farmer Dep., pp. 32, Exh. 5 (Delta Bates #1625-1626).

Lindsay wrote in his journal that he volunteered to help with Mr. Hill's schedule, stating in part: "*Mark has told me that his wife has been diagnosed with breast cancer and I know he is upset and stressed out due to this life changing event. I discussed her condition (as I have done before) with him and offered my support to work around his schedule if he needed that to make sure he could be with her during appointments or treatments. I have advised his lead David Farmer to offer support to him during this time as well." Lindsay Dep., Exh. 16 (Delta Bates #2366-2367).

When Buice deducted Mr. Hill's vacation time it was anything but a "normal Lead AMT timekeeping act." This is evident from Delta's evasive actions and answers throughout this case when being question about when the time was deducted and who was at work at the time. San Souci Dep., Exh. 14 (Delta Bates #2422), and Farmer Dep., Exh. 38 (Delta Bates #1610-1612).

Mr. Hill testified that he asked Bell and Craig to check the computer record and neither did. Hill Dep., pp. 162-163. On December 22, 2016, shortly after the CEO email, Bell asked Dennis Lindsay when Buice had deducted Mr. Hill's time and Lindsay confirmed it was not October 29, 2016 as Buice had falsely stated, but Monday, October 24, 2016. Farmer Dep., Exh. 42 (Delta Bates #2339). Delta

also ultimately admitted that David Farmer was at work on Monday, October 24, 2016. Delta's Responses and Objections to Plaintiff's First Requests for Admission, No. 2; Delta Bates #3026. Finally, under the MPS timekeeping system, Mr. Hill's pay was not going to be docked regardless of whether Buice deducted the vacation time, so there was no act of pay protection on Buice's part. Lindsay Dep., pp. 72-78.

7.

**Defendant's Alleged Fact:**

Farmer had not told Buice of this "extraordinary" arrangement, and there was nothing unusual about Buice applying Hill's vacation hours to his missed shift as "we all put in [AMT] time for each other" and such actions by Buice "happen[s] regularly." Deposition of Lead Dave Farmer ("Farmer Dep."), attached to the accompanying brief as Exhibit "B", pp. 58, 59, 61, 62; Deposition of Nicole Bell ("Bell Dep."), attached to the accompanying brief as Exhibit "C", p. 142.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that Mr. Farmer did not tell Buice that an arrangement had been agreed to for Mr. Hill to make up the vacation day later.

Plaintiff denies the remainder of Defendant's asserted fact as stated. Mr. Farmer testified that Buice "should've probably brought it to my attention" and "he should have maybe said to me, hey, you know, Mark was gone and we didn't talk, we didn't speak that day" before deducting the time. Farmer Dep., pp. 115-116.

Farmer attempted to justify Buice's action by explaining that it was proper for Buice to deduct the time while he and Hill were at work under the condition that it was a new system the leads were

- 9 -

learning at the time. Farmer Dep., pp. 58-62. However, Lindsay disputed this and testified to the contrary (that it was not a new system at that time) and in fact Lindsay had completed the "new" MPS training in January and February 2013, almost 4 years prior. Lindsay Dep. pp. 72-73; Delta Bates #3229.

Furthermore, when Mr. Buice deducted Mr. Hill's vacation time it was **not** a "normal Lead AMT timekeeping act." This is evident from Delta's actions throughout this case when being equivocal and evasive about when the time was deducted and who was at work at the time. San Souci Dep., Exh. 14 (Delta Bates #2422), and Farmer Dep., Exh. 38 (Delta Bates #1610-1612). Mr. Hill testified that he asked Bell and Craig to check the computer record and neither did. Hill Dep., pp. 162-163.

On December 22, 2016, shortly after the CEO email, Bell asked Dennis Lindsay when Buice had deducted Mr. Hill's time and Lindsay confirmed it was not October 29, 2016, as Buice had falsely stated. Instead, it was Monday, October 24, 2016. Farmer Dep., Exh. 42 (Delta Bates #2339). Delta ultimately admitted that David Farmer was at work on Monday, October 24, 2016. Delta's Responses and Objections to Plaintiff's First Requests for Admission, No. 2; Delta Bates #3026.

Finally, under the MPS timekeeping system, Mr. Hill's pay was not going to be docked regardless of whether Buice deducted the vacation time, so there was no act of pay protection on Buice's part. Lindsay Dep., pp. 72-78.

8.

**Defendant's Alleged Fact:**

After he raised this vacation issue with Lindsay/Craig, Hill was aware that he could have obtained his 12 hours of vacation back by working an extra future shift, but Hill chose not to do so and instead chose to agree to have the 12-hours of vacation applied to his missed shift -- just as Buice had followed the normal practice of recording vacation hours for that shift to prevent Hill from being pay docked for missing that shift. Hill Dep., pp. 95, 96.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that he elected not to work a day to make up for the day missed because to return the time is a process that Mr. Hill's lead Mr. Farmer would need to address "through the MPS people" and it is a process try to correct the problem. Farmer Dep., pp. 63-64. Mr. Hill knew he would miss many other days helping his wife fight breast cancer and because of the complicated process he would be required to fix what Hill contended Buice inappropriately did. As a result, Mr. Hill concluded it would be easier to address other days missed that Buice had not taken the liberty to deduct without consulting anyone. Hill Dep., pp. 95-100. Farmer Dep., Exh. 42.

Plaintiff denies the remainder of Defendant's asserted fact as stated. Plaintiff denies that Buice had followed the normal practice of recording vacation hours for that shift to prevent Hill from being pay docked for missing that shift. When Mr. Buice deducted Mr. Hill's vacation time it was anything but a "normal Lead AMT timekeeping act." This is evident from Delta's actions throughout this case when being evasive when questioned about when the time was

deducted and who was at work at the time. San Souci Dep, Exh. 14 (Delta Bates #2422), and Farmer Dep., Exh. 38 (Delta Bates #1610-1612).

Mr. Hill testified that he asked Bell and Craig to check the computer record and neither did. Hill Dep., pp. 162-163. On December 22, 2016, shortly after the CEO email, Bell asked Dennis Lindsay when Buice had deducted Mr. Hill's time and Lindsay confirmed it was not October 29, 2016, as Buice had falsely stated. Instead, it was Monday, October 24, 2016. Farmer Dep., Exh. 42 (Delta Bates #2339). Delta also ultimately admitted that David Farmer was at work on Monday, October 24, 2016. Delta's Responses and Objections to Plaintiff's First Requests for Admission, No. 2; Delta Bates #3026.

Finally, under the MPS timekeeping system, Mr. Hill's pay was not going to be docked regardless of whether Buice deducted the vacation time, so there was no act of pay protection on Buice's part. Lindsay Dep., pp. 72-78.

9.

**Defendant's Alleged Fact:**

As a result of this application of vacation hours that favored Hill and that was Hill's ultimate choice as to how to treat his missed shift, Hill asked Lindsay to direct one of his Leads, Buice, to not to interact with him in any way, to not give him any instructions, and to not even check on him, and, shortly thereafter, Hill wrote Delta, "I don't want Mike Buice interacting with me at all." Hill Dep., p. 91; Exh. 4, at Hill 00813; Deposition of Dennis Lindsay ("Lindsay Dep.,"), attached to the accompanying brief as Exhibit "D", pp. 28, 29.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that he asked that Buice not interact with him, but not in the first meeting with PLM Dennis Lindsay.

Plaintiff denies the remainder of Defendant's asserted fact as stated.

Mr. Hill in frustration requested no interaction with Buice only after both David Craig and Mr. Lindsay refused to ask Buice not to harass Mr. Hill. After that, Mr. Lindsay and Mr. Craig notified all five leads in shop 382 that Mr. Hill had reported harassment, and they not only refused to stop the harassment but also violated Delta policy by failing to investigate the harassment. Hill Dep., pp. 92; Lindsay Dep., pp. 32-35, Exh. 101 (Hill Bates #340); Deposition of David Craig ("Craig Dep.") attached to the accompanying Brief as Exhibit "G", pp. 20-23, 26-28, and Exh. 127 (Delta Bates #3195); Warren Dep., pp. 34.

This application of vacation hours did not favor Mr. Hill, since under the MPS timekeeping system, Mr. Hill's pay was not going to be docked regardless of whether Buice deducted the vacation time, so there was no act of pay protection on Buice's part. Lindsay Dep., pp. 72-78.

Bell admitted that during her tenure with Delta, Delta HR had never once acknowledged that it had made a mistake in a discrimination or retaliation investigation. Bell Depo. at 79.

10.

### Defendant's Alleged Fact:

With respect to the second of the three allegedly "harassing" incidents, Hill asked Bell and Craig to investigate an event whereby, on November 14, 2016, Buice

merely told Hill to get back to work (or back to his part) when Hill admits he was having a personal discussion with another employee rather than working. Hill Dep., p. 101-105; Exh. 4, p. 12 (Hill 000811).

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that that he did make a complaint about a second instance of harassment and that Buice did remove Mr. Hill from the tool room and reprimand him when Mr. Hill was having a personal discussion with another employee, tool room attendant Wanda Dooley. Hill Dep., pp. 104-105.

Plaintiff denies the remainder of Defendant's asserted fact as stated.

Me. Hill was reprimanded, not merely told to get back to work and treated differently than a non-complaining employee. Conversations amongst employees like the one Hill had with Dooley at Delta are common, but they do not normally result in reprimands. Hill Dep., pp. 104-105. During this incident, Buice did not remove and reprimand AMT Charles Flowe (who had not complained of harassment), who was known to spend a lot of time in the tool room on a regular basis, and who was in the tool room before Mr. Hill arrived and remained there after Mr. Hill was removed and reprimanded by Buice. Hill Dep., pp. 101.

Mr. Hill never asked Bell or Craig to investigate any event. Mr. Hill cooperated with the investigations after they were initiated. Hill Dep., pp. 155-158.

11.

**Defendant's Alleged Fact:**

Hill then asked Buice why he was singling him out and harassing him, and Buice responded that he had or was going to tell everyone else to get back to work (which Buice did). Hill Dep., pp. 101-105; Farmer Dep., Exh. 14.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that Buice did tell some other shop 382 AMT's to return to work **after** Mr. Hill had questioned Buice about singling him out and harassing him.

Plaintiff denies the remainder of Defendant's asserted fact as stated. Buice was singling Hill out. For example, Buice did not remove and reprimand AMT Mr. Flowe (who was also present), as stated in Plaintiff's response above in no. 10. Hill Dep., pp. 101-113.

12.

**Defendant's Alleged Fact:**

Hill did not go back to work as directed by Buice but instead, after standing around for about ten minutes, approached Buice who was sitting at his desk and accused Buice of harassing him for asking him to return to work – causing Buice to put up his hand with an open palm as if to send a signal for Hill to hold back or calm down. Hill Dep., pp. 106-113.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that he did not immediately go back to work as directed by Buice and that he approached Buice shortly after this.

Plaintiff denies the remainder of the asserted fact as stated.

Specifically, Plaintiff denies that when Buice put his hand up in Mr. Hill's face it was to send a signal for Mr. Hill to hold back or calm down. At his deposition, Mr. Hill did not agree with Delta's

counsel's suggestion that this was the nonverbal meaning of Buice's hand gesture when he replied, "you could say that."

Mark Sloan and Buice wrote statements about the incident that day and Buice wrote another statement on December 5, 2016 describing the event. No mention was made about Buice's hand in Mr. Hill's signaling anything except that **Mr. Hill** asked Buice to stop putting his hand in Mr. Hill's face because it was threatening to him. However, Buice refused repeatedly, so Mr. Hill walked off to avoid further confrontation. Hill Dep., pp 101 – pp. 115; Lindsay Dep., Exh. 111 (Delta Bates #2614); San Souci Dep., Exh. 14 (Delta Bates #2422); and Deposition of Nicole Bell ("Bell Dep.") attached to the accompanying Brief as Exhibit "H", Exh. 73 (Delta Bates #2539).

13.

**Defendant's Alleged Fact:**

Hill then told Buice that he thought his action (of using his open palm to ask Hill to calm down) was threatening to him and he three times stated, "Please do not to that" and then walked away. Hill Dep., p. 108, 112.

**Plaintiff's Response:** Admitted.

However, Plaintiff does note that there is a typographical error: "Please do not **to** that" should read "Please do not **do** that."

14.

**Defendant's Alleged Fact:**

AMT Mark Sloan (who Hill did not accuse of harassment and who Hill considered to be "pretty objective in the situation") witnessed the interaction between Buice and Hill at Buice's desk and reported to Delta that (1) Hill used a loud voice acted in an erratic and aggressive manner towards Buice; and (2) Buice did not use a loud voice and, after Buice raised his open palm as a gesture asking Hill to back off, Hill became even more aggressive

towards Buice. Hill Dep., p. 107, 160; Deposition of Dennis Lindsay, Exh. 111 (Hill/Delta 002365).

**Plaintiff's Response:** Admitted in part, denied in part.[3]

Plaintiff admits that he considered Mr. Sloan to be objective, but only as it specifically applied to his November 14, 2016 written statement describing the incident that happened the same day. Hill Dep., pp. 160.

Plaintiff denies the remainder of Defendant's asserted fact as stated.

Sloan stated that Mr. Hill's voice was raised, there was no profanity, Mr. Buice raised his hand toward Mr. Hill, Mr. Hill asked Mr. Buice to stop, Mr. Buice did not stop and then Mr. Hill asked again and Mr. Buice did not comply then Sloan walked away, which Mr. Hill agreed with was all accurate. Lindsay Dep., Exh. 111 (Delta Bates #2614).

Plaintiff objects that parts of Defendant's asserted material fact is not supported by the evidence cited. None of the citations by Delta contain any description by Sloan of Mr. Hill being "erratic," "aggressive," or "even more aggressive" on November 14, 2016.

15.

**Defendant's Alleged Fact:**

Between the second and third incident reported by Hill, on November 15, 2016, Lead AMT Warren (who was not involved in either of the first two incidents reported by

---

[3] Plaintiff notes that the correct Bates number for Exhibit 111 is "Hill/Delta 2614" and not "2365."

Hill addressed above) wrote to Lindsay that, on the previous date, Hill had told him:

I don't need you! You need to know that I am off the chain! After I found out you don't care for me and you are with Buice. I am off the chain!!! You know what that means don't you? I am watching you! I am going to get you and Buice! THE CHAINS ARE OFF!!!!

Deposition of Nathan Warren ("Warren Dep."), attached to the accompanying brief as Exhibit "E", Exh. 17, p. 4.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that Warren allegedly reported the above to Lindsay.

Plaintiff denies the remainder of Defendant's asserted fact as stated and specifically denies that he made the statements or anything remotely related to them. Hill Dep., pp. 142-143.

There is also a disputed question of fact regarding the origin of this statement. That is, there is a question as whether Lindsay solicited and influenced this statement from Warren or whether Warren presented this statement to Lindsay out of the blue.

In his deposition, Warren testified that Lindsay had requested the statement, but Lindsay's contemporaneous handwritten journal notes state that Lindsay never requested any statement about Mr. Hill from Warren in November 2016. Warren Dep., pp. 34-36, Exh. 16 (Delta Bates #2368).

16.

**Defendant's Alleged Fact:**

Warren then made a report to Lindsay that said:

My personal opinion is that Mark is under more stress than he can handle. I am concerned he is going to have a medical crisis. Later I have talked to Dennis [Lindsay]

about the situation and he recommended to Mark the EAP [Employee Assistance Program]. He is very volatile and it makes the situation very sensitive.

Warren Dep., Exh. 17, p. 3.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that Warren made these statements in an email on November 15, 2016 and further stated: "I am very concerned with his state of mind. He is acting very irrational. […] [this is] more of a concern of Mark's state of mind and the stress he is under." Warren Dep., Exh. 17, p. 1 (Delta Bates #2600). Warren testified that he was concerned with Hill's "state of mind" and that:

Hill] was so preoccupied and so upset [following his wife cancer diagnosis]. He was very, very upset. To the point I would think he's at the point and I'm not a doctor, but his blood pressure being risen and something, you know, like a **stroke or a heart attack.** […] I was afraid someone that upset could have a **heart attack or a stroke**.

Warren Dep., pp. 25, 38 and 51-54.

Plaintiff denies that the statements asserted in the statement of material facts are true and there is a dispute of fact as to whether Warren had a retaliatory motive to make these statements, as eight (8) days prior to this statement by Warren, Mr. Hill had reported Warren for harassment. Hill Dep., pp. 127-132; Lashley Dep., pp. 38.

17.

### Defendant's Alleged Fact:

Finally, with respect to the third of the three allegedly "harassing" incidents reported by Hill, on December 2, 2016, Hill reported to Lindsay, Craig and Bell that, earlier that day, he had purchased items from a vendor at Delta and took them out to his car in a large

- 19 -

grey garbage bag. Hill Dep. Exh. 4, pp. 8, 12-13 (Hill 00807; Hill 0811-0812).

**Plaintiff's Response:** Admitted.

18.

**Defendant's Alleged Fact:**

Hill understood that walking out to his car with a large bag of items from the shop might raise some suspicions, and he claimed that an AMT told him that "one of the other leads [who Hill determined was Buice or Warren] had questioned whether I was stealing something from Delta or not in that grey bag." Hill Dep., p. 128, 130, 131; Exh. 4, pp. 12-13 (Hill 0811-0812).

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that a Delta employee told Mr. Hill that someone had questioned what Mr. Hill was taking to his car.

Plaintiff denies the remainder of Defendant's asserted fact as stated. Although Hill stated this act might raise some suspicions, Hill denies it might justify accusing him of theft. Hill Dep., pp. 127-132; Craig Dep., Exh. 116.

Plaintiff also specifically denies that it was an AMT, as it was lead AMT Ed King who witnessed it and informed Mr. Hill of this. Mr. King stated in his written statement that "Nathan implied that Mark must be stealing something." Warren Dep., Exh. 21.

19.

**Defendant's Alleged Fact:**

Nothing at all happened to Hill because of this alleged question by a Lead AMT about the items in his gray bag and whether or not he had stolen items. Hill Dep., p. 134.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that he was not formally disciplined for the question or issue regarding the gray bag.

Plaintiff denies the remainder of Defendant's asserted fact as stated. Mr. Hill claims that had he not been the one to raise the issue of the theft accusation, he likely would have been written up or punished in some manner by Defendant. However, this event confirmed Mr. Hill's suspicion that both Warren and Buice did harbor a retaliatory animus against him and that they would not stop because Delta would do nothing to protect Mr. Hill from them. Mr. Hill further denies that "[n]othing at all happened to Hill." Mr. Hill reported the false allegation of theft against him to Delta VP Mike Moore, among others, in hopes of finally being protected from Warren and Buice's discriminatory and retaliatory acts. This, in turn, was a factor in the later claims of discrimination and harassment by Hill. Hill Dep., pp. 127-132; Craig Dep., pp. 34, Exh. 116 (Delta Bates #2692-2701).

20.

**Defendant's Alleged Fact:**

> Bell and Craig investigated the three events below and found that nothing at all improper had occurred towards Hill in any of these events. Hill Dep., Exh. 5.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that Bell and Craig conducted a purported investigation between the two of them that found nothing illegal had occurred.

Plaintiff denies the remainder of Defendant's asserted fact as stated, as Hill maintains that his complaints were not truly

investigated. The "investigation" conducted did not properly look into his complaints and was not sufficient. Craig did not interview all the witnesses to the incidents and Bell falsely stated during Delta's 30(b)(6) deposition that she conducted the interviews, when she in fact only interviewed Mr. Hill. Craig Dep., pp. 39; 30(b)(6) Dep., pp. 53-77.

Furthermore, Delta did not follow its own policies as to the first level investigation into Mr. Hill's Complaints. Instead of warning Warren not to retaliate according to Delta policy, Lindsay and Craig notified both Warren and Buice that Mr. Hill had reported them for harassment. Rule 30(b)(6) Deposition of Delta Air Lines, Inc. ("30(b)(6) Dep.") attached to the accompanying Brief as Exhibit "I", pp. 65-66; Lindsay Dep., pp. 33; Craig Dep., pp. 23.

21.

**Defendant's Alleged Fact:**

Bell and Craig learned in their investigation that some Delta employees (including Warren in his statement referenced above) had expressed concerns about Hill's recent behavior in the workplace. Hill Dep., Exh. 5, p. 3.

**Plaintiff's Response:** Denied.

In his summary of the investigation sent to Bell on December 8, 2016, Craig makes no mention whatsoever of some employees expressing concerns about Mr. Hill's behavior in the workplace. Farmer Dep., Exh. 38 (Delta Bates #1610-1612). Other than the false "chains are off" accusation by Warren (who was one of the alleged harassers and had a self-interest to state this falsely), there were no specific concerns made about Mr. Hill's behavior—all other concerns were

vague and ambiguous in that they were not attached to any specific time or place or actual action or statement by Mr. Hill.

None of these concerns were reported until **after** Mr. Hill reported workplace discrimination and harassment. The exhibit cited by Delta's is misleading (to say the least). Exhibit 5 of Mr. Hill's deposition was not created by Delta until **after** the CEO email on December 22, 2016. Exactly 30 minutes after Mr. Hill sent his email to Delta's CEO Ed Bastian, Bell's immediate supervisor in Human Resources, Cassandra Lee Austin, instructed her to "Please prepare an executive summary that outlines the actions taken by Craig and you." San Souci Dep., Exh. 1.

Other than Warren's November 15th statement, all the false allegations about Mr. Hill listed on page 3 of Exhibit 5 of Mr. Hill's deposition (Bell's Executive Summary) have nothing to do with Bell's and Craig's early December investigation. Craig's final report of the investigation was sent to Bell on December 8, 2016 and the false negative reports about Mr. Hill began on December 19, 2016. San Souci Dep., Exh. 5; Farmer Dep., Exh. 38 (Delta Bates #1610-1612).

22.

**Defendant's Alleged Fact:**

AMT Sloan (who again Hill testified was "pretty objective in the situation") reported that (1) Hill has been extremely upset of late; (2) a number of employees were scared to be in the shop due to Hill's erratic behavior; (3) he was worried that Hill might do serious harm to himself as well as others in the shop; and (4) he did not want to return to the shop when Hill was present. Hill Dep., P. 160; Exh. 5, p. 3.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that Sloan allegedly made these statements **after** Mr. Hill complained of harassment and discrimination multiple times.

Plaintiff denies that he thought Sloan was objective outside of the written statement he made contemporaneously about the November 14, 2016 tool room incident with Buice. Hill Dep., pp. 145-146; San Souci Dep., Exh. 11 (Delta Bates #1452-1454).

23.

**Defendant's Alleged Fact:**

Lead AMT Dave Farmer (who was and is a friend of Hill's) reported in part to Lindsay on November 21, 2016:

Mark Hill has recently found out that his wife has breast cancer and it has brought him an enormous amount of stress. I have done what you asked me, I have been helping and supporting in every way I can. Mark in his anger is lashing out at Delta, the leads, the PLM and our department. We are, and will continue to be supportive but I also have the responsibility of looking out for what is best for Delta, our shop and the other 12 guys on my crew. . .. It is with great reserve and respect that I tell you the following statements. . .. Mark needs to get a fresh start in a different shop in Delta Air Lines. Mark is lashing out and feels like he is treated unfairly and unjustly. This is the exact opposite of what has happened. . .. I am very concerned that this may escalate into a bigger issue if it goes ignored. We have come to a point in time that we cannot ignore such actions that may escalate into work place violence. I have not seen this as of yet but I cannot explain how upset Mark is with his department. I am open to talking about this more if that is what is needed, but I hate to see the shop be a place where people dread to come into work.

Farmer Dep., pp. 78, 79, Exh. 20.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that the email bears Farmer signature and is offered as a statement made by Farmer.

Plaintiff denies the remainder of Defendant's asserted fact as stated. Plaintiff also objects that Defendant's asserted material fact is not supported by the evidence cited, because the witness clarified his statement cited above in his deposition.

In his clarification, Mr. Farmer explained that: "I just feel like in this day and age you're not -- you shouldn't -- people shouldn't push people or not address issues and allow it to escalate until someone loses their temper, you know what I'm saying, to speak with this guy, you know, give him a chance, he's a good mechanic, hear his side of the story, you know." Farmer Dep., pp. 81–82.

It is disputed that Farmer created the statement offered in this statement of material fact. That is, documentary evidence and deposition testimony shows that it is unlikely that Farmer actually wrote his own November 21, 2016 email. Farmer Dep., pp. 78–83. Most notably, Farmer claimed to have written the email on a note pad prior to November 21st, had someone proofread it for him, and then he typed it up himself and sent it on November 21st. Farmer Dep., pp. 79–80.

However, the evidence shows this is not possible because Dennis Lindsay requested the November 21st email on that same day, so it is not believable that Mr. Farmer began writing it on a notepad prior to it being requested by Lindsay. Farmer Dep., pp. 78-79; Lindsay Dep., pp. 50–55.

Additionally, Farmer testified that he had Warren proofread this email, yet Warren denied proofreading this email for Farmer in his deposition. Compare Farmer Dep., pp. 77-83 and Warren Dep., pp. 40-42. Lindsay also testified that "David is not the greatest writer." Lindsay Dep. p. 51. And Warren testified that "Dave Farmer has trouble with grammar and sentence structure when he's writing emails." Warren Dep., p. 40. The evidence suggests the email was likely written by someone (potentially the alleged harasser Warren) whose writing skills far exceed Mr. Farmer's, when comparing the emails proofread by Warren versus Farmer's email that was not proofread. Compare Warren Dep., Exh. 18 (Delta Bates #2498), Exh. 19 (Delta Bates #2391), and Exh. 20 (Delta Bates #2447).

24.

**Defendant's Alleged Fact:**

On December 20, 2016, Farmer reported to Lindsay that Hill had come to him "very upset" about the distribution of overtime and then that several others in the department told Farmer that Hill had been stating "Mother-Fuck Delta," Mother-Fuck the leads," and "Mother-Fuck the upper management and I am gonna stick this up their asses." Farmer Dep., p. 77, Exh. 18.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that the email bears Farmer signature and is offered as a statement made by Farmer.

Plaintiff denies the remainder of Defendant's asserted fact as stated. Plaintiff also objects that Defendant's asserted material fact is not supported by the evidence cited, because the witness clarified his statement cited above in his deposition.

Farmer clarified his December 20th email, stating that he was not concerned about Mr. Hill's behavior during the overtime issue that had arisen on December 16, 2016, which was the subject of the December 20th email to Lindsay. Farmer Dep., pp. 73-74. The evidence suggests that the December 20th email Defendant refers to was written by Warren, as it was "proofread" by Warren (one of the two alleged harassers) and was emailed to Lindsay from Warren's email account (not from Farmer's email account), while Farmer was not even at work. Farmer Dep., pp. 75-77, 83-84, 85-92, 93-95, Exh. 41 (Delta Bates #2343), and Exh. 43 (Delta Bates #2341-2342); Warren Dep., Exh. 18 (Delta Bates #2498).

25.

**Defendant's Alleged Fact:**

Farmer wrote to Lindsay, "I am not sure what to do, my men are looking to me for direction and help on this and I feel that action must be taken." Farmer Dep., Exh. 18.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that this is offered as a statement made by Farmer.

Plaintiff denies the remainder of Defendant's asserted fact as stated. Plaintiff also objects that Defendant's asserted material fact is not supported by the evidence cited, because the witness clarified his statement cited above in his deposition.

Farmer clarified his December 20th email, stating that he was not concerned about Mr. Hill's behavior during the overtime issue that had arisen on December 16, 2016, which was the subject of the

December 20th email to Lindsay. Farmer Dep., pp. 73-74. The evidence suggests that the December 20th email Defendant refers to was written by Warren, as it was "proofread" by Warren (one of the two alleged harassers) and was emailed to Lindsay from Warren's email account (not from Farmer's email account), while Farmer was not even at work. Farmer Dep., pp. 75-77, 83-84, 85-92, 93-95, Exh. 41 (Delta Bates #2343), and Exh. 43 (Delta Bates #2341-2342); Warren Dep., Exh. 18 (Delta Bates #2498).

26.

**Defendant's Alleged Fact:**

On December 21, 2016, Craig and Bell met with Hill to apprise him of the results of their investigation and, after this meeting, Bell told her supervisor, Lisa Abraham Brown ("Brown"), that Hill had acted in an irrational and concerning manner during the meeting as described in more detail below. Hill Dep. pp. 151, 152; Deposition of Nicole Bell ("Bell Dep."), pp. 149, 150.

**Plaintiff's Response:** Admitted.

27.

**Defendant's Alleged Fact:**

Bell reported that, during the meeting, Hill (1) became emotional and angry (2) clenched his fists and became red-faced (3) then "directly after that reaction he would start to laugh, which was, again, concerning [with him] being in a safety-sensitive position" (4) would purport to repeat back what Bell or Craig had just said but he would state something different than what was just said (5) repeatedly switched back and forth from laughing to showing anger and (6) his conduct caused her to be concerned about his behavior. Hill Dep., pp. 133, 134, 135, 146, 147, 149, 150.

**Plaintiff's Response:** Denied.

The citations referenced do not support the facts asserted because this fact asserts that Bell reported these six things, but

nowhere do the facts referenced show Bell reporting anything in the citations to Mr. Hill's deposition.

Craig was present during that meeting but did not have the same concerns whatsoever about Mr. Hill that Bell allegedly expressed to Brown. The documentary evidence shows that Delta did not respond to the December 21st meeting, but almost immediately responded to the CEO email (3 minutes later) sent at 11:09AM on December 22, 2016. Bell Dep., pp. 146-151; Craig Dep., pp. 79-80, 81-87; Farmer Dep., Exh. 39 (Delta Bates #1886-1890).

Mr. Craig's deposition testimony directly refutes Bell's testimony on these points: (1) Mr. Craig never said Mr. Hill was angry, he did say Mr. Hill was "emotional at times" and that "the behavior was a little erratic during that meeting" while voicing his disagreement with the harassment investigation conclusion and he explained past events; (2) Mr. Craig never said anything about Mr. Hill having "clenched fists" or being "red faced" (and Bell never documented this contemporaneously) but he did say Mr. Hill was "very passionate that his version of events was the absolute truth"; (3) Mr. Craig said nothing about Mr. Hill laughing during the meeting; (4) Mr. Craig never mentioned Mr. Hill repeating anything back; (5) Mr. Craig made no mention of Mr. Hill "laughing" or "showing anger"; and, (6) Mr. Craig did respond that he was concerned, but not to the level that Bell expressed, and that Mr. Hill never said or did anything inappropriate during the meeting. Craig Dep. pp. 76-79.

28.

**Defendant's Alleged Fact:**

The day after the meeting that concerned Bell, on December 22, 2016, Hill sent a lengthy email to 18 individuals, including Bell, Lindsay, Craig and Delta's CEO, and wrote that he felt that he was in a "very surreal irrational environment." Hill Dep. Exh. 7, p. 3; pp. 150, 151.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that he did send an email to the individuals referenced above, but disputes that the meeting was truly concerning to Bell.

Plaintiff denies the remainder of Defendant's asserted fact as stated. The December 22, 2016, complaint that was sent by Hill was not limited to a statement that Hill felt that he was in a "very surreal irrational environment." Plaintiff objects that asserted material fact is not supported by the evidence cited, because Defendant includes only a portion of Mr. Hill's December 22, 2016 email, and in fairness the full statement must be considered to understand the statement's context.

29.

**Defendant's Alleged Fact:**

Among other things, Hill wrote in his email:

I related the story of how a friend of mine [actual name changed to John Smith in this SOUF for confidentiality purposes] in 381 had committed suicide because of issues similar to this where you realize that no matter how much evidence piles up in your favor during harassment or unfair treatment like this Delta the Corporation will crush the individual because they can. I related that while I personally have very strong mental and physical control some humans are frail and sometimes when they see

no hope for fairness and justice or just basic human dignity they react irrationally.

Hill Dep., Exh. 7, p. 2. (emphasis added).

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that this statement is included in his December 22, 2016, complaint.

Plaintiff objects that asserted material fact is not supported by the evidence cited, because Defendant includes only a portion of Mr. Hill's December 22, 2016 email, and in fairness the full statement must be considered to understand the statement's context.

30.

**Defendant's Alleged Fact:**

Hill wrote that what he claimed had recently happened to him (i.e., the three incidents addressed above), "I think this is probably what happened in [Department] 381 when [Smith] died." Hill Dep., Exh. 7, p. 3.

**Plaintiff's Response:** Plaintiff objects that Defendant's asserted material fact is not a material fact. Defendant also objects that asserted material fact is not supported by the evidence cited, because Defendant includes only a portion of Mr. Hill's December 22, 2016 email, and in fairness the full statement must be considered to understand the statement's context. With these objections made, Plaintiff admits he wrote the statement.

31.

**Defendant's Alleged Fact:**

When asked at his deposition why he raised Smith's suicide in this email, he testified in pertinent part, "there are people who are frail or maybe mentally ill, and we don't know it. We don't know what they'll do," and that

his reference to Smith's suicide in the email "was not a good statement." Hill Dep., pp. 167, 168.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff objects that Defendant's asserted material fact is not a material fact. Defendant also objects that asserted material fact is not supported by the evidence cited, because Defendant includes only a portion of Mr. Hill's December 22, 2016 email, and in fairness the full statement must be considered to understand the statement's context. With these objections made, Plaintiff admits he stated the above referenced quote in his deposition.

However, Plaintiff denies the remainder of Defendant's asserted to the extent it suggests he was suicidal. Mr. Hill made it very clear that he was **never** suicidal, let alone during the relevant time period of this lawsuit, stating:

Generally in meetings like this management eventually gets around to blaming the employee. I related the story of how a friend of mine [actual name changed to John Smith in this PSMF for confidentiality purposes] in 381 had committed suicide because of issues similar to this where you realize that no matter how much evidence piles up in your favor during harassment or unfair treatment like this Delta the Corporation will just crush the individual employee because they can. I related that while I personally have very strong mental and physical control some humans are frail and sometimes when they see no hope for fairness and justice or just basic human dignity they react irrationally.

Hill Dep., pp. 165-173

This was also supported by his immediate supervisor David Farmer's testimony. Farmer Dep., pp. 51.

32.

**Defendant's Alleged Fact:**

Bell reviewed the events about Hill with her HR supervisors, and she was advised to contact Delta's outside EAP consultant (at a company called Optum), Rose Molitor ("Molitor"), and, after Bell explained the events to Molitor, Molitor determined that Hill must contact her and not be permitted to return to work until he had been evaluated by EAP. Bell Dep., pp. 55, 148-154.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that Bell reviewed the events about Hill with her HR supervisors, and she contacted Delta's outside EAP consultant (at a company called Optum), Rose Molitor ("Molitor").

Plaintiff denies the remainder of Defendant's asserted fact as stated.

Bell testified that Delta recommended that Hill be referred to mandatory EAP because Bell had concerns about his mental health. Bell testified that Hill's behaviors in her December 21 meeting with Hill were objective manifestations that supported her conclusion that Hill needed to be referred to EAP to see a mental health therapist. Bell Depo., pp. 101-102, 134-135, 146-148. Bell explained that conclusion was reached after Hill told her about his wife's cancer and that he was being subjected to discrimination and retaliation, he began clenching his fists, laughing inappropriately and switching back and forth between anger and laughter. Bell Depo 146-48.

Optum Psychologist Rose Molitor's EAP Case Notes explicitly state that Molitor spoke with Nicole Bell twice on December 23, 2016 and that Molitor would not "trigger" (medical term for approval to

- 33 -

psychologically evaluate an employee involuntarily) Mr. Hill despite what Bell had told her regarding Mr. Hill's behavior: "Nicole denied EE (Mr. Hill) had been violent in the workplace and denied EE has threatened anyone." "Nicole was informed EAP would not trigger EE without talking to him but that the workplace can trigger him if having concerns about safety and can inform him he needs to be cleared by EAP," and, "Informed Nicole this MC is not triggering EE at this time." San Souci Dep., Exh. 4 (at pp. 4-5).

33.

**Defendant's Alleged Fact:**

> On December 23, 2019, Hill attended a meeting with Craig and Bell (who participated by phone) and was told that he was to call Molitor (which Hill then did) and that he would be suspended with continued pay and benefits for review by EAP. Hill Dep., pp. 175, 176, 179, 181.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that on December 23, 2019, Hill attended a meeting and he was told that he was to call Molitor (which Hill then did) and that he would be suspended with continued pay and benefits for review by EAP.

Plaintiff denies that the meeting was only with that included include Craig and Bell (who participated by phone). Corporate Security (Larry Todd Hammett) was also present during this meeting and escorted Mr. Hill off the property after this meeting. Hill Dep., pp. 175-178. Furthermore, pages 179 and 181 of Mr. Hill's deposition do not have any relevance to, much less support for, Defendant's asserted material fact.

34.

**Defendant's Alleged Fact:**

Because Hill was unhappy with the investigation done by Craig and Bell of his harassment allegations, on December 26, 2016, Delta's then Manager – Equal Opportunity Brian San Souci ("San Souci") emailed Hill and informed him that he was going to do a second investigation of his complaints of alleged "harassment." Hill Dep., pp. 181, 182.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that Mr. San Souci emailed him on December 26, 2016 and informed him that he was going to conduct a second level investigation.

Plaintiff denies the remainder of Defendant's asserted fact as stated.

Specifically, the evidence shows that Mr. San Souci initially emailed Mr. Hill on December 23, 2016, about 5 hours after Mr. Hill's email to the CEO, in what appears to be a response on behalf of Delta's CEO, where Mr. San Souci offered to "make [Mr. Hill's] concerns [about discrimination and retaliation] a priority" and made no mention of the events of the day even though documents show that Mr. San Souci was heavily involved in the decision to refer Mr. Hill to EAP and suspend him. San Souci Dep., pp. 60, Exh. 1 (Delta Bates #1638); Lindsay Dep., pp. 81, Exh. 114 (Delta Bates #3017-3025); Craig Dep., pp. 59, Exh. 119 (Delta Bates #2221); Delta Bates #848-849, 4385, 9452-9453, and 9395-9396.

The testimony cited by Defendant to support the asserted fact actually states that Mr. San Souci emailed Mr. Hill out of the blue – not because Mr. Hill was unhappy with the investigation.

35.

**Defendant's Alleged Fact:**

At Hill's request, San Souci in conjunction with two others (EO Program Manager Pamela Kelly and TechOps HR Manager Terrence Jackson) interviewed 14 employees who Hill wrote to San Souci would support his "harassment" allegations. Hill Dep., pp. 183, 192, 193; Exh. 9.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that Mr. San Souci, Ms. Kelly and Mr. Jackson interviewed 14 Delta employees.

Plaintiff denies the remainder of Defendant's asserted fact as stated.

Hill denies that the interviews limited for Plaintiff's "harassment" allegations. The 3 harassment complaints were Hill's initial complaints. The complaints at issue at this level of investigation (and in the complaint in this case) included Hill's discrimination and retaliation complaints. The various complaints that were investigated are discussed at Hill Dep., pp. 14-18, 74, 92, 101-113, 150-152, 155-156, 162-163, 215-217, Exh. 4, pp. 8, 12-13 (Hill 00807; Hill 0811-0812), Exh. 7; Craig Dep, pp. 20-23, 26-28, and Exh. 127 (Delta Bates #3195); Bell Dep pp. 114-130, 149, 150, 189-193, 190-191, 222., Exh. 62, 47 (Hill Bates #1181-1182), 48 (Hill Bates #1185-1186), 49 (Hill Bates #1187-1188), 50 (Hill Bates #1171-1172), 51 (Hill Bates #1195-1196), 52 (Hill Bates #1142), Exh. 59 (Delta Bates #1398-1411); Lindsay Dep., pp. 26-27, 32-35, 47, Exh. 103, Exh. 16 (Delta Bates #2366-2367), Exh. 101 (Hill Bates #340); 30(b)(6) Dep., pp. 59, 65-66; Farmer Dep., pp. 24, 32, 64, 95-96 Exh. 34 (Delta Bates #1079-1080), 35 (Delta Bates #1138-1140),

39, Exh. 9 (Delta Bates #2277), Exh. 5 (Delta Bates #1625-1626); San Souci Dep., pp. 68, 80, 137-138; Exh. 4 and 6; Lashley Dep., pp. 37-38; Warren Dep., pp. 34; and Delta Bates #721-871, 1712-1713, 1763-1764, 2459, 3513-3919 (3676-3678 and 3720-3723), 4583-4584, 4940-4949, 9158-9164.

Bell, Hill's HR Manager for the investigation, admits that she did not then (and does not now) really know what regarded as discrimination is. Bell Depo at 170-80. However, she acknowledged that San Souci's second level investigation was an investigation into Hill's subsequent complaints of discrimination and retaliation (and not only harassment as stated in Defendant's statement of material fact). Bell Depo at 68, 159-60.

Mr. Hill did not request this second level investigation by Mr. San Souci or Delta EO. Delta already decided it would do a second level investigation through EO 8 hours prior to Mr. San Souci sending Mr. Hill the above referenced email on December 23, 2016, as Mr. San Souci stated in an earlier email to other Delta management and HR that "the matter will be investigated by EO." Delta Bates #9452-9453. Hill Dep. pp. 155-158.

Pages 192-193 of Mr. Hill's deposition make no mention of the interviews conducted other than carryover from a question from Defense counsel, which is not relevant to Delta's asserted fact above.

- 37 -

36.

**Defendant's Alleged Fact:**

As reported in San Souci's February 17, 2017 9-page investigation memo, in mid-January 2017 interviews, none of the 14 employees identified by Hill supported Hill's complaints. Hill Dep., Exh. 9.

**Plaintiff's Response:** Plaintiff objects that Delta's asserted material fact is not admissible and does not otherwise comply with Rule 56(c) because it is an opinion and conclusory in nature, which does not comply with Rule 56 (stating that none of the interviews of the employees supported Mr. Hill's complaints is clearly conclusory). With this said, the statement is admitted in part, denied in part.

Plaintiff admits that Mr. San Souci's February 17, 2017 investigation memo consisted of 9 pages and contained summaries from 14 employee interviews held in mid-January 2017.

Plaintiff denies the remainder of Defendant's asserted fact as stated.

First, there is a dispute of fact as to whether some of the employees during their interviews were even asked about the situations Mr. Hill reported to San Souci. Hill Dep., pp. 182-186, 251-253 and 255-262. Second, San Souci was unable to recollect any specific questions he asked or that he instructed Pam Kelly or Terrence Jackson to ask during the EO investigation interviews. San Souci Dep., pp. 77-82 and 101-107. Third, San Souci couldn't explain why he did not gather the witness statements from the previous investigation conducted by Bell and Craig, but he did sate that he

preferred "new second level information" to witness statements written contemporaneously. San Souci Dep., pp. 76-80. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

37.

**Defendant's Alleged Fact:**

Interviewee AMT David Brock stated (1) he was concerned about Hill's wife but that he personally feared Hill (2) Hill had made the shop uncomfortable talking openly talking about his collection of firearms when Hill does not hunt and (3) Hill had recently told employees that he successfully completed an eight-month process to obtain silencers for his guns (and Hill admitted purchasing a silencer when he did not hunt and claimed it was "just a whim"). Hill Dep. p. 149, Exh. 9, pp. 4, 5.

**Plaintiff's Response:** Plaintiff also objects that Delta's asserted material fact is not admissible because it is hearsay and Delta cannot rely on inadmissible hearsay in support of its motion for summary judgement. Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) ("[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment") (internal citations omitted). With this said, the statement is admitted in part, denied in part.

Plaintiff admits that Mr. San Souci's February 17, 2017 investigation memo included a summary of Mr. Brock's interview.

Plaintiff denies the remainder of Defendant's asserted fact as stated. Plaintiff disputes that Brock would ever have stated that he personally feared Mr. Hill. Hill Dep, pp. 161-162, 165, 241-242.

Hill has personally known AMT David Brock for over 20 years. Brock has never stated to Hill that he personally feared Hill because of his gun ownership. Second Hill Dec. at ¶ 20. Hill does not believe Mr. Brock would ever have stated that he personally feared him because of Hill's lawful gun ownership or discussing Hill's gun ownership with him. Second Hill Dec. at ¶ 20. Mr. Brock is an avid gun owner and enthusiast and he would often bring the subject of guns up to Hill at work. Second Hill Dec. at ¶ 21. Mr. Brock is not only a multiple gun owner, who does not hunt, he also has a full scale machine shop at his residence and has been known to illegally mill out AR-15 assault rifle (called 80% lowers or "Ghost Guns") lower receivers for co-workers not only at his machine shop but also on Delta property. Second Hill Dec. at ¶ 22.

Based on Hill's knowledge and relationship with Mr. Brock, Hill reasonably believes that Brian San Souci's EO Memo that states Mr. Brock informed Delta that he was afraid of Hill is false. Second Hill Dec. at ¶ 23.

Furthermore, there is a dispute of fact as to whether some of the employees during their interviews were even asked about the situations Mr. Hill reported to San Souci or if this was just a fishing expedition for Delta to find reasons to support its suspending Plaintiff on EAP leave after the fact. Hill Dep., pp. 182-186, 251-253 and 255-262; San Souci Dep, pp. 77-82 and 101-107.

38.

**Defendant's Alleged Fact:**

Interviewee AMT Charles Flowe stated that (1) he was concerned about Hill's mindset because of Hill's accusations that Buice was out to get him and (2) Hill had been vocal in the workplace about owning guns. Hill Dep. pp. 147, 148, 149; Exh. 9, p. 3; Delta Deposition under Rule 30(b)(6) (with Bell as Rule 30(b)(6) witness) hereinafter "Rule 30(b)(6), Dep.", attached to the accompanying brief as Exhibit "F", Exh. 145, p. 2-3.

**Plaintiff's Response:** Plaintiff also objects that Delta's asserted material fact is not admissible because it is hearsay and Delta cannot rely on inadmissible hearsay in support of its motion for summary judgement. Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) ("[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment") (internal citations omitted). Plaintiff also objects that Delta's asserted material fact is not supported by some of its citations. With this said, the statement is admitted in part, denied in part.

Plaintiff admits that Mr. San Souci's February 17, 2017 investigation memo included a summary of Mr. Flowe's interview. Plaintiff denies the remainder of Defendant's asserted fact as stated.

There is a dispute of fact as to whether some of the employees during their interviews were even asked about the situations Mr. Hill reported to San Souci or if this was just a fishing expedition for Delta to find reasons to support its suspending Plaintiff on EAP leave after the fact. Hill Dep., pp. 182-186, 251-253 and 255-262; San Souci Dep, pp. 142-145. Furthermore, Delta misleadingly quotes

Flowe's statement from San Souci's final report but compared to Jackson's original summary of his EO interview with Flowe, Flowe makes no mention of Mr. Hill's "mindset" or of Mr. Hill being "vocal in the workplace about owning guns." San Souci Dep., pp. 90, 138, 144, Exh. 9 (Delta Bates #2274-2275), Exh. 13 (Delta Bates #1859), and Exh. 14 (Delta Bates #2422); Delta Bates #836-837.

Furthermore, pages 147-149 and Exhibit 9 of Mr. Hill's deposition and Exhibit 145 of the 30(b)(6) deposition do not support the asserted material fact. Additionally, Exhibit 9 is just a report of the statement and not the actual statement of Mr. Flowe, so it is inadmissible hearsay.

39.

**Defendant's Alleged Fact:**

> Interviewee AMT Paul Rosenstein reported that (1) he had witnessed Hill become overly aggressive towards another employee (2) Hill had become aggressive and his temper "can rise from 0 to 100 in a matter of seconds" and (3) most of the AMTs try to avoid Hill as much as possible. Rule 30(b)(6) Dep., Exh. 145, pp. 2-3.

**Plaintiff's Response:** Plaintiff objects that Delta's asserted material fact is not admissible because it is hearsay and Delta cannot rely on inadmissible hearsay in support of its motion for summary judgement. Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) ("[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment") (internal citations omitted). With this said, the statement is admitted in part, denied in part.

Plaintiff admits that Mr. San Souci's February 17, 2017 investigation memo included a summary of Mr. Rosenstein's interview.

Plaintiff denies the remainder of Defendant's asserted fact as stated.

First, Rosenstein was not interviewed in the San Souci investigation. He was interviewed by Terrence Jackson on February 28, 2017 by phone as one of the final two "volunteer" witnesses. Warren Dep., Exh. 26 (Delta Bates #2387-2388).

Second, Delta itself questioned the validity of the Rosenstein interview, as in an email from Bell planning a conference call, several questions about Jackson's summary of the Rosenstein interview were typed in bold print throughout the summary: first when Jackson stated that Rosenstein described a confrontation between Mr. Hill and co-worker Richie Cruse the question is asked "WHEN DID THIS OCCUR"; later on in the same subject it states in bold "MANAGER ADVISED"; and at the end of the summary it states in bold "PROBABLE CAUSE (NO)." Delta Bates #8461-8462.

The email cited to (Exhibit 145) discusses what Paul Rosenstein said, but it is not Paul Rosenstein writing the email or a transcript of him being directly interviewed, and therefore it is inadmissible hearsay.

40.

**Defendant's Alleged Fact:**

In January 2017, after Molitor told Bell that EAP was likely to clear Hill to return to work in a couple of days, Bell informed Molitor that there had been new concerns raised in the San Souci-led investigation of Hill's complaints that Bell wanted EAP to review, and, as

- 43 -

a result, Molitor made the decision for EAP to revoke the return to work process at that time and stated, "I need to see the document [of the results of that investigation]," which was later sent to Molitor. Bell Dep., pp. 157-160; Rule 30(b)(6) Dep., pp. 100-101.

**Plaintiff's Response:** Denied.

While Bell testified that Molitor told her that "EAP was likely to clear Hill to return to work in a couple days," it is disputed, as what Molitor actually told Bell in a January 19, 2017 email was: "This is an update to let you know that Marks provider has signed off that she believes Mark is able to return to work."

In fact, EAP never revoked Mr. Hill's return to work, **Delta refused to let Mr. Hill return to work**. Delta Bates #3057. Mr. Hill's official release to return to work was signed by Mr. Hill's local psychologist Barbara Bower on January 18, 2017 and was never revoked, rescinded or in any other way altered. Hill Bates #1422.

Finally, Molitor never stated "I need to see the document." Instead, Bell emailed Molitor stating: "There were interviews conducted yesterday with several employees as a continuum to the investigation that the provider may want to consider" … "we may want to hold off until all the meeting have been completed," and Molitor replied: "That makes sense, Nicole. I will hold off on setting anything up until hearing further from you." Therefore, Delta in effect delayed Mr. Hill's return to work until late April 2017. Delta Bates #3055–3060; Hill Bates #1422.

41.

**Defendant's Alleged Fact:**

After EAP later concluded that Hill could return to work with a recommendation that he be moved to another department in order to give him a "clean start," in April 2017, Hill was returned to work in his same title, pay and benefits, and with same shifts and off days in another Department. Hill Dep., pp. 209, 210; Deposition of David Craig ("Craig Dep."), attached to the accompanying brief as Exhibit "G", pp. 85-86; Bell Dep., pp. 169, 170; Rule 30(b)(6) Dep., pp. 104, 105.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that he was returned to work in late April 2017 with the same shift and off days, and that Mr. Hill's local psychologist did recommend that Mr. Hill transfer work groups **after** she read the two investigation reports from Delta.

However, Plaintiff denies the remainder of Defendant's asserted fact as stated.

Mr. Hill disputes that it was EAP who made the decision to transfer him to a new department, as it was made clear by Molitor that EAP had no input into employee decisions. On March 20, 2017, Molitor recorded in her case notes that she had told Mr. Hill on the phone the same day that: "This MC clarified with EE that all employment decisions come from Delta and that EAP is not involved in any decisions." It was Delta's decision to involuntarily transfer Mr. Hill. Bell Depo. at 171. The decision was made by Bell and the other decision-makers who also decided to refer Hill to mandatory EAP. Bell Depo. at 171.

While it is true that Mr. Hill's local psychologist did recommend Mr. Hill's transfer, there is no documentary evidence

produced by Delta to show that Ms. Bower's recommendation was ever considered by Delta, although there is documentation of a conference call held on January 23, 2017 (which included 7 or 8 members of Delta HR, EO, and legal) and according to call organizer San Souci the purpose of the call was "to address concerns of reintroducing Mr. Hill into 382," which shows that Delta was considering transferring Mr. Hill well before Ms. Bower's recommendation. San Souci Dep., Exh. 4 (p. 8) and Exh. 10 (Delta Bates #2231-2232); Craig Dep., pp. 91-92; Lindsay Dep., p. Exh. 111 (Delta Bates #2614) and Exh. 112 (Delta Bates #3036-3037); Hill Dep., pp. 252-253 and 255-263; Delta Bates #8458.

Pages 209-210 of Mr. Hill's deposition and pages 85-86 of Mr. Craig's deposition do not prove or support the asserted material fact, nor do they have any relevance to the asserted material fact.

42.

**Defendant's Alleged Fact:**

Delta considered Hill's transfer to another Department as an AMT using his exact same skill set (essentially doing the same AMT work but in the hangar instead of in the shop) (1) to be a "fresh start" for Hill (considering that he had complained repeatedly about working in his old department and even stated he did not want to have to interact at all with one of his Lead AMTs - Buice); and (2) in the interests of the employees of his previous department as several had expressed fear about working with him. Craig Dep. pp. 85-86; Bell Dep., pp. 169, 170.

**Plaintiff's Response:** Denied.

The transfer outside of Delta's rigid seniority system was unprecedented and highly unusual and his transfer to the hangar job was more arduous, dirty and physically difficult. Lashley Dep., pp.

22-23; Hill Dep., pp. 208-209. Furthermore, Mr. Hill never complained about working in his old department—he complained about being harassed, discriminated and retaliated against. Finally, while only three (3) co-workers ever specifically stated they feared Mr. Hill (two (2) of whom made these statements after Delta evacuated the shop in Department 382 and had security walk Mr. Hill off the property on December 23, 2016), none of them gave any credible or specific reason why they feared Mr. Hill and Delta never asked. Lashley Dep., pp. 22- 24; Hill Dep., pp. 208-209.

43.

**Defendant's Alleged Fact:**

> While Hill alleges that there have been less overtime opportunities in his new department, he admits that there have been overtime opportunities both in Atlanta and on special short-term assignments at other locations (where he can fly to on Delta for free) and that he has always declined those opportunities since April 2017. Hill Dep., pp. 25-26.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that he alleges that there have been less overtime opportunities in his new department and he has not worked overtime in his new department.

Plaintiff denies the remainder of Defendant's asserted fact as stated.

Mr. Hill has explained that he has been unable to accept the limited opportunities that have been offered in the new department. Further, even if he took every opportunity to work overtime in his new department, it would amount to less than one third of his overtime opportunities in his old department. Additionally, unlike

- 47 -

his old department, about 95 percent of the overtime in Department 242 is unscheduled and requires travel, so Mr. Hill would have to leave on a moment's notice to airports nationwide (and sometimes worldwide). Hill Dep., pp. 24-27 and Second Hill Dec. at ¶ 16.

Mr. Hill has worked at Delta as an AMT for over 30 years. Second Hill Dec. at ¶ 10. He is familiar with the overtime opportunities offered to AMT's at Delta. Second Hill Dec. at ¶ 11. Throughout Hill's career at Delta he has received overtime and is familiar with the past overtime Delta has offered and the work he has performed to qualify for overtime. Second Hill Dec. at ¶¶ 11-12.

When Hill was in Department 382, he regularly worked approximately 625 hours of overtime over the course of a year, based on the average of his overtime hours worked in 2014-2016 (the three-year period prior to his mandatory EAP suspension in late December 2016). Second Hill Dec. at ¶ 12. Delta typically offers overtime by seniority, but in his former shop, Department 382, there was so much overtime available that essentially anyone could sign up to work it. Second Hill Dec. at ¶ 12. Hill estimates that he has lost over $14,000.00 in overtime opportunities and pay during the four-month period of his mandatory EAP suspension alone. Second Hill Dec. at ¶ 13.

Hill has suffered significant lost overtime wages based on his April 2017 involuntary transfer from the shop in Department 382 ("Dept. 382") to the hangar in Department 242 ("Dept. 242"), because there are significantly less overtime opportunities in Dept. 242.

- 48 -

Second Hill Dec. at ¶ 14. Based on his experience and past accrual of overtime, Hill estimate that his involuntary transfer from the shop in Dept. 382 to the hangar in Dept. 242 has caused him to lose over $120,000.00 in overtime opportunities based on his transfer from the shop in Dept. 382 to the hangar in Dept. 242. Second Hill Dec. at ¶¶ 15-17.

44.

**Defendant's Alleged Fact:**

> While Hill complains that he did not seek overtime in his new department for his first few months there because of his wife's primary cancer treatments, he has not ever taken an overtime opportunity in his transferee department since September 2017 when his wife's primary treatments were concluded. Hill Dep., pp. 25-26, 70, 71.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that he has not taken the sparse overtime opportunities (compared to his old shop in Dept. 382).

Plaintiff denies the remainder of Defendant's asserted fact as stated.

Delta has made no attempt to address the overtime compensation lost during Mr. Hill's 4-month EAP suspension and the large difference in overtime opportunities between the two departments (382 and 242). Nor has Delta attempted to reimburse Mr. Hill for the 50 psychotherapy sessions or anger management course that Delta forced Mr. Hill to submit to from December 2016 until April 2018. Hill Dep., pp. 201-202 and Second Hill Dec. at ¶¶ 18-19.

45.

**Defendant's Alleged Fact:**

Hill received a team journal entry from his new manager in his transferee department on June 22, 2017 (stating that supervision had been unable to locate him on a shift and that "it was imperative that you understand the importance to complete each assignment quickly and be ready to move onto the next task") and that team journal entry was removed in July 2017 after Hill filed an internal grievance challenging it. Hill Dep., pp. 212, 213, 214, Exh. 13.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that he did receive a retaliatory written reprimand in the form of a team journal on June 22, 2017.

Plaintiff denies the remainder of Defendant's asserted fact as stated. Plaintiff also objects that Defendant's asserted material fact is not supported by the evidence cited because Delta fails to mention the write-up occurred on the same day that Mr. Hill had notified Van Kale earlier that morning that he had filed an EEOC Charge against Delta. Furthermore, the retaliatory write up was for a day for which Mr. Hill was not scheduled to work (and therefore was not at work) and for an aircraft Mr. Hill had not ever worked on. Hill Dep., pp. 211- 215, Exh. 13 (Hill Bates #0227).

46.

**Defendant's Alleged Fact:**

In 2017, Hill claimed he received "undue surveillance" based solely on a co-worker statement to him, but he admits that (1) the co-worker (who worked in another area) would have had no personal knowledge of any such surveillance; and (2) when HR asked Hill who this co-worker was, Hill would not identify him or her to HR. Hill Dep. pp. 215, 216, 217.

**Plaintiff's Response:** Admitted in part, denied in part.

Plaintiff admits that he declined to identify the co-workers who informed him about the undue surveillance to HR.

Plaintiff denies the remainder of Defendant's asserted fact as stated.

Specifically, Mr. Hill has never been insubordinate and never "refused" — he simply explained to HR that the source would not even tell him his source and the source was afraid that if identified, the source would be subjected to the same type on retaliation and discrimination as Mr. Hill. Following Mr. Hill's request to not provide the information, HR did not press Mr. Hill for any names. Hill Dep., pp. 215-216.

Furthermore, on multiple occasions Mr. Hill's visits to Department 382 were reported to management and/or HR, usually by Warren to the point where after Mr. Hill complained of the possible undue surveillance HR instructed management: "thus we are not [to] surveillance" Mr. Hill. Delta Bates #2459.

47.

**Defendant's Alleged Fact:**

In recommending that Hill be returned to work in a different department in 2017, EAP (Optum) also determined that Hill should continue therapy with the EAP therapist for a period of a year after his return to work. Rule 30(b)(6) Dep., pp. 114, 115.

**Plaintiff's Response:** Plaintiff objects that Defendant's asserted material fact is not supported by the evidence cited. Pages 114-115 of the 30(b)(6) deposition do not prove or support the asserted material fact.

Plaintiff denies that Hill the decision to returned Mr. Hill work was made by EAP (Optum). It was Delta's decision to involuntarily transfer Mr. Hill. Bell Dep., pp. 171. The decision was made by Bell and the other decision-makers who also decided to refer Hill to mandatory EAP. Bell Dep., pp. 171. Plaintiff admits that EAP supported Delta's decision and, in turn, recommended the transfer. But, more importantly, Delta was not bound by EAP's recommendations in this case. Delta has continuously stated that EAP recommended that Mr. Hill get a fitness for duty exam before returning to work, yet Delta decided not to do that but to (1) transfer Mr. Hill and (2) subject him to continued psychotherapy sessions for another year as a condition of continued employment. Therefore, Delta was the ultimate decisionmaker in Mr. Hill's involuntary medical treatment, not EAP. Delta's Responses and Objections to Plaintiff's First Requests for Admission, No. 65-66; San Souci Dep., Exh 4. p. 7-8.

With this objection stated, Plaintiff admits that at the return to work meeting on April 11, 2017, Mr. Hill was forced to sign a return to work agreement "as a condition of returning to work," which required another full year of involuntary psychotherapy and required Mr. Hill to sign a release of all healthcare information related to the Mandatory EAP back to Delta. Lindsay Dep., Exh. 113; Delta Bates #1077.

**RESPECTFULLY SUBMITTED,** this 1st day of April, 2020.[4]

### HORNSBY LAW GROUP

*/s/ Amelia Grubbs*_____
Brandon Hornsby
Ga. State Bar No. 367680
Amelia Grubbs
Ga. State Bar No. 696724

1180 W Peachtree St NW #2220
Atlanta, GA 30309
Tel: 404-577-1505
Fax: 404-577-1565          Attorneys for Plaintiff

---

[4] Counsel certifies that this pleading was prepared using Courier New 12-point font.

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2020, I filed the foregoing with the Clerk of Court using the NextGen CM/ECF system which will automatically send e-mail notification of such filing to opposing counsel of record: Benjamin A. Stone and Thomas J. Munger.

### HORNSBY LAW GROUP

*/s/ Amelia Grubbs*
Brandon Hornsby
Ga. State Bar No. 367680
Amelia Grubbs
Ga. State Bar No. 696724

1180 W Peachtree St NW #2220
Atlanta, GA 30309
Tel: 404-577-1505
Fax: 404-577-1565          Attorneys for Plaintiff