IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VINCENT MARK HILL,

     Plaintiff,

    v.

DELTA AIR LINES, INC.,

    Defendant.

CIVIL ACTION FILE

NO. 1:18-CV-05589-JPB-WEJ

## FINAL REPORT AND RECOMMENDATION

Plaintiff, Vincent Mark Hill, works for defendant, Delta Air Lines, Inc. ("Delta").  He alleges that Delta engaged in discrimination and retaliation against him in violation of the Americans With Disabilities Act, as amended, 42 U.S.C. § 12101 et seq. ("ADA").  (See Compl. [1], Counts One-Two.)[1]  This matter is before the Court on Defendant's Motion for Summary Judgment [56].  For the reasons stated below, the undersigned **RECOMMENDS** that said Motion be **GRANTED**.

------

[1] The Court granted the parties' Joint Stipulation and Consent Motion to Dismiss ERISA Claim, which had been alleged in Count Three.  (See Order [35] of Sept. 11, 2019.)

## I.   <u>STATEMENT OF FACTS</u>

In support of its Motion for Summary Judgment, defendant as movant filed a Statement of Undisputed Facts ("DSUF") [56-1].   <u>See</u> N.D. Ga. Civ. R. 56.1(B)(1).   As required by Local Civil Rule 56.1(B)(2)(a), plaintiff submitted a response.   (<u>See</u> Pl.'s Resp. to Def.'s Statement of Facts ("PR-DSUF") [80-2].)   As allowed by Local Civil Rule 56.1(B)(2)(b), plaintiff filed a statement of additional facts which he contends are material and present a genuine issue for trial.   (<u>See</u> Pl.'s Statement of Additional Material Facts ("PSAMF") [80-1].)   Defendant then filed a Response to PSAMF [84].   <u>See</u> N.D. Ga. Civ. R. 56.1(B)(3).

In an Order [23] dated May 20, 2019, this Court notified the parties that a movant's statement of material facts should include "[n]o more than **fifty (50) numbered facts**" except by leave of Court.   (<u>Id.</u> at 1.)   The Court also directed that "**there must be only one sentence per number**."   Those limitations also applied to the non-movant's statement of additional material facts.   (<u>Id.</u> at 2.)   With regard to the non-movant's response to the movant's statement of material facts, this Court's Order provided that, if "the respondent denies a numbered fact, **a concise factual explanation, limited to a brief paragraph, supported by a citation to the record must be offered**."   (<u>Id.</u>)

2

In recognition of the limitations on PSAMF, plaintiff sought leave of Court to file up to 100 proposed additional material facts. (See Pl.'s Mot. [61].) Plaintiff also sought leave to file a responsive brief five pages longer than the 25 pages allowed under Local Civil Rule 7.1(D). (Id.) In an Oral Order entered February 25, 2020, the Court granted plaintiff's Motion in part, allowing him 30 pages of briefing and 15 additional material facts, for a total of 65.

Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment [80] ("Pl.'s Opp'n") is 30 pages long; however, it does not appear to be double-spaced as required by the Local Civil Rule 5.1(C)(2), but 1.5 spaced. If this Opposition Brief had been double-spaced, by the Court's calculation, it would have been at least 39 pages long—nine pages longer than permitted.[2]

_____

[2] Under Local Civil Rule 7.1(F), this Court could, in its discretion, decline to consider plaintiff's Opposition Brief [80] because it fails to conform to the requirements of the Local Rules. Alternatively, the Court could elect to consider only the first 24 pages of his brief (which the Court estimates is the equivalent of 30 double-spaced pages). See Mitchell v. Dixie Transp., Inc., No. 1:16-CV-00336, 2019 WL 6137488, at *1 (N.D. Ga. Nov. 19, 2019) ("As a matter of fairness, the Court will not consider anything beyond the required page limit."); Thornton v. Jackson, 998 F. Supp. 2d 1365, 1368 (N.D. Ga. 2014) (court did not consider portion of plaintiffs' opposition brief, filed with 1.5 spacing, that exceeded page limitation). Nevertheless, the Court considers the entire brief.

3

Moreover, PR-DSUF failed to comply with the directive found in this Court's Order of May 20, 2019, that a denial contain a "concise factual explanation, limited to a brief paragraph, supported by a citation to the record." While plaintiff responded to almost all of Delta's proposed facts by stating, "Admitted in part, denied in part," in reality he admitted the proposed fact and then spent multiple paragraphs (and sometimes entire pages) explaining away his admissions or making lengthy arguments that focused on immaterial fact disputes. Plaintiff, in effect, wrote another brief using PR-DSUF, one that was 54-pages long (and would have been much longer if double-spaced). As this Court has stated in a similar situation:

> [P]laintiffs must remember that a response to a statement of undisputed material facts is not an opportunity to write another brief. If the fact stated is true, admit it. If the fact is legitimately disputed, then say why, cite the evidence that supports the denial, and stop.

Walker v. U.S., I.R.S., No. 4:07-CV-0102-HLM, 2009 WL 1241929, at *3-4 (N.D. Ga. Feb. 26, 2009) (quoting Darnell v. Georgia Power Co., No. 4:04-CV-0166-HLM, slip op. at 8 (N.D. Ga. Dec. 21, 2005)) (footnote omitted).

More troubling is plaintiff's penchant in PR-DSUF's lengthy responses to misstate the facts or make assertions based on speculation which is unsupported by any probative record evidence. The Court elaborates on this point many times,

4

infra.  This penchant is also reflected in plaintiff's Opposition Brief.  In the first paragraph of that filing, Mr. Hill asserts there is evidence that Lead AMT Nathan Warren stated, "'Now that Mark Hill's wife has cancer, I am going to double down and make his life miserable.'"  (Pl.'s Opp'n 1.)  Plaintiff provides no record citation where the Court can locate the language he quotes.  He does not include this statement in PSAMF.  The obvious reason why is because there is no evidence that Mr. Warren made this statement.  The only testimony relating to this topic was provided by Michael Lashley, who testified that (1) he was less than 50% sure he ever heard that comment from anyone; and (2) if he did hear it, he does not know who said it (i.e., he did *not* testify that Mr. Warren said it).  (Lashley Dep. [66] 41-42.)

Fidelity to the record is expected from plaintiff's counsel as an officer of the Court.  Zealous representation is no excuse for misrepresentation of evidence.  Unfortunately, in the course of writing this Report and Recommendation, the undersigned has learned that no confidence can be placed in the representations of plaintiff's counsel regarding the facts or the law.  Delta asserts that this has been one of the most expensive single-plaintiff cases it has ever litigated in this District.  (Def.'s Reply Br. [82] 2.)  The Court assumes that Delta's desire not to expend any more money on this matter is the reason it has not filed a motion for sanctions.

Finally, with regard to PSAMF, this Court allowed plaintiff to file 65 one-sentence paragraphs.  Because he used numerous lengthy run-on sentences, semi-colons, and bullet points, plaintiff far exceeded this limitation.  By the Court's conservative count, PSAMF contains 111 proposed facts, 46 more than was allowed.  Some of his proposed facts (see, e.g., PSAMF ¶¶ 2, 13) go for a page or more (and would have been longer had they been double-spaced).

"Such disregard for the procedural rules of this Court will not be tolerated." Gainor v. Douglas Cty., Ga., 59 F. Supp. 2d 1259, 1297 (N.D. Ga. 1998).  There must be consequences.  Accordingly, the Court **strikes** PSAMF.  See Gass v. CBOCS, Inc., No. 4:10-CV-00225-HLM-WEJ, 2012 WL 13135377, at *2 (N.D. Ga. July 24, 2012), R&R adopted, 2012 WL 13135403 (N.D. Ga. Sept. 18, 2012) (striking PSAMF for violations of the Local Civil Rules).

Despite this ruling, the Court nevertheless made a painstaking review of PSAMF.  Striking PSAMF has made no difference in the undersigned's recommendation because almost all of its factual assertions are either immaterial (PSAMF ¶¶ 1-14, 16-18, 20-22, 24-32, 34-39, 41-65), unsupported in whole or in

part by the record cited (id. ¶¶ 1, 2, 4, 10-11, 13-15, 19-22, 25, 28, 31, 34-35, 42-43, 45-49, 52-54, 56-59), or both.[3]

So much of what plaintiff asserts is immaterial because, as discussed infra, the undisputed material facts show that in the weeks after Mr. Hill's wife's cancer diagnosis, Delta received reports from several employees that he made threats, became highly erratic, clenched his fists in meetings with management, and wrote an email to many Delta employees (including its CEO) which twice mentioned suicide.  Alarmed at these events and concerned for Mr. Hill, Delta reported them to its Employee Assistance Plan ("EAP"), which recommended that Mr. Hill be referred to it and only allowed to return to work after it recommended that he do so.  Delta followed that recommendation and placed him on leave with full pay and benefits until Delta followed the EAP's recommendation to return him to work in another Department.  Mr. Hill was not harmed and was able to be at home with his wife (who was undergoing cancer treatment) with full pay and receive counseling

_____

[3] Additionally, given that PSAMF repeats much of what was asserted in PR-DSUF, the Court's extensive review of PR-DSUF has led it to consider many of plaintiff's "facts," but they are immaterial or unsupported.  (Compare PSAMF ¶ 1, with PR-DSUF ¶ 20; compare PSAMF ¶¶ 11 and 15, with PR-DSUF ¶ 32; compare PSMAF ¶ 18, with PR-DSUF ¶ 34; and compare PSMAF ¶ 49, with PR-DSUF ¶ 42.)  Moreover, the Court reviewed plaintiff's Opposition Brief [80], which cites many paragraphs of PSAMF.

(under Delta's health plan).  Nothing in PSAMF counters these undisputed material facts.  These undisputed material facts lead to the inescapable conclusion that plaintiff's ADA discrimination and retaliation claims are without merit.

The Court utilizes the defendant's proposed facts (DSUF) and plaintiff's responses thereto (PR-DSUF) as follows.  Where plaintiff admits a proposed fact, the Court accepts it as undisputed for purposes of this Motion and cites only the proposed fact.  Where plaintiff admits a proposed fact in part, the Court includes the undisputed part.  Where plaintiff denies a proposed fact in whole or in part, the Court reviews the record and determines whether a fact dispute exists.  If the denial is without merit, and the record citation supports the proposed fact, then the Court deems the particular paragraph of DSUF admitted.  Finally, the Court modifies some proposed facts to more accurately reflect the record and considers the facts in light of the standards for summary judgment, discussed infra Part II.

### A.    Plaintiff's Job at Delta and his Reporting Structure

In the fall of 2016, Delta employed plaintiff as an aircraft maintenance technician ("AMT") in Department 382 (components shop) in Atlanta.  Depending on his day and shift, Mr. Hill reported for work assignments to one of a group of Department 382 Lead AMTs–including Dave Farmer, Mike Buice, and Nathan

Warren.  The Lead AMTs reported to Manager David Lindsay, who in turn reported to General Manager David Craig.  (DSUF ¶ 1.)[4]

Mr. Hill's AMT position is safety-sensitive under FAA regulations.  (DSUF ¶ 2.)  Although plaintiff admits this proposed fact, he spends almost an entire page denying it to the extent that Delta suggests his position was also "security sensitive." (PR-DSUF ¶ 2.)  Because Delta makes no such suggestion, this lengthy denial is not material and the Court deems DSUF ¶ 2 admitted.

**B.    The Health of Mr. Hill's Spouse**

On October 16, 2016, Mr. Hill learned that his wife might have breast cancer, a diagnosis that was confirmed on November 1, 2016.  (DSUF ¶ 3.)  Plaintiff's denial of PR-DSUF ¶ 3 is indicative of the immaterial fact disputes he seeks to create that waste this Court's time and try its patience.  DSUF ¶ 3 is supported by

---

[4] Plaintiff admits that he worked primarily for Lead AMT Farmer, and occasionally worked for other Lead AMTs.  He claims, however, that he did not report to Lead AMT Buice in 2016 because Mr. Buice had been transferred to the tooling line.  (PR-DSUF ¶ 1, citing Hill Second Decl. [77-12] ¶ 24.)  However, DSUF ¶ 1 is supported by the record cited.  Plaintiff testified that when Lead AMT Farmer was not working, he reported to any Lead AMT who was on duty, including Mr. Buice.  (Hill Dep. [57] 66.)  Plaintiff is not allowed to contradict his clear deposition testimony through a subsequent declaration.  See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984).  In any event, this claimed fact dispute is immaterial.  Therefore, the Court deems DSUF ¶ 1 admitted.

the record cited.  (See Hill Dep. [57] 69 ("Q:  When did you first learn in 2016 that

[your wife] might have—might have cancer?  A:  It was about 7:30 on Sunday,

October—October the 16th.").)  Despite that clear response to the question,

plaintiff "denies that he was told she 'might' have breast cancer."  (PR-DSUF ¶ 3.)

Instead, he states as follows:

> Mr. Hill was notified that his wife had a very high likelihood of breast
> cancer.  Hill Dep., pp. 69-70.  The radiologist report of Bi-Rads 4C
> (Breast Imaging Reporting and Data System) is indicative of a 79%
> chance of breast cancer and, as a result, Hill believed that he had been
> told his wife had breast cancer.  Hill Dep., pp. 69-70.  Second Hill Dec.
> at ¶ 6.

(Id.)  Because plaintiff's purported denial simply restates Delta's proposed fact, the

Court deems DSUF ¶ 3 admitted.

### C.    Plaintiff Reports Three Incidents of Alleged Harassment

In November and December of 2016, Mr. Hill reported to Mr. Lindsay, Mr.

Craig and Delta Human Resources Manager Nicole Bell three alleged incidents

involving either Lead AMT Buice or Lead AMT Warren that he claimed amounted

to harassment because of his wife's health condition.  (Mr. Hill never claimed that

either Lead AMT said anything to him about his wife's condition, and instead at

most acted "indifferent" to her condition when he once talked about it in a meeting with Messrs. Lindsay, Farmer, Buice, and Warren.)  (DSUF ¶ 4.)[5]

### 1.    **First Incident**

Mr. Hill reported to Mr. Lindsay and then to Messrs. Lindsay and Craig on November 7, 2016, that he "was afraid . . . maybe of being harassed," and that he had been harassed and would like it to stop, based on the fact that (1) he had failed to report for his scheduled 12-hour shift on Friday, October 21, 2016, and (2) a Lead AMT (who was determined to be Mr. Buice) had followed the normal Lead AMT timekeeping act of applying 12 hours from Mr. Hill's vacation bank to that

---

[5] Plaintiff admits that he reported three incidents he believed were harassment, but denies the rest of DSUF ¶ 4, asserting that he reasonably believed that Lead AMTs Buice and Warren were harassing him because of his wife's cancer. (PR-DSUF ¶ 4.)  However, none of the record he cites supports that assertion. Specifically, there is no probative evidence that Mr. Warren had "done the same thing" to another employee (Withers) who had cancer.  The cited testimony (Hill Dep. [57] 115-19) shows only that Mr. Warren had written up Mr. Withers (who died in 2013) because he had used a positive space pass for personal travel in violation of Delta policy.  Plaintiff agreed that it was proper for Mr. Warren to apply Delta policy to that individual and issue discipline.  (Id. at 122.)  Plaintiff repeats the claim that Mr. Lashley heard Mr. Warren say, "Now that Mark Hill's wife has cancer, I am going to double down and make his life miserable."  However, as discussed supra, Mr. Lashley did not hear Mr. Warren say that.  The claim that Mr. Warren's nickname is "The Jackal" is immaterial.  Finally, none of plaintiff's so-called evidence of prior harassment even mentions Mr. Buice.  Because plaintiff does not contravene DSUF ¶ 4, the Court deems it admitted.

11

missed shift so that he would not be later docked 12-hours pay for missing it. (DSUF ¶ 5, modified per record cited.)[6]  Mr. Hill complained about this normal practice by Lead AMT Buice (that was in Mr. Hill's best interest) because Mr. Hill had recently reached a verbal arrangement with Lead AMT Farmer (who was Mr. Hill's Lead on most of his shifts) that he could miss a scheduled shift due to his wife's condition and avoid his pay being docked for that missed shift by working a future unscheduled shift.  (Id. ¶ 6, modified per record cited.)[7]  Mr. Farmer had

_____

[6] Plaintiff denies the above-proposed fact, asserting that it is not supported by the record cited. (PR-DSUF ¶ 5.)  However, it is amply supported.  The evidence plaintiff cites in his lengthy responsive discourse is immaterial, and the assertions he makes are unsupported.  For example, plaintiff claims that he never failed to report for a scheduled shift.  (Id.)  The testimony he cites to support that claim (Farmer Dep. [65] 35) states only that the Lead AMTs had received permission to work with Mr. Hill to meet his needs.  If he needed to work an off day to have a day off during the week, that was permissible.  But plaintiff himself confirmed to Delta's counsel that "there was one Friday that you were scheduled, and you did not report to work."  (Hill Dep. [57] 80.)  Plaintiff also challenges the statement that what Mr. Buice did was a "normal Lead AMT timekeeping act."  (PR-DSUF ¶ 5.)  None of the record plaintiff cites refutes that statement.  The discrepancy plaintiff identifies concerning when Mr. Buice made the deduction (i.e., October 29 versus October 24) is immaterial.  This is because, as discussed infra, plaintiff elected not to undo what Mr. Buice had done.  Thus, the Court deems DSUF ¶ 5 admitted.

[7] Plaintiff claims that what Mr. Buice had done did not benefit him because his pay was not going to docked regardless under the MPS timekeeping system. (PR-DSUF ¶ 6.)  However, the Court cannot locate this fact in the lengthy portion of the record plaintiff cites (id., citing Lindsay Dep. [62] 72-78).

not told Mr. Buice of this arrangement he had with plaintiff; moreover, according to Mr. Farmer, there was nothing unusual about Mr. Buice applying Mr. Hill's vacation hours to his missed shift as "we all put in [AMT] time for each other" and such actions by Mr. Buice "happen regularly."  (Id. ¶ 7.)[8]

After he raised this vacation issue with Messrs. Lindsay and Craig, Mr. Hill was aware that he could have obtained his 12 hours of vacation back by working an extra future shift, but he chose not to do so; instead, he chose to have the 12 hours of vacation applied to his missed shift—which is just what Lead AMT Buice had done by following the normal practice of recording vacation hours for that shift to prevent Mr. Hill from having his pay docked for missing it.  (DSUF ¶ 8.) Although plaintiff admits the preceding fact, he claims that he only chose this option to save Mr. Farmer from having to do a lot of paperwork.  (PR-DSUF ¶ 8.) However, that denial is non-responsive to the proposed fact.  Moreover, that denial

_____

[8] Plaintiff admits that Mr. Farmer did not tell Mr. Buice of the arrangement. (PR-DSUF ¶ 7.)  However, he denies the rest of the proposed fact by asserting that Mr. Farmer testified that Mr. Buice should have told him what he had done.  (Id.) Plaintiff seeks to undermine Mr. Farmer's testimony that Leads put in AMT time for each other by pointing to a claimed discrepancy between his testimony and that of Mr. Lindsay.  (Id.) Again, even if there is a discrepancy, it is not material. Because plaintiff does not contravene DSUF ¶ 7, the Court deems it admitted.

does not refute the fact that the election plaintiff made ratified what Mr. Buice had done.  Therefore, the Court deems DSUF ¶ 8 admitted.

As a result of this application of vacation hours that favored Mr. Hill and that was his ultimate choice as to how to treat his missed shift, Mr. Hill asked Mr. Lindsay to direct AMT Lead Buice not to interact with him in any way, not to give him any instructions, and not to check on him; shortly thereafter, Mr. Hill wrote Delta, "I don't want Mike Buice interacting with me at all."  (DSUF ¶ 9.)[9]

### 2.   Second Incident

Mr. Hill asked Ms. Bell and Mr. Craig to investigate an event whereby, on November 14, 2016, Lead AMT Buice told Mr. Hill to get back to work (or get back to his part); Mr. Hill admits that he was having a personal discussion with another employee at the time instead of working.  (DSUF ¶ 10.)  Plaintiff admits the preceding fact (see PR-DSUF ¶ 10) but asserts that he was "reprimanded" and

---

[9] Plaintiff admits that he requested that Mr. Buice not be allowed to interact with him, but he denies the rest of the proposed fact by articulating the reasons why he made that request.  (PR-DSUF ¶ 9.)  Because his reasons are immaterial and do not dispute the fact that he made the request, the Court deems DSUF ¶ 9 admitted.

not merely told to return to work.  (Id.)[10]  He also claims that Mr. Buice did not tell another employee in the tool room to return to work.  (Id.)[11]

Mr. Hill then asked Lead AMT Buice why he was singling him out and harassing him.  Mr. Buice responded that he had or was going to tell everyone else to get back to work (which he did).  (DSUF ¶ 11.)  Plaintiff admits that Mr. Buice ordered other employees back to work, but claims that he did not do so until he accused the Lead AMT of singling him out and harassing him.  (PR-DSUF ¶ 11.)

Mr. Hill did not go back to work as directed by Lead AMT Buice.  Instead, he stood around in his work area for about ten minutes and counted the number of employees whom he considered to be working and not working.  He then approached Mr. Buice, who was sitting at his desk, and said: "There's three people working out of nine.  You told me you weren't singling me out and harassing me.

_____

[10] If plaintiff wants to call what Mr. Buice said to him a "reprimand," then that is his choice; however, it creates no fact dispute.  Mr. Buice issued no discipline to Mr. Hill.

[11] Mr. Hill also claims that he did not ask Ms. Bell or Mr. Craig to investigate his complaint, but he merely cooperated after they initiated an investigation.  (PR-DSUF ¶ 10.)  This claim is immaterial but also nonsensical.  An employee would expect his employer to investigate a complaint.  Had Delta not done so, then it is likely that plaintiff would have added a count to the Complaint alleging failure to investigate.

15

But you haven't said anything to anybody else this morning and tell them to get back to work." (Hill Dep. [57] 106-107.) Plaintiff admitted that he was upset and raised his voice above a normal tone. (Id. at 107.)

These actions by plaintiff led Mr. Buice to put his hand up toward Mr. Hill's face with an open palm as if to send a signal for him to hold back or calm down. (DSUF ¶ 12, modified per record cited.)[12] Mr. Hill did not like that Mr. Buice had

_____

[12] PR-DSUF repeatedly denies clear deposition testimony. It is frustrating for the Court to have to highlight this continually. It creates far too many footnotes and unnecessarily lengthens this Report and Recommendation. For example, among the testimony cited to support DSUF ¶ 12 is the following:

Q     And when [Mr. Buice] put his hand up, did he put his hand up with an open palm?

A     Yes. It was like that (indicating), yeah.

Q     Like hold back, calm down?

A     Yeah, you could say that.

(Hill Dep. 108.) Despite that testimony, PR-DSUF asserts the following:

Plaintiff denies that when Buice put his hand up in Mr. Hill's face it was to send a signal for Mr. Hill to hold back or calm down. At his deposition, Mr. Hill did not agree with Delta's counsel's suggestion that this was the nonverbal meaning of Buice's hand gesture when he replied, "you could say that."

16

done that.  (Hill Dep. 108.)  Mr. Hill told Mr. Buice that he thought his action (of using his open palm to ask Mr. Hill to calm down) was threatening to him, and three times he stated, "Please do not do that" and then walked away.  (DSUF ¶ 13.)[13]

AMT Mark Sloan witnessed the interaction between Messrs. Buice and Hill at Mr. Buice's desk.  Delta notes that plaintiff did not accuse Mr. Sloan of harassment and considered him to be "pretty objective in the situation."  (DSUF ¶ 14.)  Mr. Sloan reported the following to Delta:

> Mike Buice and I were having a conversation when Mark Hill came up and interrupted our conversation.  I do not have knowledge to what had Mr Hill agitated, and why his voice was raised.  What I remember is Mr Buice raised his left hand, palm out, fingers spread apart, with nothing in his hand.  Mr Hill said, don't do that, I feel threatened.  Evidently Mr Buice repeated that again, I did not see him raise his hand, I just saw his left hand raised, palm out, fingers spread apart, with nothing in his hand[.]  Mr Hill again said don't do that, I feel threatened.  I never heard Mr Buice raise his voice or use any profane language.  I also never heard Mr Hill use any profane language.  At that point, I decided it was time to leave the area, I was not comfortable there.

———————————————

(PR-DSUF ¶ 12.)  Contrary to plaintiff's counsel's claim, Mr. Hill clearly agreed with Delta's counsel's suggestion.

[13] Plaintiff unambiguously admitted only three of Delta's 47 facts proposed facts.  (See PR-DSUF ¶¶ 13, 17, 26.)  This is one of them.

(Pl.'s Ex. 111 [62-1], at 59.)[14]

### 3.   Event Between the Second and Third Incidents

On November 15, 2016, between the second and third incidents reported by Mr. Hill, Lead AMT Warren (who was not involved in either of the first two incidents) wrote to Mr. Lindsay that, on the previous date, Mr. Hill had made numerous comments to him, which included the following:

> I don't need you!  You need to know that I am off the chain!  After I found out you don't care for me and you are with Buice.  I am off the chain!!!  You know what that means don't you?  I am watching you!  I am going to get you and Buice!  THE CHAINS ARE OFF!!!!

(DSUF ¶ 15, quoting Pl.'s Ex. 17 [64-1], at 10.)

Plaintiff admits that Lead AMT Warren reported these comments to Mr. Lindsay, but he denies making them.  (PR-DSUF ¶ 15.)  Mr. Hill did not know of any reason why Delta management would have disbelieved Mr. Warren's report.  (Hill Dep. 143.)[15]  Mr. Warren's report to Mr. Lindsay also included the following:

---

[14] To avoid dealing with plaintiff's extended denials of the rest of DSUF ¶ 14, the Court simply quotes Mr. Sloan's statement.

[15] Plaintiff argues that there is a question whether Mr. Lindsay "solicited and influenced" this statement.  He points to the contradiction between Mr. Warren's testimony (i.e., that Mr. Lindsay asked him for a statement, see Warren Dep. [64] 34-36) and Mr. Lindsay's journal entry (Pl.'s Ex. 16 [64-1], at 3), where he wrote that he did not request a statement from Mr. Warren.  (PR-DSUF ¶ 15.)  There is a

18

> My personal opinion is that Mark is under more stress than he can handle. I am concerned he is going to have a medical crisis. Later I have talked to Dennis [Lindsay] about the situation and he recommended to Mark the EAP. He is very volatile and it makes the situation very sensitive.

(DSUF ¶ 16, quoting Pl.'s Ex. 17 [64-1], at 10.) Plaintiff admits that Mr. Warren made the above report to Mr. Lindsay, but he denies its truth. (PR-DSUF ¶ 16.)[16]

---

fact dispute over whether Mr. Lindsay solicited a written statement from Mr. Warren. However, that dispute is immaterial. The material facts are: (1) an incident happened between plaintiff and Mr. Warren; and (2) Mr. Warren wrote a statement about it, either on his own or at Mr. Lindsay's request. However, there is no probative evidence that Mr. Lindsay *influenced* what Mr. Warren wrote in his statement. To assert otherwise as plaintiff does misrepresents the record. The Court must construe the evidence in a light most favorable to the non-movant; however, the Court does not have to credit speculation. See Marshall v. City of Cape Coral, Fla., 797 F.2d 1555, 1559 (11th Cir. 1986) (While "[a]ll reasonable inferences arising from the evidence must be resolved in favor of the non-movant" on a motion for summary judgment, "inferences based upon speculation are not reasonable.").

[16] Plaintiff also impugns Mr. Warren by claiming that he wrote this report in retaliation for reporting him for harassment eight days earlier. (PR-DSUF ¶ 16.) However, the record he cites fails to support the claim that anything had happened eight days earlier. The record citation he provides to support his claim (Hill Dep. 127-32) relates plaintiff's testimony about the third incident on December 2, 2016 (discussed infra). He also cites Mr. Lashley's deposition to support his claim (Lashley Dep. [66] 38), but that testimony relates to the already discredited assertion that he overheard Mr. Warren say, "Now that Mark Hill's wife has cancer, I am going to double down and make his life miserable." Plaintiff cites no probative evidence suggesting that Mr. Warren had a retaliatory motive for informing Mr. Lindsay what plaintiff had said. But even if Mr. Warren had such a

### 4.   __Third Incident__

On December 2, 2016, Mr. Hill reported to Messrs. Lindsay and Craig and Ms. Bell that, earlier in the day, he had purchased items from a vendor at Delta and took them out to his car in a large gray garbage bag.  (DSUF ¶ 17.)  Mr. Hill understood that walking out to his car with a large bag of items from the shop might raise some suspicions, and he claimed that Lead AMT Ed King told him that one of the other Leads (who Mr. Hill believed was Messrs. Buice or Warren) had questioned whether he was stealing something from Delta.  (Id. ¶ 18, modified per record cited.)  Plaintiff admits that nothing negative happened to him as a result of the questions raised about what was in the gray bag.  (Id. ¶ 19.)[17]

### D.   __Delta's Investigation of Mr. Hill's Complaints__

HR Manager Bell and General Manager Craig investigated the three incidents listed above and found that nothing improper had occurred toward Mr. Hill.  (DSUF ¶ 20.)  The report of their investigation is in the record.  (See Hill Dep. Ex. 5 [57-1], at 20-22.)  Plaintiff admits that Ms. Bell and Mr. Craig investigated,

---

motivation, there is no probative evidence that what he reported was false, or if it were false, that Delta knew it was false.

[17] Plaintiff's long and argumentative response to DSUF ¶ 19 is immaterial and does not contravene it.  (See PR-DSUF ¶ 19.)  Thus, the Court deems DSUF ¶ 19 admitted.

but asserts that "his complaints were not truly investigated." (PR-DSUF ¶ 20.) He claims that Mr. Craig did not interview all the witnesses to the incidents, and that Ms. Bell falsely stated during her Rule 30(b)(6) deposition that she conducted the interviews, when she only interviewed Mr. Hill. (Id.) The testimony plaintiff cites (Craig Dep. [63] 39) shows that Mr. Craig interviewed Messrs. Sloan and Warren, but not Charles Floe, Wanda Dooley, and David Brock. However, there is no requirement that one manager interview all of the witnesses or that every potential witness be interviewed. More importantly, there is nothing in the 24-page record excerpt that plaintiff cites (Bell Dep. [69] 53-77) which shows that Ms. Bell testified falsely. She never said that she conducted all the interviews. Instead, she testified that human resources and the employee's operational leaders conducted the interviews (id. at 53), which is what occurred.

In denying DSUF ¶ 20, plaintiff also claims that Delta did not follow its policies in investigating his complaint. He says that Delta's policy (Pl.'s Ex. 131 [69], at 82) directs interviewers to inform interviewees as they close a meeting that Delta will not tolerate retaliation. (PR-DSUF ¶ 20.) He asserts that, instead of

telling Messrs. Warren and Buice not to retaliate, Messrs. Lindsay and Craig informed them that he (plaintiff) had reported them for harassment.  (Id.)[18]

In reality, Delta's Rule 30(b)(6) representative (Ms. Bell) testified only that Mr. Lindsay could not remember making that anti-retaliation statement, and that while Mr. Craig told Messrs. Warren and Buice to treat everyone equally, he did not recall using the term "retaliate."  (Bell Dep. [69] 64-66.)  Mr. Lindsay testified that he directed Messrs. Warren and Buice not to target Mr. Hill and that they should handle themselves in a professional manner.  (Lindsay Dep. [62] 32-33.)

Even if Delta had not followed its policies, it is immaterial.[19]  There is no evidence that this claimed failure to inform Messrs. Warren and Buice that retaliation would not be tolerated caused any harm to Mr. Hill.  In other words, there is no probative evidence that either of these two Lead AMTs retaliated against plaintiff after their interviews.  Because plaintiff has not contravened the above proposed fact, the Court deems DSUF ¶ 20 admitted.

---

[18] It is difficult to understand how Delta's managers could have investigated a claim of harassment without telling the alleged harassers what they did or said and to whom.

[19] There is a question whether the document plaintiff cites is even a policy. It states on its face that it is "Guidelines for Delta Leaders."  (See Pl.'s Ex. 131 [69-1], at 74.)

Ms. Bell and Mr. Craig learned in their investigation that some Delta employees (including Lead AMT Warren in his above-referenced statement) had expressed concerns about Mr. Hill's recent behavior in the workplace.  (DSUF ¶ 21, citing Hill Dep. Ex. 5 [57-1], at 20-22.)  Plaintiff denies this proposed fact. Plaintiff asserts that Mr. Craig's summary of his investigation, which he sent to Ms. Bell on December 8, 2016 (Pl.'s Ex. 38 [80-4], at 58-60), "makes no mention whatsoever" of some employee's expressing concern about his behavior in the workplace.  (PR-DSUF ¶ 21.) However, that is not true.  Mr. Craig's report (which he called a "general outline of the investigation") mentions the altercation between plaintiff and Mr. Buice on November 14, 2016 (discussed <u>supra</u> Part I. C. 2.), as well as Mr. Sloan's statement about it.  Moreover, as also discussed <u>supra</u> Part I. C. 3., Lead ATM Warren had already notified Mr. Lindsay of plaintiff's "the chains are off" comment from November 14, 2016.  Although Mr. Warren's concerns were not mentioned in Mr. Craig's report, Delta knew of them.

Plaintiff also claims that all of the concerns employees expressed about him were vague, false, and not reported until after he sent his email to Delta's CEO and others on December 22, 2016 (discussed <u>infra</u>).  He further contends that his December 22 email led Delta to create the Executive Summary of its investigation that Delta cites in supported of DSUF ¶ 21.  (PR-DSUF ¶ 21.)  It could be true that

23

plaintiff's December 22 email to the CEO led Human Resources to create the Executive Summary. However, there is no probative evidence that Delta fabricated its contents. The Executive Summary's "Additional Finding" on its third page list a number of concerns received from employees about Mr. Hill's behavior, all of which occurred before December 22, 2016.[20] The Executive Summary did just what its title implied. It summarized all that had happened with Mr. Hill, from the initial investigation by Mr. Craig through the meeting that Mr. Hill had with Mr. Craig and Ms. Bell on December 21, 2016 (discussed infra).

Although the reports came into management over a period of time, it is uncontroverted that by December 22, 2016, a number of Delta employees had expressed concerns about Mr. Hill's recent behavior in the workplace. One of those was AMT Sloan (who again Mr. Hill testified was "pretty objective in the situation"), who reported that (1) Mr. Hill has been extremely upset of late; (2) a number of employees were scared to be in the shop due to his erratic behavior; (3)

---

[20] Plaintiff is correct that Mr. Craig's report of his investigation (sent to Ms. Bell on December 8, 2016) did not mention these additional findings. However, there is nothing in Mr. Craig's report which said that it was a "final report" as plaintiff claims. Indeed, his report could not have included events that occurred after he wrote it.

he was worried that Mr. Hill might do serious harm to himself as well as others in the shop; and (4) he did not want to return to the shop when Mr. Hill was present. (DSUF ¶ 22.)[21]

Another Delta employee who reported issues with plaintiff was his friend and supervisor, Lead AMT Farmer.  (DSUF ¶ 23.)  Mr. Farmer's November 21, 2016, email to Mr. Lindsay states in relevant part as follows:

> Mark Hill has recently found out that his wife has breast cancer and it brought him an enormous amount of stress.  I have done what you asked me, I have been helping and supporting in every way I can. Mark in his anger is lashing out at Delta, the leads, the PLM and our department.  We are, and will continue to be supportive but I also have the responsibility of looking out for what is best for Delta, our shop and the other 12 guys on my crew.  . . .  It is with great reserve and respect that I tell you the following statements.  . . .  Mark needs the opportunity to get a fresh start in a different shop in Delta Air Lines. Mark is lashing out and feels like he is treated unfairly and unjustly. This is the exact opposite of what has happened.  . . .  I am very concerned that this may escalate into a bigger issue if it goes ignored. We have come to a point in time that we cannot ignore such actions that may escalate into work place violence.  I have not seen this as of yet but I cannot explain how upset Mark is with his department.  I am open to talking about this more if that is what is needed, but I hate to see the shop be a place where people dread to come in to work.

---

[21] Plaintiff admits that Mr. Sloan made the statements referenced above but claims that he only considered him "objective" when he reported the tool room incident he had with Mr. Buice on November 14, 2016.  (PR-DSUF ¶ 22.)  Plaintiff does not explain why his view of Mr. Sloan's objectivity changed.

(Id., quoting Pl.'s Ex. 20 [65-1], at 18.)[22]

This was not the last time Lead AMT Farmer had an issue with Mr. Hill. On December 20, 2016, Mr. Farmer reported to Mr. Lindsay that Mr. Hill had come to him "very upset" about the distribution of overtime, and then that several others in the Department told Mr. Farmer that Mr. Hill had been saying, "Mother-Fuck

───────────────

[22] Plaintiff admits that Mr. Farmer sent this email, but he claims that it should be disregarded because Mr. Farmer "clarified" his email in his deposition testimony. (PR-DSUF ¶ 23.) However, nothing in the record cited to support that claim (Farmer Dep. [65] 81-82) shows that Mr. Farmer disavowed what he wrote about Mr. Hill in the email. The testimony that plaintiff cites is in response to a question about what Mr. Farmer meant when he wrote that one cannot ignore actions that may escalate into workplace violence. He testified that he wanted Mr. Lindsay to know what was happening with Mr. Hill so that he (Lindsay) could talk to Mr. Hill and hear his side of the story. Plaintiff also contends that it is "unlikely" that Mr. Farmer authored the email. (PR-DSUF ¶ 23.) However, nothing in the evidence plaintiff cites (Farmer Dep. [65] 78-83) supports this contention. When shown a copy of the email and asked, "[D]id you write this e-mail?", Mr. Farmer replied, "Well I did." (Id. at 79.) He then explained that he first wrote out his thoughts on a yellow legal pad, and then either Lead AMTs King or Warren proofread it for him, making only "punctuation and a couple corrections." (Id. at 80, 82.) Mr. Farmer unequivocally stated that he then typed the email and sent it. (Id. at 81.) Plaintiff argues that because Mr. Lindsay requested on November 21, 2016 that Mr. Farmer write up what Mr. Hill had said to him, it was "not possible" for Mr. Farmer to have completed his email on the same day, especially since he has poor writing skills. (PR-DSUF ¶ 23.) This is complete speculation and insulting to Mr. Farmer. A Lead AMT who is responsible for maintenance on highly sophisticated jet airplanes should be able to write a 500-word email in one day. Plaintiff's claim that Mr. Warren "likely" wrote the email is simply that—a claim—with no supporting evidence.

26

Delta," "Mother-Fuck the leads," and "Mother-Fuck the upper management and I am gonna stick this up their asses."  (DSUF ¶ 24, quoting Pl.'s Ex.18 [65-1], at 16.)[23]  Mr. Farmer wrote to Mr. Lindsay, "I am not sure what to do, my men are looking to me for direction and help on this and I feel that action must be taken." (Id. ¶ 25.)[24]

On December 21, 2016, Mr. Craig and Ms. Bell met with Mr. Hill to apprise him of the results of their investigation.  After this meeting, Ms. Bell told her supervisor, Lisa Abraham Brown, that Mr. Hill had acted in an irrational and concerning manner during the meeting as described in more detail below.  (DSUF

---

[23] Plaintiff admits that this email purports to come from Mr. Farmer, but he denies that the evidence supports it, because he again claims that Mr. Farmer "clarified" his email in his deposition testimony.  (PR-DSUF ¶ 24.)  However, nothing in the record cited by plaintiff (Farmer Dep. [65] 73-74) show that Mr. Farmer disavowed what he wrote in his email.  Plaintiff asserts that the "evidence suggests that [Mr. Farmer's email] was written by Warren, as it was 'proofread' by Warren . . . and was emailed from Warren's email account."  This is another speculative assertion.  Mr. Farmer testified as follows when shown Exhibit 18: "Q … Did you write the below email?  A  I did." (Id. at 75.)  Plaintiff cites no evidence suggesting that Mr. Famer was not at work when he drafted the email.  Because plaintiff's denials are not supported with citations to probative record evidence, the Court deems DSUF ¶ 24 admitted.

[24] Plaintiff seeks to controvert DSUF ¶ 25 using the same unsuccessful arguments he made to DSUF ¶ 24, discussed supra note 23.  Because plaintiff's denials are not supported with citations to probative record evidence, the Court deems DSUF ¶ 25 admitted.

¶ 26.)  Ms. Bell reported to Ms. Brown that Mr. Hill (1) became emotional and angry; (2) clenched his fists and became red-faced; (3) then "directly after that reaction he would start to laugh, which was, again, concerning [with him] being in a safety-sensitive position;" (4) would purport to repeat back what Ms. Bell or Mr. Craig had just said but he would state something different than what was just said; and (5) repeatedly switched back and forth from laughing to showing anger.  Mr. Hill's conduct caused Ms. Bell to be concerned about his behavior.  (Id. ¶ 27.)[25]

_____

[25] Plaintiff denies the above proposed fact because the record cited (i.e., Hill Dep. 133-35, 146-47, 149-50) fails to support it.  (PR-DSUF ¶ 27.)  While that denial is technically correct, plaintiff must have known that this was a typographical error and that Delta meant to cite Ms. Bell's deposition transcript [67], not Mr. Hill's [57].  Ms. Bell's testimony supports DSUF ¶ 27.  Plaintiff then denies the above fact based on his assertion that Mr. Craig, who was also present for the December 21 meeting, "directly refutes" Ms. Bell's itemized points.  (PR-DSUF ¶ 27.)  The record plaintiff cites (Craig Dep. [63]  76-79) does not refute what Ms. Bell wrote.  Mr. Craig testified that Mr. Hill "became emotional at times" and that his "behavior was a little erratic."  (Id. at 77.)  He also noted that Mr. Hill was "under significant stress based off of what he had told us, around his family situation, with his wife with cancer."  (Id. at 78.)  Mr. Craig did testify that Ms. Bell was more concerned about what had happened during the meeting than he was, likely because he had "a fairly thick skin" and was perhaps a "little more tolerant" than Ms. Bell.  (Id. at 77-78.)  Although in Mr. Craig's opinion Mr. Hill did nothing inappropriate in the meeting (id. at 78), he did not contradict Ms. Bell's observations.  Thus, the Court deems DSUF ¶ 27 admitted.

E.   **Plaintiff's Blast Email of December 22, 2016**

On December 22, 2016, the day after the meeting that had concerned Ms. Bell, Mr. Hill sent a lengthy email to 18 individuals, including Ms. Bell, Messrs. Lindsay and Craig, and Delta's CEO.  Plaintiff wrote that he felt he was in a "very surreal irrational environment."  (DSUF ¶ 28, quoting Hill Dep. Ex. 7 [57-1], at 26.)  Mr. Hill included the following peculiar passage in that email:

> I related the story of how a friend of mine John Smith [name changed for confidentiality purposes] in 381 had committed suicide because of issues similar to this where you realize that no matter how much evidence piles up in your favor during harassment or unfair treatment like this Delta the Corporation will crush the individual because they can.  I related that while I personally have very strong mental and physical control some humans are frail and sometimes when they see no hope for fairness and justice or just basic human dignity they react irrationally.

(Id. ¶ 29.)

After referencing what he claimed had recently happened to him (i.e., the three incidents addressed above), Mr. Hill wrote, "I think this is probably what happened in [Department] 381 when [Smith] died."  (DSUF ¶ 30.)[26]  When asked

---

[26] Plaintiff admits that he sent the December 22 email, but objects to DSUF ¶¶ 28-30 because they include only a part of his long email.  He argues that the full email must be considered to understand his statements in context.  (PR-DSUF ¶¶ 28-30.)  The Court has reviewed the entire email but finds no need to include all of it here.  The Court does note, however, that the email's subject line is "Harassment,"

at his deposition why he raised Mr. Smith's suicide in this email, Mr. Hill testified

in pertinent part, "There are people who are frail or maybe mentally ill, and we

don't know it.  We don't know what they'll do," and that his reference to Mr.

Smith's suicide in the email "was not a good statement."  (Id. ¶ 31.)[27]

### F.    Delta Sends Mr. Hill to the EAP

Ms. Bell reviewed the events about Mr. Hill with her Human Resources

supervisors; she was advised to contact Delta's outside EAP consultant, Rose

Molitor, who worked for a company called Optum.  Ms. Bell did so on December

23, 2016, and after explaining the events to Ms. Molitor, she (Molitor) determined

that Mr. Hill must contact her and that he not be permitted to return to work until

he had been evaluated by EAP.  (DSUF ¶ 32.)[28]  On December 23, 2019, Mr. Hill

---

and it focuses on his claims of mistreatment at the hands of Messrs. Buice and
Warren.

[27] Plaintiff admits that Delta accurately quoted his deposition testimony but
asserts that he was not suicidal.  (PR-DSUF ¶ 31.)  However, that denial is non-
responsive to the proposed fact.

[28] Plaintiff admits that Ms. Bell reviewed his situation with her supervisors
and that she contacted Ms. Molitor at Optum.  However, he denies the rest of that
proposed fact.  (PR-DSUF ¶ 32.)  However, what plaintiff writes is mostly non-
responsive to the proposed fact.  The Court mentions one point.  Plaintiff asserts
that Ms. Molitor's notes reflect that she told Ms. Bell the EAP would not trigger
the employee for a mandatory EAP evaluation without talking to him, but that the
workplace can trigger him if it was having concerns about safety and can inform

attended a meeting with Mr. Craig and Ms. Bell (who participated by phone).  He was directed to call Ms. Molitor (which Mr. Hill did) and notified that he was suspended with continued pay and benefits pending review by the EAP.  (Id. ¶ 33.)[29]

### G.     The San Souci Investigation

In response to Mr. Hill's December 22, 2016 email to Delta's CEO, Delta's Equal Opportunity Manager, Brian San Souci, contacted Mr. Hill via email on December 23, 2016.  (Pl.'s Ex. 8 [68-1], at 32.)  He informed Mr. Hill that he was going to conduct a second investigation of his complaints of alleged harassment. (DSUF ¶ 34.)  Mr. Hill emailed Mr. San Souci in response on December 26, 2016 and gave him the names of 14 employees whom he claimed would support his harassment allegations.  (Hill Dep. Ex. 8 [57-1], at 29.)

---

him that he needs to be cleared by the EAP.  (Id., citing Pl.'s Ex. 4 [68-1], at 13.) While the notes contain those statements, they do not contradict Ms. Bell's undisputed testimony that Delta triggered Mr. Hill's EAP referral only after Ms. Molitor recommended it.  (Bell Dep. [67] 55, 148-54.)

[29] Plaintiff admits the above statement in part and asserts that a representative of Delta's corporate security was also present at the meeting and escorted him out of the building.  (PR-DSUF ¶ 33.)

Mr. San Souci, in conjunction with Equal Opportunity Program Manager Pamela Kelly and TechOps HR Manager Terrence Jackson, interviewed those 14 employees.  (DSUF ¶ 35.)[30]  As reported in Mr. San Souci's February 17, 2017 nine-page investigation memo, in their mid-January 2017 interviews, none of the 14 employees identified by Mr. Hill supported his complaints.  (Id. ¶ 36, citing Hill Dep. Ex. 9 [57-1], at 37-45.)[31]  As discussed below, three more ATMs expressed concerns about Mr. Hill.

---

[30] Plaintiff's two-page argument about the above proposed fact is non-responsive.  (PR-DSUF ¶ 35.)  The undisputed facts are that Mr. Hill's email provided Mr. San Souci with the names of 14 employees whom he believed would support his claims of harassment.  (See Mr. San Souci and his team interviewed them all.  The Court thus deems DSUF ¶ 35 admitted.

[31] Plaintiff objects to the above proposed fact on the grounds that it is conclusory.  (PR-DSUF ¶ 36.)  The Court overrules the objection, because the above fact accurately summarizes the results of the investigation.  Plaintiff also denies the above proposed fact, asserting that there is a fact dispute whether some of the employees were even asked about the situations Mr. Hill reported to Mr. San Souci.  However, nothing in the record that plaintiff cites (Hill Dep. 182-86, 251-53, 255-62) supports that assertion.  Plaintiff also denies the above proposed fact based on his contention that Mr. San Souci was unable to recollect any specific questions he asked or what questions he instructed Ms. Kelly or Mr. Jackson to ask.  Mr. San Souci's claimed inability to recall the specific questions he asked in an investigation that occurred almost three years before his deposition took place fails to create a fact dispute.  In any event, plaintiff again misrepresents the record he cites.  Mr. San Souci never testified that he could not recall the specific questions that were asked.  Instead, he testified that they began each interview with general questions, and then asked specific questions about the alleged harassment that Mr.

AMT David Brock stated that (1) he was concerned about Mr. Hill's wife but that he personally feared him; (2) Mr. Hill had made the shop uncomfortable talking openly talking about his collection of firearms when he does not hunt; and (3) Mr. Hill had recently told employees that he successfully completed an eight-month process to obtain silencers for his guns (and he admitted purchasing a silencer when he did not hunt and claimed it was "just a whim"). (DSUF ¶ 37.)

AMT Charles Flowe stated that (1) he was concerned about Mr. Hill's mindset because of his accusations that Lead AMT Buice was out to get him; and (2) Mr. Hill had been vocal in the workplace about owning guns. (DSUF ¶ 38.)

AMT Paul Rosenstein reported that (1) he had witnessed Mr. Hill become overly aggressive towards another employee; (2) Mr. Hill had become aggressive

---

Hill had said the employee could verify. (San Souci Dep. [68] 104.) Mr. San Souci also testified that he directed Ms. Kelly and Mr. Jackson to ask specifically about the issues that Mr. Hill had raised in his December 26 email. (Id. at 107.) Finally, plaintiff denies the above proposed fact based on his claim that Mr. San Souci could not explain why he did not collect the witness statements from Ms. Bell and Mr. Craig's first investigation. (PR-DSUF ¶ 36.) That too misrepresents what the witness said. Mr. San Souci was asked if he would have wanted to look at those statements; he replied that he would have. (San Souci Dep. 77.) He simply could not remember if he had asked for them and could not think of any reason why he would not have asked for them. (Id. at 77-78.) Given plaintiff's failure to contravene DSUF ¶ 36, the Court deems it admitted.

and his temper "can rise from 0 to 100 in a matter of seconds"; and (3) most of the AMTs try to avoid Mr. Hill as much as possible.  (DSUF ¶ 39.)[32]

### H.    Plaintiff's Return to Work

In January 2017, after Ms. Molitor told Ms. Bell that the EAP was likely to clear plaintiff to return to work in a couple of days, Ms. Bell informed her that there had been new concerns raised in the San Souci-led investigation of Mr. Hill's complaints that Ms. Bell wanted the EAP to review.  As a result, Ms. Molitor made the decision for the EAP to revoke the return to work process at that time and stated,

_____

[32] Plaintiff objects to DSUF ¶¶ 37-39 as inadmissible hearsay.  (PR-DSUF ¶¶ 37-39.)  However, because all three interviewees could testify at any trial, their statements are not inadmissible hearsay.  See Jones v. UPS Ground Freight, 683 F.3d 1283, 1294 (11th Cir. 2012) ("The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial.").  Plaintiff further denies these three proposed facts on the grounds that he believes that these AMTs would not have said those things about him.  (PR-DSUF ¶¶ 37-39.)  However, plaintiff's beliefs are not evidence.  Moreover, plaintiff has submitted no probative evidence showing that these employees did not make the statements or suggesting why Delta should not have believed them.  Plaintiff's criticisms of the Rosenstein summary fail to create any fact dispute.  Thus, the Court deems DSUF ¶¶ 37-39 admitted.  One final point.  Plaintiff makes the completely unsubstantiated claim in his brief that Mr. San Souci "altered" the results of his investigation.  (Pl.'s Opp'n 23, 28.)  Ms. San Souci made only non-material revisions one might expect the author of a lengthy report to make.

"I need to see that document" (i.e., the results of the San Souci investigation), which was then sent to her.  (DSUF ¶ 40.)[33]

After the EAP later concluded that Mr. Hill could return to work with a recommendation that he be moved to another Department in order to give him a "clean start," Delta returned Mr. Hill to work in another Department in April 2017, with the same title, pay, benefits, shifts, and days off.  (DSUF ¶ 41.)  Plaintiff admits that he returned to work in April 2017, but asserts that it was Delta, not the EAP, who made that decision to transfer him to another Department.  (PR-DSUF ¶ 41.)  He supports this assertion by citing Ms. Bell's testimony showing that she and the other managers who decided to contact the EAP about him were the ones who

---

[33] Plaintiff denies the above proposed fact, asserting that Ms. Bell delayed his return to work, not Ms. Molitor.  He claims that his therapist (Barbara Bower) cleared him to return to work on January 15, 2017, and this was never reversed.  (PR-DSUMF ¶ 40.)  However, the document that plaintiff cites (Hill Bates 001422) shows that Ms. Molitor had the final say.  Moreover, Ms. Molitor told Ms. Bell that she (Molitor) had revoked that clearance to return to work.  (Bell Dep. [67] 160.)  (The other document that plaintiff cites to support his assertion, Delta Bates 003057, is from the EAP handbook and is immaterial.)  Plaintiff finally claims that Ms. Molitor never said, "I need to see the document," and supports that claim by citing an email exchanged between Ms. Molitor and Ms. Bell.  (PR-DSUF ¶ 40.)  However, Ms. Bell testified that Ms. Molitor made that statement during a telephone call.  (Bell Dep. 158.)  The email does not undermine Ms. Bell's testimony.  Because plaintiff has failed to contravene DSUF ¶ 40, the Court deems it admitted.

decided to transfer him.  (<u>Id.</u>, citing Bell Dep. 170-71.)[34]  What plaintiff fails to acknowledge, however, is Ms. Bell's undisputed testimony that Delta made that transfer decision only *after* receiving a recommendation from the EAP that it do so. (Bell Dep. 170.)[35]

Plaintiff also disputes that Delta followed Ms. Molitor's recommendation by claiming that Delta managers scheduled a conference call for January 23, 2017, where the meeting's organizer, Mr. San Souci, wrote in the meeting invitation email that "[t]his call is to address concerns of reintroducing Mr. Hill into [Department] 382."  (PR-DSUF ¶ 41, quoting Hill_Delta_008458 [80-4], at 257.) However, nothing in that email addresses transferring Mr. Hill to another Department.  Plaintiff also throws in a long string of record cites to support his

---

[34] Plaintiff also points to Ms. Molitor's notes, where she wrote that she told him "that all employment decisions come from Delta and that EAP is not involved in any decisions."  (PR-DSUF ¶ 41, quoting an unidentified document, which the Court located as Pl.'s Ex. 4 [68-1], at 17.)  It is undisputed that Delta makes the employment decisions.  However, it is also undisputed that Delta made the decision employment decisions here after receiving recommendations from mental health professionals.

[35] In recommending that Mr. Hill be returned to work in a different Department in 2017, the EAP also determined that he should continue therapy for a year after his return to work.  (DSUF ¶ 47.)  After a long and argumentative response, plaintiff finally admits this proposed fact.  (PR-DSUF ¶ 47.) Nevertheless, any dispute is immaterial.

claim that Delta was considering transferring him well before Ms. Bower's recommendation (PR-DSUF ¶ 41), but none of those cites supports that claim.[36] Because plaintiff has not controverted DSUF ¶ 41, the Court deems it admitted.

Delta considered Mr. Hill's transfer to another Department as an AMT using his exact same skill set (essentially doing the same AMT work but in the hangar instead of in the shop) (1) to be a "fresh start" for him (considering that he had complained repeatedly about working in his old Department and even stated he did not want to have to interact at all with one of his Lead AMTs—Mr. Buice); and (2) in the interests of the employees of his previous department as several had expressed fear about working with him. (DSUF ¶ 42.)[37]

_____

[36] Plaintiff admits that his therapist (Ms. Bower) supported his transfer to another Department. (See PR-DSUF ¶ 41 ("[I]t is true that Mr. Hill's local [therapist] did recommend Mr. Hill's transfer").) However, he seeks to get around this inconvenient fact by asserting that Delta produced no documentary evidence showing that it ever considered Ms. Bower's recommendation. (PR-DSUF ¶ 41.) Delta did not have to produce any documentary evidence. Plaintiff produced it. He attached the EAP's treatment notes as Exhibit 7 to his Complaint [1]. In that document, Ms. Molitor writes the following entry for March 8, 2017: "Received call from B.J. Bower, therapist. . . . B.J. stated she would recommend [Mr. Hill] change work groups." (Compl. Ex. 7 [1-7], at 8.) Ms. Molitor obviously then relayed that recommendation to Delta.

[37] Plaintiff asserts that his transfer was outside of Delta's rigid seniority system, unprecedented, and highly unusual. (PR-DSUF ¶ 42.) However, none of the record cites he provides support that assertion. He also claims that the work in

37

While Mr. Hill alleges that there have been less overtime opportunities in his new Department, he admits that there have been overtime opportunities both in Atlanta and on special short-term assignments at other locations (to which he can fly for free on Delta), and that he has always declined those opportunities since April 2017.  (DSUF ¶ 43.)  While Mr. Hill complains that he did not seek overtime in his new Department for his first few months there because of his wife's primary cancer treatments, he has not ever taken an overtime opportunity in his transferee Department since September 2017, when his wife's primary treatments concluded. (Id. ¶ 44.)   Plaintiff makes a long and argumentative denial of the preceding

_____

his new Department was more arduous, dirty, and physically difficult than the work in his old Department.  (Id.)  Again, his record cites do not support those claims. The citation to plaintiff's deposition (Hill Dep. [57] 208-209) concerns Ms. Bower's recommendation that he be transferred, not the work he performed in the new Department.  In the other record citation, Mr. Lashley testified that he was "unfamiliar" with the Department to which plaintiff has been transferred.  He testified only that, in general, hangers are dirtier than Department 382 and the work there is more physically demanding.  (Lashley Dep. [66] 22-23.)  The rest of plaintiff's argumentative response—asserting that he never complained about working in his old Department and that he believed none of his former co-workers feared him—fails to controvert DSUF ¶ 42; thus, the Court deems it admitted.

proposed facts.  (See PR-DSUF ¶¶ 43-44.)  However, nothing he says controverts the fact that he has accepted no overtime opportunities in the new Department.[38]

In 2017, Mr. Hill claimed he received "undue surveillance" based solely on a co-worker statement to him, but he admits that (1) the co-worker (who worked in another area) would have had no personal knowledge of any such surveillance; and (2) when Human Resources asked Mr. Hill who this co-worker was, Mr. Hill would not identify him or her.  (DSUF ¶ 46.)  Because plaintiff's denial of the preceding proposed fact is non-responsive (PR-DSUF ¶ 46), the Court deems DSUF ¶ 46 admitted.

## II.   **SUMMARY JUDGMENT STANDARD**

The "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment

_____

[38] Plaintiff also argues that Delta has made no attempt to address the overtime compensation he lost during his four-month suspension or to reimburse him for the cost of the 50 therapy sessions or the anger management course he had to attend.  The Court notes that the overtime issue is immaterial, because there are no damages with no liability, and Delta has none here.  Moreover, plaintiff's out-of-pocket costs for therapy have been *de minimis*, as the visits were covered by Delta's health plan (Def.'s Reply Br. 11-12.)  The Court excludes DSUF ¶ 45 as immaterial because plaintiff does not complain about his receipt of a team journal entry on June 22, 2017.  (See Pl.'s Opp'n 1-2.)

bears the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." Rice-Lamar v. City of Fort Lauderdale, Fla., 232 F.3d 836, 840 (11th Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Those materials may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quotation marks omitted). Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). If in response the non-moving party does not sufficiently support an essential element of her case as to which she bears the burden of proof, summary judgment is appropriate. Rice-Lamar, 232 F.3d at 840.

40

"In determining whether genuine issues of material fact exist, [the Court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party." Id. (citing Anderson, 477 U.S. at 255).

In deciding a summary judgment motion, the court's function is not to resolve issues of material fact but rather to determine whether there are any such issues to be tried. Anderson, 477 U.S. at 249-50. The applicable substantive law will identify those facts that are material. Id. at 248. Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment. Id. Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. For factual issues to be "genuine," they must have a "real basis in the record." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quotation marks omitted). When the record as a whole could not lead a rational trier of fact to find for the non-movant, there is no "genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. **DISCUSSION**

Plaintiff claims that Delta discriminated and retaliated against him in violation of his rights under the ADA. The Court considers these two claims separately below.

41

A.    **Plaintiff's ADA Discrimination Claim**

In Count One, plaintiff alleges that his December 23, 2016, referral to the EAP with continued pay and benefits (1) was made because Delta regarded him as disabled and (2) amounted to "undue medical tests and exams" on account of that perceived disability.  (Compl. [1] ¶¶ 143-44.)

Under the ADA, an individual is disabled if he has a physical or mental impairment that substantially limits one or more of his major life activities; if he has a record of such an impairment; or if he is regarded as having such an impairment.   42 U.S.C. § 12102(1)(A)-(C).   A plaintiff can show that he was wrongly regarded as having an impairment if he "establishes that he [] has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment" that is not transitory.  Id. §12102(3)(A), (B).  "A transitory impairment is an impairment with an actual or expected duration of 6 months or less."  Id. §12102(3)(B).  With regard to medical examinations:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

Id. § 12112(d)(4)(A).

Plaintiff's allegation that Delta regarded him as having a mental impairment is not supported by the evidence he cites.[39]  Plaintiff claims that Ms. Bell considered him to have a mental health impairment.  (Pl.'s Opp'n [80] 4.)  Given plaintiff's track record of misrepresenting the record evidence (see, e.g., supra note 39), the Court cannot credit his description of Ms. Bell's testimony.  Instead, the Court summarizes below the pages of her deposition transcript that plaintiff cites. (See Pl.'s Opp'n 4, citing Bell Dep. [67] 146-48; PR-DSUF ¶ 32, citing Bell Dep. 101-102, 134-35, 146-48.)

In those first cited pages, Ms. Bell testified that she referred Mr. Hill to the EAP at their initial meeting because she thought its services could help him and his wife through the process of dealing with her cancer diagnosis.  (Bell Dep. 101-102.)  At the next excerpt, Ms. Bell discussed the meeting she and Mr. Craig had with Mr. Hill on December 21, 2016.  (Id. at 134-35.)  She testified that in this

---

[39] The Court does not consider comments by non-decisionmakers like Lead AMT Warren (cited in Pl.'s Opp'n 4) or AMT Lashley (id. at 5).  But, in Mr. Lashley's case, there is nothing to consider.  Specifically, plaintiff claims that Mr. Lashley testified that "employees were led to believe by management that [he] was suffering from a mental health disorder."  (Id., citing PSAMF ¶ 14 and PR-DSUF ¶ 16.)  However, PR-DSUF ¶ 16 makes no mention of Mr. Lashley.  The excerpt from Mr. Lashley's testimony cited to support PSAMF ¶ 14 (Lashley Dep. [66] 20-22) contains no discussion of what management may have led employees to believe. This is just another misrepresentation of the record.

meeting, Mr. Hill would state that he was satisfied with the investigation Human Resources had conducted and then immediately assert that he was dissatisfied. His contradictions concerned Ms. Bell. (Id. at 134.) She thought he "probably needed some help as he was dealing with the issue with his wife just being diagnosed." (Id.) She also recalled that Mr. Hill would clench his hands when he did not like something the managers would say, and he would go from being red-faced and angry one minute to laughter the next, which was concerning given that he worked in a safety-sensitive position. (Id. at 134-35.)[40] In the final excerpt cited, Ms. Bell described again the meeting that she and Mr. Craig had with Mr. Hill on December 21, 2016. She testified that she had concerns about his behavior in that meeting, i.e., the clenched fists, the anger then laugher, and the frequent contradictions, which could have been the result of his mental health. (Id. at 146-48.)

Plaintiff also points to an email authored by Delta manager Mike McBride (to whom Mr. Craig reported) as support for his claim that Delta regarded him as impaired. (Pl.'s Opp'n 7.) In that email, after recounting all that had been

---

[40] As noted above, Ms. Bell wrote an email to her boss describing Mr. Hill's behavior in their meeting on December 21, 2016, which is discussed supra at DSUF ¶ 26.

discovered about plaintiff during the workplace investigation, Mr. McBride wrote that Mr. Hill was an "unstable individual who potentially poses a risk to our people and our operation." (Dec. 22, 2016 email from McBride to Abraham Brown [80-14] 165 (Hill/Delta__001869).)[41]

The case law is clear that the types of comments listed above are legally insufficient to support a "regarded as" disability discrimination claim. For example, in Morgan v. Cty. Comm'n of Lawrence Cty., No. 5:14-CV-01823-CLS, 2016 WL 3525357, at *28 (N.D. Ala. June 20, 2016), aff'd per curiam sub nom. Morgan v. Lawrence Cty. Comm'n, 687 F. App'x 787 (11th Cir. 2017), comments by two county commissioners that the plaintiff had a "mental problem" or was "crazy" did not pertain to any cognitive or intellectual deficiency, but rather reflected the two

---

[41] Plaintiff also claims that Delta communicated that he was suicidal. (Pl.'s Opp'n 7.) That claim is also factually unsupported. It was Mr. Hill who placed references to suicide in his email to Delta's CEO and others. Plaintiff also asserts that Delta showed that it perceived him to be mentally impaired because it evacuated his work area and escorted him off the property. (Id. at 5-6.) However, it is not atypical for Delta to have security escort a suspended employee off its property. (Craig Dep. [63] 70.) The record also shows that Delta only removed the employees from the shop after granting Mr. Hill's request to go there and pick up his tools. (Id. at 70-71.) Delta's desire to avoid a scene or embarrassment for Mr. Hill is not evidence that it perceived him as impaired.

commissioners' perception of plaintiff as being paranoid, unable to peacefully coexist with other County employees, disrespectful, or otherwise disgruntled.

Similarly, in Watson v. City of Miami Beach, 177 F.3d 932 (11th Cir. 1999), the court stated as follows:

> [The plaintiff] failed to present any evidence from which a rational juror could find he was regarded as having a mental impairment. [The plaintiff] points to evidence which shows other officers regarded him as "paranoid," "disgruntled," "oppositional," "difficult to interact with," "unusual," "suspicious," "threatening," and "distrustful." These characterizations of [the plaintiff's] behavior merely show he had serious personality conflicts with members of his department. Such conflicts do not rise to the level of a mental impairment under the ADA.

Id. at 935; see also Mickens v. Polk Cty. Sch. Bd., 430 F. Supp. 2d 1265, 1274 (M.D. Fla.), aff'd per curiam, 195 F. App'x 928 (11th Cir. 2006) (School Board employees' characterizations of plaintiff as "really upset," "insubordinate," "volatile," "disrespectful," "confrontational," "combative," "defensive," "agitated," "irrational," "loud," "irate," "angry," "unprofessional," "unhappy," "threatening," "unpredictable," and "difficult," including testimony as to his "uncharacteristic behavior" and his tendency to "fly off the handle," demonstrate plaintiff's ongoing conflict with his supervisors and colleagues in the workplace. "As a matter of law, '[s]uch conflicts do not rise to the level of a mental impairment under the ADA.'") (quoting Watson, 177 F.3d at 935).

The statements quoted above from <u>Morgan</u>, <u>Watson</u>, and <u>Mickens</u> did not support those plaintiffs' claims that their employers regarded them as impaired. The same holds true here.  Ms. Bell and Mr. McBride simply made comments as laypersons that were descriptive of plaintiff's unusual behavior and statements; they do not show that they regarded him as having a mental impairment.  Indeed, the referral to the EAP was to find out the source of his unusual behavior and statements and to provide treatment if necessary.[42]

Plaintiff's claim that the referral to the EAP was an unlawful medical examination also fails given the extant case law.  In order to show that a challenged medical examination was proper, "an employer must demonstrate that (1) there was

---

[42] Even if Delta had concluded that Mr. Hill had a mental impairment (and there is no such evidence), it could only have concluded that the impairment was transitory (e.g., likely caused by his adjustment to his wife's cancer diagnosis) and thus could not support a regarded as disabled claim in any event.  As noted above, Delta returned Mr. Hill to his safety-sensitive job within much less than six-months as occurred in <u>Snider v. U.S. Steel-Fairfield Works Medical Department</u>, 25 F. Supp. 3d 1361, 1367 (N.D. Ala. 2014), <u>aff'd</u>, 591 F. App'x 908 (11th Cir. 2015) (per curiam) (court found that Snider's alleged impairment was "transitory and minor" and, as such, failed to qualify as a disability).  Plaintiff seeks to distinguish <u>Snider</u> by asserting that while he returned to work within four months, Delta required him to continue to visit with the EAP's counselor for a year after his return. (Pl.'s Opp'n 12.)  However, there is nothing in the record to suggest that the decision to require Mr. Hill to continue counseling after his return to work was due to a continuing perceived disability.

an objective, legitimate reason to question the employee's capacity to perform his duties, (2) a medical examination was required to determine whether the plaintiff could perform job-related duties, and (3) the examination requested was a 'reasonably effective method' of resolving achieving the employer's asserted business necessity."  Owusu-Ansah v. Coca-Cola Co., No. 1:09-CV-2664-SCJ-WEJ, 2011 WL 13133744, at *8 (N.D. Ga. June 17, 2011), R&R adopted, 2011 WL 13141637 (N.D. Ga. July 8, 2011), aff'd, 715 F.3d 1306 (11th Cir. 2013) (quoting Mickens, 430 F. Supp. 2d at 1279).

Courts have found job-relatedness and business necessity where an inquiry into an employee's mental health is triggered by safety concerns.  See, e.g., Krocka v. City of Chicago, 203 F.3d 507, 515 (7th Cir. 2000) ("We have stated that where inquiries into the psychiatric health of an employee are job related and reflect a concern with the safety of employees, the employer may . . . require that the employee undergo a physical examination designed to determine his ability to work."); Leach v. Mansfield, No. H-07-4331, 2009 WL 3190463, at *4 (S.D. Tex. Sept. 28, 2009) (requiring psychiatric examination and doctor's note certifying ability to return to work of employee who complained of emotional reaction from work stress and sent increasingly aggressive e-mails to other employees); Bodenstab v. Cty. of Cook, 539 F. Supp. 2d 1009, 1020 (N.D. Ill. 2008) (finding

that it would be "grossly negligent" for an employer not to order a psychiatric examination when an employee makes serious workplace threats); Mickens, 430 F. Supp. 2d at 1279-80 (erratic behavior in response to performance criticism was legitimate basis for requiring medical exam).

Moreover, employers do not have to wait until an employee's job performance suffers, or a perceived threat results in injuries before requiring the employee undergo a fitness for duty examination.  See Brownfield v. City of Yakima, 612 F.3d 1140, 1145 (9th Cir. 2010) (rejecting plaintiff's argument that business necessity standard cannot be met without showing employee's job performance had suffered as a result of medical problems); Watson, 177 F.3d at 934-35 (finding medical inquiry of police officer who displayed "unusually defensive and antagonistic behavior towards his co-workers and supervisors" permissible under ADA); Cody v. CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 599 (8th Cir. 1998) ("Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims . . . ."); Fritsch v. City of Chula Vista, No. 98-0972-E-CGA, 2000 WL 1740914, at *6 (S.D. Cal. Feb. 22, 2000) ("In today's climate of workplace violence, an employer need not wait for the sound of gunfire to institute a preliminary investigation into the mental stability of an employee").

49

Here, the undisputed evidence demonstrates that Delta had a "reasonable, objective concern about [Mr. Hill]'s mental state, which affected job performance and potentially threatened the safety of its other employees." Owusu-Ansah, 715 F.3d at 1312.  Mr. Hill was in a safety-sensitive position.  He made a direct and overt threat to Messrs. Warren and Buice when he stated, "I am going to get you and Buice!  THE CHAINS ARE OFF!"[43]  Moreover, the EAP referral was not based on one statement, a generalized concern, or simply vague reports by others. Several employees, including plaintiff's good friend, AMT Lead Farmer, reported

---

[43] Plaintiff's denials that he made the various statements employees attributed to him are irrelevant, as Delta's decisionmakers believed their reports that he had made them.  See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (explaining that, when evaluating reason for discharge, inquiry is limited to whether decision makers believed employee engaged in the reported misconduct and, if so, whether that belief was the reason for the adverse action). Moreover, plaintiff's troubling statements were made in the email he sent to Delta's CEO and in meetings attended by Delta managers, who witnessed his bizarre behavior for themselves.  See EEOC, Notice No. 915.002, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations Of Employees Under the Americans with Disabilities Act, ¶ 5, 2000 WL 33407181 (July 27, 2000) ("An employer also may be given reliable information by a credible third party that an employee has a medical condition, or the employer may observe symptoms indicating that an employee may have a medical condition that . . . will pose a direct threat.  In these situations, it may be job-related and consistent with business necessity for an employer to make disability-related inquiries or require a medical examination.").

concerns based on specific events, such as his aggression toward Lead AMTs, his sudden focus on guns and buying a silencer, his claim that the chains were off, etc. Several employees reported that they were afraid to work around plaintiff. HR Manager Bell also observed Mr. Hill's concerning and aberrant behavior at the December 22, 2016 meeting. And Mr. Hill himself at least implied in a blast email to Delta leaders including its CEO that his situation was such that he believed his suicide would not be a surprise. His claim that three very minor incidents[44] amounted to cause for suicide alone triggered reasonable concern. Mr. Hill also acknowledged his own disorientation and emotional stress to Delta.

Defendant's actions here were not only legitimate as a matter of law, but also (as Mr. Farmer urged) it would have been irresponsible if Delta had simply ignored all these actions by an individual who is responsible for repairing and maintaining commercial aircraft. Plaintiff's lack of prior disciplinary action and positive job performance reviews do not rebut defendant's legitimate concern. See Owusu-

---

[44] Those three incidents included: (1) Lead AMT Buice pay-protecting Mr. Hill for a missed shift in the manner that Mr. Hill preferred; (2) Mr. Buice once telling Mr. Hill and others to get back to work when he admittedly was not working; and (3) Lead AMTs Warren or Buice questioning whether Mr. Hill was stealing items under admittedly suspicious circumstances (but which had no negative consequences for Mr. Hill).

51

Ansah, 715 F.3d at 1311 (stating that plaintiff's denial of misbehavior and assertion that he had no prior incidents showing that he had a propensity for workplace violence "is not dispositive").

Additionally, defendant engaged a third-party medical expert—the EAP—to advise it how best to determine whether plaintiff could safely perform his job duties. See Sullivan v. River Valley Sch. Dist., 20 F. Supp. 2d 1120, 1126 (W.D. Mich. 1998), aff'd, 197 F.3d 804 (6th Cir. 1999) (noting that, by obtaining advice from outside psychologist that mental examination was necessary, employer buttressed its claim that medical inquiry was proper).  Only after Ms. Molitor of the EAP recommended a fitness for duty evaluation as the best means to make that determination did defendant require plaintiff to submit to it.   Requesting a psychological examination under those circumstances was a reasonably effective means to determine if plaintiff could safely perform his duties.  See Mickens, 430 F. Supp. 2d at 1280 ("Requesting a psychological examination constitutes "a reasonably effective method" of achieving the [defendant's] goal of determining whether [the plaintiff] could perform his duties."); Fritsch, 2000 WL 1740914, at *6 ("It was reasonable and appropriate for the employer to seek the guidance of a mental health worker, and to follow that advice. This procedure allowed the employer to gather the necessary information to allay its reasonable fears that an

52

employee was unfit to perform her job responsibilities."). Importantly, those mental health professionals, not defendant, determined the scope of the fitness for duty evaluation necessary to evaluate plaintiff's mental health. See Conrad v. Bd. of Johnson Cty. Comm'rs, 237 F. Supp. 2d 1204, 1234 (D. Kan. 2002) (declining to hold employer liable for specific inquiries made by independent health professional retained to conduct fitness for duty examination of employee).

In sum, the undisputed evidence reveals sufficient justification for requiring plaintiff to undergo a fitness for duty evaluation. "Given the information it had about Mr. [Hill] at the time, [Delta] did not violate § 12112(d)(4)(A) by requiring him to undergo a psychiatric/psychological fitness-for-duty evaluation. The evaluation, in [this Court's] view, was 'job-related and consistent with business necessity.'" Owusu-Ansah, 715 F.3d at 1311 (quoting 42 U.S.C. § 12112(d)(4)(A)); see also Jackson v. Fulton Cty., Ga., No. 1:12-CV-0518-ODE-ECS, 2015 WL 12859407, at *20-21 (N.D. Ga. Jan. 26, 2015), R&R adopted, 2015 WL 12862930 (N.D. Ga. Mar. 11, 2015) (undisputed evidence showed that employer was justified in requesting that plaintiff submit to a psychiatric fitness for duty examination). Thus, defendant complied with § 12112(d)(4)(A)'s business necessity and job relatedness requirements when it insisted that plaintiff be evaluated before he could return to work. Accordingly, the undersigned

**RECOMMENDS** that defendant's Motion for Summary Judgment as to plaintiff's disability discrimination claim (Count One) be **GRANTED**.

### B.    Plaintiff's ADA Retaliation Claim

In Count Two of his Complaint, plaintiff alleges that Delta violated the anti-retaliation provision of the ADA. See 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.").[45]  This anti-retaliation provision contains both an "opposition clause" and a "participation clause."  Mr. Hill is proceeding under the opposition clause, because at the time of his alleged protected activity, he had not yet filed a charge (and thus participated) with the Equal Employment Opportunity Commission.

_____

[45] The Complaint also cites 42 U.S.C. § 12203(b), the ADA provision outlawing interference, coercion, or intimidation.  (See Compl [1] ¶¶ 155-60.) However, plaintiff's Opposition Brief does not cite or discuss this provision, but focuses only on the above-quoted anti-retaliation provision.  The Court limits its discussion to the anti-retaliation provision as well.  See Road Sprinkler Fitters Local Union 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994) (affirming district court's holding that plaintiff abandoned a claim that was raised in the complaint but ignored in all subsequent filings).  In any event, there is no evidence of interference, coercion or intimidation of Mr. Hill in this case.

Where, as here, an employee alleges retaliation under the ADA without direct evidence of the employer's intent, courts apply the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Batson v. Salvation Army, 897 F.3d 1320, 1328-29 (11th Cir. 2018). Under that framework, the plaintiff must first establish a prima facie case. To do so, a plaintiff must show: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action. Parker v. Econ. Opportunity for Savannah-Chatham Cty. Area, Inc., 587 F. App'x 631, 633 (11th Cir. 2014) (per curiam).[46] If a prima facie case is established, the burden then shifts to the

_____

[46] Plaintiff asserts that "[c]omparator evidence is another way to establish a *prima facie* case of retaliation." (Pl.'s Opp'n 24.) The above-mentioned three-prong retaliation prima facie case, which has been used for decades in the Eleventh Circuit, makes no mention of using comparator evidence. Plaintiff cites Lewis v. City of Union City, 918 F.3d 1213, 1218 (11th Cir. 2019) (en banc), to support his assertion, but Lewis is not a retaliation case. Given that comparator evidence is not material in a retaliation prima facie case, the undersigned need not consider it. Regardless, the comparator evidence that plaintiff submits is not probative. First, the alleged comparators, Messrs. Correia and Plain, were required to undergo mandatory EAP referrals and, just like with Mr. Hill, Delta followed the recommendations of Optum on returning them to work and required them to stay in contact with Optum after they had returned to work.. (See Pl.'s Ex. 115 [62-1], at 90-91, 100; Pl.'s Ex. 138 [69-1], at 225-26, 231, 233.) Unlike Mr. Hill, however, Mr. Correia was disciplined–he received a Final Corrective Action Notice (with

defendant employer to articulate a legitimate non-retaliatory reason for its actions that negates the inference of retaliation.  <u>Stewart v. Happy Herman's Cheshire Bridge, Inc.</u>, 117 F.3d 1278, 1287 (11th Cir. 1997).  If the employer does so, the burden shifts back to the employee to demonstrate that the employer's proffered reason was pretextual.  <u>Id.</u>

Plaintiff has failed to establish any element of a prima facie case.  With regard to the first element, for an expression to be protected under the ADA, the plaintiff must show that he "subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, [and] also that his belief was objectively reasonable in light of the facts and record presented."  <u>Weeks v. Harden Mfg. Corp.</u>, 291 F.3d 1308, 1312 (11th Cir. 2002) (internal quotation marks and citation omitted).  "The objective reasonableness of an employee's belief that h[is] employer has engaged in an unlawful employment practice must be measured against existing substantive law."  <u>Clover v. Total System Servs., Inc.</u>, 176 F.3d 1346, 1351 (11th Cir. 1999).  Where the conduct opposed is not actually unlawful, the conduct must be "close enough to support an objectively reasonable belief that

---

required EAP) and then was terminated (after refusing to go to EAP).  (Pl.'s Ex. 115 [62-1], at 74-83, 90-91, 100, 140-42.)

it is."  Id.  A plaintiff is charged with "substantive knowledge" of what the ADA

does and does not prohibit.  Harper v. Blockbuster Entm't Corp., 139 F.3d 1385,

1388 n.2 (11th Cir. 1998).

     Mr. Hill argues that he engaged in protected expression in (1) his November

7, 2016 complaint that he had been harassed by Lead AMT Buice because of his

wife's cancer diagnosis; (2) the December 21, 2016 meeting with Ms. Bell and Mr.

Craig, where he complained about harassment from Lead AMTs Buice and Warren;

and (3) his December 22, 2016 email to Delta's CEO and others where he again

complained about harassment by Messrs. Buice and Warren and what he perceived

as Delta's ineffective investigation of his earlier complaints against them.  (Pl.'s

Opp'n 14.)[47]

------------------------------------------------

[47] Plaintiff also cites to various paragraphs of PSAMF (which in turn rely on emails he sent after his EAP referral) that he claims were protected activity.  (Pl.'s Opp'n 14.)   However, these cites merely echo the initial complaint or are immaterial.  PSAMF ¶ 18 relies on plaintiff's December 26, 2016, email to Mr. San Souci (Pl.'s Ex. 28 [64-1], at 26-33) which relayed the names of 14 witnesses plaintiff alleged would support his claim that Messrs. Buice and Warren had harassed him.  PSAMF ¶ 20 references plaintiff's January 12, 2017, email to Mr. San Souci (Pl.'s Ex. 6 [68-1], at 28-29), in which he asserts the same harassment claims against Messrs. Buice and Warren, claims their conduct may be FMLA harassment, and mentions an ADA association discrimination claim.  PSAMF ¶ 22 mentions a January 24, 2017 email in which plaintiff asserts that he intends to file an EEOC Charge but does not articulate anything other than that Delta may not be

Under existing substantive law, to sustain a claim of harassment that violates the ADA (or any similar civil rights statute), the plaintiff must show that the conduct about which he has complained "was sufficiently severe or pervasive to alter the terms and conditions of employment." Lowe v. Delta Airlines, Inc., No. 1:16-CV-3717-TWT-JSA, 2017 WL 2982336, at *14 (N.D. Ga. May 31, 2017), R&R adopted, 2017 WL 2972878 (N.D. Ga. July 12, 2017), aff'd per curiam sub nom. Lowe v. Delta Air Lines Inc., 730 F. App'x 724 (11th Cir. 2018). "In evaluating the objective severity of the harassment, [a court should] consider, among other factors:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the

---

in compliance with unidentified federal law.  PSAMF ¶ 24 refers to an unrelated event from 2003 and states that Ms. Molitor at the EAP told him of a report from Delta that he had been red-faced and had clenched fists.  In PSAMF ¶ 26, plaintiff references an email he wrote to Mr. San Souci in which he denied the report he had been red-faced and with clenched fists.  PSAMF ¶ 42 relates to a March 21, 2017 email that Mr. Hill sent to Ms. Molitor which was not forwarded to Delta.  PSAMF ¶ 43 cites a March 21, 2017 email (Pl.'s Ex. L [80-14], at 200-204) wherein Mr. Hill claimed that he was retaliated against since reporting workplace harassment by Messrs. Buice and Warren.  Mr. Hill also cites an email he sent after he returned to work (PSAMF ¶ 47) and his June 1, 2017 EEOC Charge (id. ¶ 50), but they are immaterial because they occurred after his return to work.

employee's job performance." <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1276 (11th Cir. 2002).[48]

Judged against these standards, the undersigned reports that the three incidents plaintiff alleged about Messrs. Buice or Warren are not "close enough" to constitute harassment as a matter of law. The incidents were not frequent and were not severe. The alleged conduct by Messrs. Buice or Warren was not physically threatening or humiliating and did not unreasonably interfere with plaintiff's job performance. Indeed, the undisputed material facts show that there is no factual basis for any claim that Messrs. Buice or Warren mistreated plaintiff in any way or that they harassed Mr. Hill because of his wife's cancer diagnosis.

As for the second element of plaintiff's prima facie case, the adverse employment action must be material. <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006). A materially adverse action is one that might dissuade a reasonable worker from opposing an unlawful employment practice. <u>Id.</u> None of

---

[48] Plaintiff asserts that he does not have to show that the conduct about which he complained was sufficiently severe or pervasive to alter the terms and conditions of his employment (or "close enough" to that) because he is not asserting a sexually-hostile work environment claim. (Pl.'s Opp'n 15-16 & n.15.) Mr. Hill complained about alleged harassment motivated by his wife's impairment. The standards governing harassment—whether based on sex or disability—are the same and must be applied to determine whether he engaged in protected conduct.

the actions about which plaintiff complains here were materially adverse. Suspending plaintiff (on recommendation of the EAP) with full pay and benefits was not a materially adverse action. See Green v. City of Northport, No. 7:15-CV-1854-LSC, 2018 WL 1244501, at *10 (N.D. Ala. Mar. 9, 2018) (placing employee on paid leave was not materially adverse). Escorting plaintiff out of the workplace (per normal practice) after allowing him to return to the shop to get his tools and seeking to avoid an issue with his co-workers or embarrass him (Craig Dep. [63] 70-71) was not a materially adverse action. Having plaintiff cover the cost of normal co-pays under Delta's health insurance plan pay for mental health counseling that he admitted help him was not a materially adverse action. Laterally transferring plaintiff (on recommendation of the EAP) to another AMT position was not a materially adverse action. See Martin v. Eli Lilly, & Co., 702 F. App'x 952, 958 (11th Cir. 2017); Doe v. Dekalb Cty. Sch. Dist., 145 F.3d 1441, 1448-50 (11th Cir. 1998).[49] Because none of these actions had a negative impact on plaintiff, he has failed to satisfy the second element of his prima facie case.

---

[49] Plaintiff's contention that his transfer was not lateral (Pl.'s Opp'n 19) is not supported by the record. (See supra Part I. H.) Plaintiff also claims that refusing to give him the same overtime opportunities in the new location that he had in the old location is materially adverse. (Pl.'s Opp'n 17.) That argument

As for the third and final factor, even assuming that plaintiff engaged in protected activity, and even assuming that he suffered a materially adverse employment action, there is no evidence showing that any adverse action was the result of any protected activity.  See Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013) (plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer").

A claimed materially adverse action—plaintiff's suspension and referral to the EAP—occurred close in time to what he claims was his emailed complaint to Delta's CEO and others on December 22, 2016.  (Pl.'s Opp'n 20.)  Close temporal proximity between the two events is generally sufficient for a plaintiff to establish but-for causation.  Cazeau v. Wells Fargo Bank, N.A., No. 1:13-CV-0260-AT-JFK, 2014 WL 11444089, at *17 (N.D. Ga. May 29, 2014), R&R adopted, No. 1:13-CV-0260-AT, 2014 WL 11444090 (N.D. Ga. Sept. 25, 2014), aff'd per curiam, 614 F. App'x 972 (11th Cir. 2015).  However, an inference of causation created by close temporal proximity may be negated by intervening events.  Hankins v. AirTran

_____

carries no weight when Mr. Hill has turned down all overtime opportunities in the new position.  Finally, Mr. Hill claims that he suffered a materially adverse action through Delta's surveillance of him.  (Id.)  However, there is no evidence that Delta engaged in such conduct.

61

Airways, Inc., 237 F. App'x 513, 520-21 (11th Cir. 2007) (per curiam); see also Hollan v. Web.com Grp., Inc., No. 1:14-CV-00426-LMM-WEJ, 2015 WL 11237023, at *21 (N.D. Ga. Apr. 7, 2015), R&R adopted, 2015 WL 11237033 (N.D. Ga. July 1, 2015) (intervening events may negate the inference of causation that may arise from temporal proximity.)

Here, plaintiff's baseless complaints against the AMT Leads, his comments regarding suicide in the CEO email, his bizarre behavior in meetings, reports from co-workers of his potentially threatening comments and their fear of him (which Delta took seriously), the EAP's recommendation that plaintiff not be allowed to return to work until he was cleared to do so, the concerns expressed by plaintiff's co-workers if he returned to the Department, his own desire not to interact with Lead AMT Buice, and the EAPs' recommendation that plaintiff be transferred to another Department, are intervening events which establish that his complaints of what he felt like was harassment were not what led Delta to suspend him with pay and later transfer him laterally. Therefore, summary judgment should be entered for Delta on this retaliation claim given plaintiff's failure to establish a prima facie case. See Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1433 (11th Cir. 1998) ("summary judgment against the plaintiff is appropriate if he fails to satisfy any one of the elements of a prima facie case").

62

Even assuming that plaintiff could establish a prima facie case, there is no probative evidence showing that Delta's legitimate, non-retaliatory reasons for suspending plaintiff with pay (on the recommendation of the EAP), and then returning him to work with a lateral transfer (also on the recommendation of the EAP) were pretextual. Accordingly, the undersigned **RECOMMENDS** that defendant's Motion for Summary Judgment on plaintiff's retaliation claim (Count Two) be **GRANTED**.

## IV.   CONCLUSION

For the reasons stated above,

it is **ORDERED** that Plaintiff's Statement of Additional Material Facts [80-1] is **STRICKEN** from the docket;

it is further **ORDERED** that Plaintiff's Request for Video Oral Hearing [78] (docketed as a Motion) is **DENIED**; and

it is further **RECOMMENDED** that Defendant's Motion for Summary Judgment [56] be **GRANTED**.

**SO ORDERED and RECOMMENDED**, this 5th day of June, 2020.

_Walter E. Johnson_
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE